# Dkt. 1
# [REDACTED]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| Pennantia, LLC, | § | |
| RCM 270, LLC, | § | United States Courts |
| Lynne Rose, LLC, | § | Southern District of Texas |
| RCM 245, LLC, | § | F I L E D |
| Rebekah Rose, LLC, | § | |
| RCM 225, LLC, and | § | MAY - 7 2025 |
| Anna Rose, LLC, | § | |
| | § | Nathan Ochsner, Clerk of Court |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. _____ |
| | § | |
| *Tank Barge RCM 270* (Official #1257373), | § | Admiralty |
| *Tug LYNNE ROSE* (Official #9753179), | § | |
| *Tank Barge RCM 245* (Official #1050073), | § | |
| *Tug REBEKAH ROSE* (Official #9170688), | § | |
| *Tank Barge RCM 225* (Official #1139764), and | § | |
| *Tug ANNA ROSE* (Official #1139762), their | § | |
| engines, tackle, appurtenances, etc., *in rem*, | § | |
| | § | |
| Defendants. | § | |

## VERIFIED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW plaintiffs, Pennantia, LLC ("Pennantia"), RCM 270, LLC, Lynne Rose,

LLC, RCM 245, LLC, Rebekah Rose, LLC, RCM 225, LLC, and Anna Rose, LLC (each a

"Plaintiff" and collectively "Plaintiffs"), by and through their attorneys Holland & Knight LLP,

and file this Verified Complaint against *Tank Barge RCM 270* (Official #1257373), *Tug LYNNE*

*ROSE* (Official #9753179), *Tank Barge RCM 245* (Official #1050073), *Tug REBEKAH ROSE*

(Official #9170688), *Tank Barge RCM 225* (Official #1139764), and *Tug ANNA ROSE* (Official

#1139762), their engines, tackle, appurtenances, etc. (collectively, the "Vessel Defendants"), *in*

*rem*, seeking to exercise Plaintiffs' rights of possession as title owners of the Vessel Defendants to (1) conduct inspections of the Vessel Defendants, and (2) obtain copies of certain documents, records and information of the Vessel Defendants, which constitute appurtenances of the Vessel Defendants and/or constitute Plaintiffs' maritime property.    Plaintiffs have been wrongfully deprived of their rights of possession of the Vessel Defendants by the contracted vessel manager, Rose Cay Maritime, LLC ("RCM").  Plaintiffs respectfully allege as follows:

## JURISDICTION AND THE PARTIES

1.      This is a case of admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333, arising from maritime tort and breach of maritime contract claims by RCM. This case further is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, and Plaintiffs seek relief from this Court pursuant to Rule D of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

2.      At all times material herein, Pennantia was and is a business entity organized and existing under the laws of the State of Delaware with a principal place of business located at 411 West Putnam Avenue, Suite 425, Greenwich, CT 06830.

3.      At all times material herein, RCM 270, LLC, was and is a business entity organized and existing under the laws of the State of Delaware with a principal place of business located at 411 West Putnam Avenue, Suite 425, Greenwich, CT 06830, and is the registered owner of the *Tank Barge RCM 270*.

4.      At all times material herein, Lynne Rose, LLC, was and is a business entity organized and existing under the laws of the State of Delaware with a principal place of business located at 411 West Putnam Avenue, Suite 425, Greenwich, CT 06830, and is the registered owner of the *Tug LYNNE ROSE*.

2

5.    At all times material herein, RCM 245, LLC, was and is a business entity organized and existing under the laws of the State of Delaware with a principal place of business located at 411 West Putnam Avenue, Suite 425, Greenwich, CT 06830, and is the registered owner of the *Tank Barge RCM 245*.

6.    At all times material herein, Rebekah Rose, LLC, was and is a business entity organized and existing under the laws of the State of Delaware with a principal place of business located at 411 West Putnam Avenue, Suite 425, Greenwich, CT 06830, and is the registered owner of the *Tug REBEKAH ROSE*.

7.    At all times material herein, RCM 225, LLC, was and is a business entity organized and existing under the laws of the State of Delaware with a principal place of business located at 411 West Putnam Avenue, Suite 425, Greenwich, CT 06830, and is the registered owner of the *Tank Barge RCM 225*.

8.    At all times material herein, Anna Rose, LLC, was and is a business entity organized and existing under the laws of the State of Delaware with a principal place of business located at 411 West Putnam Avenue, Suite 425, Greenwich, CT 06830, and is the registered owner of the *Tug ANNA ROSE*.

9.    At all times material herein, RCM was and is a business entity organized and existing under the laws of the State of Texas with a principal place of business located at 800 Capitol Street, Suite 2400, Houston, TX 77002-2925.

10.    The Vessel Defendants are currently, or during the pendency of this action will be, located within the jurisdiction of this Honorable Court.

3

## PENNANTIA BUYS THE DEFENDANT VESSELS

11.    In 2021, the fleet of Bouchard Transportation ("Bouchard") was sold as part of that company's administration in the U.S. Bankruptcy Court for the Southern District of Texas.

12.    Pennantia purchased approximately half the Bouchard fleet, which vessels consisted of ten (10) barges and eight (8) tugs. The eight tugs and eight of the barges were mated as articulated tug/barge (ATB) pairings, with two additional stand-alone wire barges. The Vessel Defendants are six of the eighteen vessels. All of these vessels had at that time been out of service for between 12 and 24 months as a result of the financial and managerial difficulties arising under prior ownership.

13.    The membership interests of Pennantia consist of one class of voting membership interests "Class A" and three classes of non-voting membership interests, "Class B", "Class D", and "Class P". The entirety of the issued and outstanding Class A membership interests are held by Carioca, LLC ("Carioca"), which is managed by Contrarian Capital Management, LLC ("CCM"). The Class B, Class C and Class P non-voting membership interests are held by RCM and affiliates of RCM. The Class A membership interests represent approximately █████ of the aggregate beneficial membership interests of Pennantia.

14.    Full voting control, management and decision making is controlled by the Class A Managing Member. The minority, non-voting membership interests held by RCM (and/or its affiliates) in Classes B, D and P are passive investments and do not provide any rights or involvement in management or decision making of Pennantia.

4

15.   The eighteen vessels purchased by Pennantia (the "Pennantia Fleet")[1] are each owned by individual, wholly-owned and controlled subsidiaries of Pennantia, including Plaintiffs RCM 270, LLC, Lynne Rose, LLC, RCM 245, LLC, Rebekah Rose, LLC, RCM 225, LLC, and Anna Rose, LLC, which are the owners of record of the respective Vessel Defendants.

16.   The Pennantia Fleet, including the Vessel Defendants, appurtenances thereto, and other maritime property associated therewith, are owned by Plaintiffs.

## THE SHIP MANAGEMENT AGREEMENT

17.   To manage the Pennantia Fleet, Pennantia entered into a ship management agreement with RCM, dated August 8, 2021 (the "Ship Management Agreement"). A true and correct copy of the Ship Management Agreement is annexed as Exhibit 1.

18.   Pursuant to the Ship Management Agreement, Pennantia contracted with RCM to provide technical management (which, amongst other things, entailed supervising maintenance, upkeep, documentation and provisioning of the vessels), crew management (which, amongst other things, entailed procuring, training, paying, and caring for the vessels' crews), and commercial management (which, amongst other things, entailed procuring engagements for the vessels, supervising the financial performance of the vessels, and managing the loading and discharging operations of the vessels) for the Pennantia Fleet, including the Vessel Defendants. *See* Ex. 1, Part I, Boxes 6, 7 & 8.

19.   Under Part II, Clause 18 ("General Administration") of the Ship Management Agreement, RCM is required to provide to Pennantia with documents concerning vessels in the Pennantia Fleet:

---

[1] Of the 18 vessels in the Pennantia Fleet, currently seven barges and five tugs (including all of the Vessel Defendants) are in commercial service, while three barges and three tugs remain in layup status.

On giving reasonable notice, *__[Pennantia] may request, and [RCM] shall in a timely manner make available, all documentation, information and records in respect of the matters covered by this Agreement__* either related to mandatory rules or regulations or other obligations applying to [Pennantia] in respect of the Vessel (including but not limited to STCW 95, the ISM Code and ISPS Code) to the extent permitted by relevant legislation.

Ex. 1, Part II, Clause 18(e) (emphasis added).

20.    Under Annex A, Clauses (j) and (k), of the Ship Management Agreement, RCM is required to maintain financial records for the Pennantia Fleet and to make them available to Pennantia upon request:

(j)    *__[RCM] shall keep proper and detailed books and records of [RCM] sufficient to demonstrate compliance with the terms of this Agreement__*, and in compliance [with] bookkeeping and/or accounting standards applicable to [RCM] as of the date of this Agreement.

(k)    *__[Pennantia] shall have the right to examine and audit the books and records of [RCM] at any reasonable time, which shall include Vessel records and all records sufficient to substantiate and audit [RCM]'s compliance with its obligations under this Agreement__* and any Management Agreement, and to make copies (including electronic copies of computer records) and obtain print-outs of such books and records.

Ex. 1, Annex A, Clauses (j) & (k) (emphasis added).

21.    Under Part II, Clause 19 ("Inspection of Vessel") of the Ship Management Agreement, Pennantia has the right to inspect any of the vessels in the Pennantia Fleet as Pennantia may see fit:

[Pennantia] *__may at any time__* after giving reasonable notice to [RCM] inspect the Vessel *__for any reason they consider necessary__*.

Ex. 1, Part II, Clause 19 (emphasis added).

22.    The Ship Management Agreement is not a bareboat charter, time charter, or any form of charter.

6

23.     RCM's possession and control of the Pennantia Fleet pursuant to the Ship Management Agreement is for the purpose of "carry[ing] out the Management Services in respect of the Vessel as agents for and on behalf of the [Pennantia]." Ex. 1, Part II, Clause 3 ("Authority of Managers").

24.     Regarding commercial management, RCM's authority as owner's agent is to provide commercial management services "in accordance with the Owners' instructions." Ex. 1, Part II, Clause 8 ("Commercial Management").

25.     Nothing in the Ship Management Agreement restricts Pennantia from selling vessels in the Pennantia Fleet, or selling Pennantia itself, both of which are expressly contemplated and permitted in the agreement: In the event that a vessel is sold, the Ship Management Agreement terminates as to such vessel (Ex. 1, Part II, Clause 22(c)) and in the event of a sale of Pennantia, or all or substantially all of the assets of Pennantia, the Ship Management Agreement also terminates (Ex. 1, Part II, Clause 22(e)).

## SHIP MANAGEMENT PERFORMANCE

26.     At the commencement of the Ship Management Agreement, RCM did not have the internal personnel to carry out its ship manager duties internally.  Upon information and belief, RCM initially was comprised of two persons:

27.     To perform its duties under the Ship Management Agreement, RCM intended to sub-contract crewing services and technical management, the latter of which contemplated substantial capital investments to return the vessels to service.

28.     The Pennantia Fleet improvement/return to service project far exceeded its budget, fell far behind the originally contemplated schedule, and in March 2022, the sub-contracted technical and crewing manager ceased performing its services for RCM.

7

29. RCM was responsible for finding a new crewing and technical management sub-contractor. RCM claimed to Pennantia that none of the sub-contractors that it interviewed would be the best solution for their technical and crewing manager needs. RCM instead started its own technical and crewing company called Dove Cay ("DC"), which Pennantia understands is a subsidiary or affiliate of RCM. Despite multiple requests from CCM on behalf Pennantia's majority stockholder Carioca, RCM has never produced the operating agreement between RCM and DC.

30. RCM and its sub-contracted subsidiary/affiliate DC undertook crewing and technical management of the Pennantia Fleet, including oversight of the return of the Pennantia Fleet vessels to active service.

31. In approximately March 2024, Pennantia engaged an investment banker to market the sale of Pennantia.

32. Between July and October 2024 indications of interest were received and evaluated, and it was determined that sale of the entire company was not desirable at that time.

33. In contrast, however, Pennantia received indications of interest and bids to purchase and/or to long term bareboat charter individual vessels and groups of vessels.

34. All of the indications and bids from interested third-parties required inspections of and/or surveying of the vessels, and review of vessel documents, which is typical in vessel sale and purchase (or long-term bareboat charter) transactions.

35. RCM refused to permit Pennantia access to any vessels in the Pennantia Fleet for inspections, citing a variety of rationales, running the gamut from purported safety concerns to fear of the visitors poaching crew members (and otherwise not responding to numerous requests to inspect vessels) Concurrently, RCM failed to materially provide requested vessel documents,

8

citing, among other rationales concerns about confidentiality. Significantly, any sales of vessels in the Pennantia Fleet would cause RCM to receive less revenue under the Ship Management Agreement.

36.     On or about September 29, 2024, a bidder made a bid for the *Tug LYNNE ROSE* and the *Tank Barge RCM 270*, which led to further discussions in which Pennantia's bankers sought an improved offer.

37.     In response to Pennantia's bankers' overture seeking an improved offer, the bidder countered by offering to bid to purchase or bareboat charter all of the Vessel Defendants. This offer was subject to the bidder's conducting an inspection of the Vessel Defendants in order to determine their material condition.

38.     Pennantia made numerous oral requests to RCM to inspect the Vessel Defendants, followed by an initial formal written request on November 21, 2024.

39.     In about November 2024, another bidder – a large, well-capitalized industry participant – expressed interest in purchasing the *Tank Barge RCM 250*, the *Tank Barge RCM 252*, the *Tank Barge RCM 260*, the *Tank Barge RCM 262*, the *Tug JORDAN ROSE*, and the *Tug SUSAN ROSE*, a group of vessels in the Pennantia Fleet (the "Jordan/Susan Deal").

40.     On or about December 11, 2024, as part of an effort to assemble comprehensive data on the Pennantia Fleet for the purposes of potential vessel sales, Pennantia sent RCM a request for copies of specific vessel documents (the "Diligence Request List"), and a request to access the vessels for inspection (including the Vessel Defendants).

9

41.     From Fall 2024 until this week (see the "New York Vessel Arrest Action" section directly below), RCM has refused to provide Pennantia access to any vessel for inspection in response to repeated oral and written requests providing reasonable notice.[2]

42.     As for vessel documents, RCM has materially refused to provide Pennantia access to the vessel documents identified on the Diligence Request List.

43.     Nearly all of the vessel documents sought on the Diligence Request List are the *Plaintiffs' property*, either as appurtenances to the vessels, or as maritime property. These include basic vessel documents, such as the U.S. Coast Guard ("USCG") Certificate of Documentation ("COD"), the vessel Load Line Certificate, the vessels American Bureau of Shipping ("ABS") Class Certificates,[3] a host of other regulatory and operational certificates, vessel plans, records of prior surveys, maintenance records, and other similar documents and certificates.

44.     *All* of the documents and information sought on the Diligence Request List are also vessel documents and vessel information possessed and/or used by RCM in connection with its performance of the Ship Management Agreement for which Pennantia has the right to access

---

[2] RCM may claim that Plaintiffs' lack of access representations are disingenuous as RCM hired a surveyor (DLS) at the end of December 2024 to perform a survey on one of the vessels in the Pennantia Fleet that was not one of the Vessel Defendants herein. That survey, however, was inadequate for purposes of a vessel sale (it was an appraisal-type survey that did not provide nearly enough detail for a prospective buyer). RCM may also claim to this Court (as it has to Pennantia) that one of the Vessel Defendants in this proceeding was surveyed by DLS, but if any such survey took place Pennantia never has seen (or been provided with) any survey report. Pennantia advised RCM that the Pennantia Fleet vessels need to be surveyed using the prospective purchaser's inspector of choice and with representatives of the prospective purchaser on board. RCM has refused to permit such inspections.

[3] A COD is like to a vehicle registration. Although the original CODs were issued to, and in the name of, the registered owners of the vessels (i.e., the vessel owning Plaintiffs), the original CODs are in the constructive possession of RCM, and pursuant to regulatory requirements, are required to be kept onboard the relevant Vessel Defendant. CODs are one of the most basic and commonly required vessel documents in any vessel-related transaction, and are in fact public documents that can be obtained from the Coast Guard for a fee. Nevertheless, RCM refused to provide access to copies of the CODs, during which time Plaintiff paid to obtain certified copies from the Coast Guard. RCM did not provide copies of the CODs until recently on March 19, 2025, when a small number of vessel documents were provided.

10

without limitation or restriction, excepting only making such requests in a reasonably timely manner, e.g. "*[Pennantia] may request, and [RCM] shall in a timely manner make available, all documentation, information and records in respect of the matters covered by this Agreement.*" Ex. 1, Part II, Clause 18(e) (emphasis added); *see also* Ex. 1, Annex A, Clause (k) ("*[Pennantia] shall have the right to examine and audit the books and records of [RCM] at any reasonable time, which shall include Vessel records and all records sufficient to substantiate and audit [RCM]'s compliance with its obligations under this Agreement* and any Management Agreement, and to make copies (including electronic copies of computer records) and obtain print-outs of such books and records.") (emphasis added).    Pennantia's contractual rights under the Ship Management Agreement are not in dispute.

45.    RCM's refusals to provide access to the vessels and materially incomplete access to vessel documents and information, including with respect to the Vessel Defendants, continued between October 2024 and to the date of this Complaint (although see "The New York Vessel Arrest Action" section immediately below), and included another litany of rationales and excuses, including:

   a.  In November 2024, alleging that RCM and/or DC was owed allegedly past due reimbursable payments (and alleged interest thereon) and refusing to provide access until its improper, unilateral self-help payment demands were met;

   b.  Claiming that staff vacation schedules in December 2024 through early January 2025 precluded RCM from providing access to vessel documents;

   c.  Demanding non-disclosure agreements from third-parties; and

   d.  Claiming in February 2025 that access to vessel documents was beyond the scope of the Ship Management Agreement, and that would require hiring, at Pennantia's

expense, a separate consultant to vet Plaintiffs' requests to access their own vessels and those vessels' documents.

46.     RCM's improper retention of possession of the vessel and vessel documents, including with respect to the Vessel Defendants, has wrongfully prevented Pennantia from progressing with its contemplated sale of the Vessel Defendants, and continues to do so.

47.     Approximately ten weeks ago, RCM revealed its ulterior motive for wrongfully retaining of possession of the vessel and vessel documents. RCM had been separately negotiating to purchase the Pennantia Fleet.

48.     On February 19, 2025, RCM delivered to Pennantia a short indication of interest setting forth RCM's interest in purchasing the Pennantia Fleet, which was contingent on, among other things, support of other financing parties (without any firm commitment for sources of capital), customary diligence, and demanding exclusivity for its proposed transaction.

49.     RCM has no authority – under the Ship Management Agreement or otherwise – to sell Pennantia or any assets of Pennantia. It similarly has no authority to grant itself *de facto* exclusivity as a potential buyer by denying all other potential purchasers access to both the Pennantia Fleet or its records.

50.     RCM's past and continued refusal to provide access to the vessels and vessel documents (including the Vessel Defendants) hindered (and continues to hinder) Pennantia from advancing its negotiations to sell vessels, and the Vessel Defendants.

51.     Based on information and belief, RCM's past and continued refusal to provide access to the vessels and vessel documents (including the Vessel Defendants) was intended (and is intended) to facilitate RCM's negotiation of its own, unauthorized, proposed purchase of Pennantia and/or assets of Pennantia.

12

52.     From October 2024 through March 12, 2025, Pennantia, RCM, and others engaged in no less than twelve weekly calls to discuss the lack of progress on access to the vessels and documents. In every call, RCM was asked about delivery of the vessel information on the Diligence Request List, and updates on the scheduling of inspections and surveys, without material compliance by RCM.

53.     From October 2024 through March 16, 2025, no less than ten emails were sent directing RCM to share the diligence information that belonged to Pennantia without compliance by RCM.

54.     On March 19, 2025, the consultant allegedly hired by RCM, allegedly at Pennantia's expense, to vet Plaintiffs' requests to access their own vessels and those vessels' documents, provided a small set of vessel documents to Pennantia, consisting of CODs, Class certificates, Load Line certificates and Tonnage certificates for the Pennantia Fleet,[4] but no other requested vessel documents.

55.     From October 2024 through March 16, 2025, no less than ten emails were sent to RCM directing RCM to provide access to vessels in the Pennantia Fleet for inspections and surveys. RCM refused to comply with all of those directions from Pennantia.

56.     On March 18, 2025, in response to Pennantia's most recent request to arrange vessel inspections, RCM represented that it would not provide access to the Defendant Vessels for inspection unless any personnel onboard for inspections sign confidentiality and non-solicitation agreements *with RCM* (which are not permissible conditions for Plaintiffs to access their own vessels, either pursuant to law or contract). RCM also refused access to the Defendant Vessels

---

[4] The consultant allegedly hired by RCM, however, provided no documents whatsoever regarding the *Tank Barge RCM 245*.

unless (a) all RCM and or DC crew and personnel vacated the vessel (which would render an inspection ineffective without knowledge operational crew onboard), and (b) RCM/DC removed any allegedly "proprietary" vessel documents (which is inconsistent with inspection of the vessel and rights of inspection of documents used in connection with management of the Defendant Vessels).

57.     Under Part II, Clause 8(e) of the Ship Management Agreement – the Management Obligations Clause – RCM was obligated to "undertake to use their best endeavors to provide the Management Services as agents for and on behalf of [Pennantia] in accordance with sound ship management practice and to protect and promote the interests of [Pennantia] in all matters relating to the provision of services hereunder." As set forth above, RCM has failed to follow the lawful directions and instructions of Pennantia and failed to protect and promote Pennantia's interests.

58.     Under Part II, Clause 18 of the Ship Management Agreement – the General Administration Clause – RCM "shall in a timely manner make available, all documentation, information and records in respect of the matters covered by this Agreement either related to mandatory rules or regulations or other obligations applying to [Pennantia] in respect of the Vessel . . . ." As set forth above, RCM has refused to provide documentation, information and records to Pennantia in response to numerous reasonable requests for access, including with respect to the Vessel Defendants, thereby wrongfully retaining possession of the vessel documents and information.

59.     Under Part II, Clause 19 of the Ship Management Agreement – the Inspection of Vessel Clause – Pennantia "may at any time after giving reasonable notice to [RCM] inspect the Vessel for any reason they consider necessary." As set forth above, RCM has multiple times

14

denied Pennantia access to vessels in the Pennantia Fleet, including Vessel Defendants, and thereby wrongfully retaining possession of the vessels.

60.     Under Part II, Clause 8 of the Ship Management Agreement – the Commercial Management Clauses – RCM's authority as owner's agent is to provide commercial management services "in accordance with the Owners' instructions." As set forth above, RCM has multiple times refused to follow Pennantia's instruction pertaining to commercial management, including refusing to provide information or copies of all current charters, and refusing instructions to obtain consent from Pennantia before undertaking any new charters.

61.     The foregoing actions and inactions of RCM, specifically including wrongfully retaining possession of the Vessel Defendants to prevent Pennantia from exercising its rights as owner to inspect the vessels, and wrongfully retaining possession of the vessel documents and information has, and continues to, materially disrupt Pennantia's business plans for the Pennantia Fleet and the Vessel Defendants.

62.     To the extent possible, Pennantia does not seek to interfere with vessel operations of the vessels in the Pennantia Fleet. With respect to the *Tug LYNNE ROSE* and its accompanying barge the *Tank Barge RCM 270*, those vessels currently are in drydock within the District until about May 15, 2025. If the Court were to issue process promptly in this action, Plaintiffs likely could conduct their arrest, inspection and release of those vessels before the drydock period is completed.

## THE NEW YORK VESSEL ARREST ACTION

63.     On March 26, 2025, Pennantia and the respective owners six other vessels in the Pennantia Fleet commenced a proceeding in the United States District Court for the Eastern District of New York titled *Pennantia, LLC et al. v. Tank Barge RCM 252 (Official #1292046) et*

15

*al.*, Case No. 25-CV-01711 (OEM) (MMH) (the "New York Vessel Arrest Action"), in which New York Vessel Arrest Action the plaintiffs requested the arrest of the *Tank Barge RCM 250*, the *Tank Barge RCM 252*, the *Tank Barge RCM 260*, the *Tank Barge RCM 262*, the *Tug JORDAN ROSE*, and the *Tug SUSAN ROSE* pursuant to Rule D of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure under virtually identical allegations. A true and correct copy of the Verified Complaint filed in the New York Vessel Arrest Action is annexed as Exhibit 2.

64.     Pennantia and its co-plaintiffs in the New York Vessel Arrest Action sought to commence that proceeding under seal so as to avoid publicizing the dispute between the owners of the Pennantia Fleet and their ship managers RCM, which dispute could serve to potentially scare off interested purchasers of vessels in the Pennantia Fleet and which certainly would draw intense media scrutiny. After considering the plaintiffs' application to commence the New York Vessel Arrest Action under seal – including temporarily withholding the very existence of the lawsuit from the Court's ECF docket – the Court granted the plaintiffs' sealing order application. A true and correct copy of the sealing order application and the Court's sealing order issued granting that application in the New York Vessel Arrest Action are annexed as Exhibit 3. Plaintiffs herein seek a similar sealing order – limited in time – in this proceeding for similar reasons.

65.     After the Court in the New York Vessel Arrest Action issued its sealing order and vessel arrest order on April 9, 2025 and the U.S. Marshals Service allocated resources to carry out the requested vessel arrests last week, Pennantia carried out its first vessel arrests in the New York Arrest Action on Thursday, May 1, 2025. On that day, Pennantia arrested the *Tug JORDAN ROSE* and the *Tank Barge RCM 250* and those vessels currently remain under arrest.

16

66.     During the arrest of the *Tug JORDAN ROSE* and the *Tank Barge RCM 250*, RCM's employees on board these vessels were non-cooperative to the point that the Deputy U.S. Marshal in charge of the arrest operation had to request that one of the plaintiffs' designated persons on board for the vessel inspections leave the vessels to avoid a potential breach of the peace.

67.     Once RCM learned of the arrest of the *Tug JORDAN ROSE* and the *Tank Barge RCM 250*, the *Tug SUSAN ROSE* and the *Tank Barge RCM 252* got underway from where they were moored/berthed nearby and sailed into New York harbor, where according to the *Tug SUSAN ROSE*'s vessel AIS reports they merely circled in the harbor. Upon information and belief, RCM directed the *Tug SUSAN ROSE* and the *Tank Barge RCM 252* to depart their mooring/berthing to evade arrest by the U.S. Marshal and to thwart plaintiffs' efforts to carry out the inspections and document procurement efforts that are their right as the owners of those vessels.

68.     Although RCM toned down its obstructive behavior on the *Tug JORDAN ROSE* and the *Tank Barge RCM 250* once RCM's counsel arrived on scene a few hours into the arrest process, RCM has not yet produced the electronic repair and maintenance records for those vessels, citing various difficulties (and despite Pennantia having sought access to the same for months). Upon information and belief, without the leverage of the court-ordered arrests against these vessels, RCM's obstructive behavior would continue in perpetuity.

69.     As a result of Pennantia's having commenced the New York Vessel Arrest Action, RCM also has agreed to allow the inspection of the *Tank Barge RCM 260* and the *Tank Barge RCM 262* (which inspections took place on Monday, May 5, 2025 and Tuesday, May 6, 2025, respectively). RCM also has advised that it is willing to agree to inspections of eight other vessels in the Pennantia Fleet, but excluded the Vessel Defendants in this proceeding from that offer and

17

has refused to responded to Pannantia's multiple requests as to scheduling inspections for the Vessel Defendants.

70.    RCM likewise has advised that the withheld electronic maintenance and repair records for the Pennantia Fleet may be produced as early as later this week, but to date no such production has taken place.

## COUNT I

### TORT – CONVERSION

71.    Pennantia repeats and realleges Paragraphs 1 through 70 as if set forth fully herein.

72.    Vessel owning Plaintiffs are the registered, titled owners of the Vessel Defendants.

73.    Plaintiffs provided to RCM possession of the vessels in the Pennantia Fleet as their agent to perform ship management services for the Pennantia Fleet, including the Vessel Defendants.

74.    Pennantia has instructed that RCM allow Pennantia access on the Vessel Defendants for inspections.

75.    Pennantia likewise has demanded that RCM provide Pennantia access to, or copies of, vessel documents, records and information of and pertaining to the Vessel Defendants.

76.    RCM has wrongfully retained possession of the Vessel Defendants by refusing to provide access to the Vessel Defendants for inspections and refusing to provide vessel documents and information without any legal justification for doing so.

77.    By wrongfully retaining possession and refusing access to the Vessel Defendants and documents and information of the Vessel Defendants, RCM has committed the tort of conversion, for which tort it should be found liable.

18

78.     Pennantia requests that this Court direct that RCM provide access to the Vessel

Defendants for Pennantia to arrange for inspections of the vessels, and for RCM to provide access

to or copies of the requested vessel documents, records and information.[5]

## COUNT II

## BREACH OF CONTRACT

79.     Pennantia repeats and realleges Paragraphs 1 through 70 as if set forth fully herein.

80.     In the alternative, should this Court not award Pennantia access to the Vessel

Defendants under Count I, this Court should order RCM to:

- a.  Provide specific performance of RCM's obligations under Part II, Clause 18 of the
  Ship Management Agreement – the General Administration Clause – which
  provides that RCM "shall in a timely manner make available, all documentation,
  information and records in respect of the matters covered by this Agreement either
  related to mandatory rules or regulations or other obligations applying to
  [Pennantia] in respect of the Vessel . . . .";

- b.  Provide Plaintiffs with access – pursuant to Annex A, Clause (k) of the Ship
  Management Agreement – to "the books and records of [RCM] at any reasonable
  time, which shall include Vessel records and all records sufficient to substantiate
  and audit [RCM]'s compliance with its obligations under [the] [Ship Management]

---

[5] For the sake of good order, Plaintiffs wish to make clear that the relief that they seek merely is to obtain
access to the Vessel Defendants so that they might be inspected by prospective purchasers, gain access to
the records, documents, and information related to each of the Vessel Defendants for use during prospective
buyer inquiries, and then to return the Vessel Defendants to their usual service. In light of RCM's behavior,
Plaintiffs anticipate that such access likely will require an initial visit by the U.S. Marshal to arrest the
Vessel Defendants in company with the representative of the substitute custodian, followed by the
prospective buyer inspections while the Vessel Defendants are in the custody of the substitute custodian.
Once each of the Vessel Defendants has underwent the intended inspection process, Plaintiffs will approach
the Court to lift the arrest on that particular Vessel Defendant to return it to its usual service.

Agreement and any Management Agreement," and to allow Plaintiffs "to make copies (including electronic copies of computer records) and obtain print-outs of such books and records"; and

c. Provide Pennantia immediate access to the Defendant Vessels as set forth under Part II, Clause 19 of the Ship Management Agreement – the Inspection of Vessel Clause – which provides that Pennantia "may at any time after giving reasonable notice to [RCM] inspect the Vessel for any reason they consider necessary."

## COUNT III

## REQUEST FOR COURT TO AWARD PLAINTIFFS POSSESSION OF THE VESSEL DEFENDANTS UNDER SUPPLEMENTAL RULE D

81.   Pennantia repeats and realleges Paragraphs 1 through 70 as if set forth fully herein.

82.   Pennantia is the registered owner of all vessels in the Pennantia Fleet.

83.   Vessel owning Plaintiffs are the registered, titled owners of the Vessel Defendants, and as such Plaintiffs had prior possession or constructive possession of the Vessel Defendants.

84.   Plaintiffs are entitled to demand possession of the Vessel Defendants for the purpose of inspecting the Vessel Defendants and to demand possession of the vessel documents, records and information appurtenant thereto, or otherwise constituting maritime property.

85.   RCM does not have any legal right to retain possession of the Vessel Defendants and related documents and maritime property against the rightful demand of Plaintiffs for possession and access to the Vessel Defendants and related documents, records and information.

86.   Plaintiffs therefore make this claim under Rule D of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions for a final judgment granting the requested possession of the Vessel Defendants and related documents, records and information.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray:

1. That process and due form of law according to the practices of this Court in admiralty and maritime jurisdiction be issued against the Vessel Defendants, *Tank Barge RCM 270* (Official #1257373), *Tug LYNNE ROSE* (Official #9753179), *Tank Barge RCM 245* (Official #1050073), *Tug REBEKAH ROSE* (Official #9170688), *Tank Barge RCM 225* (Official #1139764), and *Tug ANNA ROSE* (Official #1139762), their engines, tackle, appurtenances, and related maritime property, etc., *in rem*;

2. That this Court order Plaintiffs unfettered access to the Vessel Defendants and to all documents, records and information appurtenant to, or constituting maritime property, related to the Vessel Defendants;

3. That after due proceedings, judgment be entered in favor of Plaintiffs and due awarding of costs, attorneys' fees, *custodia legis* expenses, and disbursements for this case; and

4. That this Court grant Plaintiffs such other and further relief as may be just and proper.

Dated: Houston, Texas
May 7, 2025

Respectfully submitted,

**HOLLAND & KNIGHT LLP**

*/s/ Julia M. Haines*

Julia M. Haines
Texas Bar No. 8710800 / SD Bar No. 0000765
Julia.Haines@hklaw.com
Katia S. Leiva
Texas Bar No. 24143113 / SD Bar No. 3896201
Katia.Leiva@hklaw.com
811 Main Street, Suite 2500
Houston, TX 77002

21

*Pro Hac Vice Application Pending:*

**HOLLAND & KNIGHT LLP**

Michael J. Frevola
787 Seventh Avenue
New York, New York 10019
michael.frevola@hklaw.com
Telephone: 212.513.3200
Fax: 212.385.9010

*Attorneys for Plaintiffs*

## VERIFICATION

I, Joshua Trump, declare as follows:

1.    I am an Authorized Representative of Pennantia, LLC.

2.    I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, except as to these matters stated to be alleged upon information and belief, and as to those matters I believe them to be true.

3.    The source of my information is my personal knowledge and my review of Pennantia, LLC's records or documents on file.

I declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief.

Executed at Greenwich, Connecticut, on May 7, 2025.

Joshua Trump, Managing Director,
Contrarian Capital Management, L.L.C.,
Non-Member Manager of Carioca Partners, LLC,
Class A Managing Member of Pennantia, LLC

23

# EXHIBIT 1

# SHIPMAN 2009

Based on the BIMCO STANDARD SHIP
MANAGEMENT AGREEMENT

PART I

| | |
|---|---|
| 1. Place and date of Agreement<br><br>New York, New York, August 8, 2021 | 2. Date of commencement of Agreement (Cls. 2, 12, 21 and 25)<br>The first date on which the Owners obtain court approval and title to one or more vessels from the Bouchard Transportation Co. auction sale in Case No. 20-34682. See also Cl. 2 for conditions precedent to commencement and certain pre-commencement authorizations. |
| 3. Owners (name, place of registered office and law of registry) (Cl. 1)<br><br>(i) Name: Pennantia, LLC<br><br>(ii) Place of registered office: Greenwich, CT<br><br>(iii) Law of registry: Delaware, United States | 4. Managers (name, place of registered office and law of registry) (Cl. 1)<br><br>(i) Name: Rose Cay Maritime, LLC<br><br>(ii) Place of registered office: Houston, TX<br><br>(iii) Law of registry: Delaware, United States |
| 5. The Company (with reference to the ISM/ISPS Codes) (state name and IMO Unique Company Identification number. If the Company is a third party then also state registered office and principal place of business) (Cls 1 and 9(c)(i))<br><br>(i) Name: Foss Maritime Company, LLC<br><br>(ii) IMO Unique Company Identification number: [TO BE PROVIDED]<br><br>(iii) Place of registered office:<br>450 Alaskan Way S., Suite 706<br>Seattle, WA 98104<br><br>(iv) Principal place of business: Seattle, WA | 6. Technical Management (state "yes" or "no" as agreed) (Cl. 4)<br>YES |
| | 7. Crew Management (state "yes" or "no" as agreed) (Cl. 5(a))<br>YES |
| | 8. Commercial Management (state "yes" or "no" as agreed) (Cl. 6)<br>YES |
| 9. Chartering Services period (only to be filled in if "yes" stated in Box 8) (Cl.6(a))<br><br>One (1) Year | 10. Crew Insurance arrangements (state "yes" or "no" as agreed)<br><br>(i)    Crew Insurances* (Cl. 5(b)): YES<br><br>(ii)    Insurance for persons proceeding to sea onboard (Cl. 5(b)(i)):YES<br><br>*only to apply if Crew Management (Cl. 5(a)) agreed (see Box 7) |

| 11. Insurance arrangements (state "yes" or "no" as agreed) (Cl. 7)<br>YES | 12. Optional insurances (state optional insurance(s) as agreed, such as piracy, kidnap and ransom, loss of hire and FD & D) (Cl. 10(a)(iv))<br>None |
|---|---|
| 13. Interest (state rate of interest to apply after due date to outstanding sums) (Cl. 9(a))<br><br>██ per month | 14. Management fee (Cl. 12(a))<br><br>See Annex E |
| 15. Manager's nominated account (Cl.12(a))<br><br>**Account Details:**<br>Rose Cay Maritime LLC<br>Account Number: ██████<br><br>**Wire Instructions:**<br>Bank Name: ██████<br>Bank Routing/ABA: ██████<br>Bank Swift: (for international wires) ██████ | 16. Daily rate (state rate for days in excess of those agreed in budget) (Cl. 12(c))<br>N/A |
| | 17. Lay-up period / number of months (Cl.12(d))<br>N/A |
| 18. Minimum contract period (state number of months) (Cl. 21(a))<br><br>See Clause 21 and 22 | 19. Management fee on termination (state number of months to apply)<br><br>See Clause 22(b)(iv) |
| 20. Severance Costs (state maximum amount) (Cl. 22(h)(ii))<br><br>At cost (per agreed terms of subcontracting crewing agreement) | 21. Dispute Resolution<br><br>See Clause 23 |
| 22. Notices (state full style contact details for serving notice and communication to the Owners) (Cl. 24)<br><br>Pennantia LLC<br><br>411 West Putnam Avenue<br>Greenwich, CT 06830 Suite 425<br><br>Attention: Josh Trump<br>Email: jtrump@contrariancapital.com<br>Attention: Counsel<br>Email: jweisser@contrariancapital.com | 23. Notices (state full style contact details for serving notice and communication to the Managers) (Cl. 24)<br><br>Rose Cay Maritime, LLC<br><br>800 Capitol Street<br>Suite 2400<br>Houston, TX 77002-2925<br><br>Attention: ██████<br>Email: ██████<br>Attention: ██████<br>Email: ██████<br>Attention: ██████<br>Email: ██████ |

It is mutually agreed between the party stated in Box 3 and the party stated in Box 4 that this Agreement consisting of PART I and PART II as well as Annexes " A" (Details of Vessel or Vessels), " B" (Details of Crew), " C" (Budget), " D" (Associated Vessels) and " E" (Fee Schedule) attached hereto, shall be performed subject to the conditions contained herein. In the event of a conflict of conditions, the provisions of PART I and Annexes " A" , "B", "C", "D" and "E" shall prevail over those of PART II to the extent of such conflict but no further.

| Signature(s) (Owners) | Signature(s) (Managers) |
|---|---|
| | |

ANNEX "A" (DETAILS OF VESSEL OR VESSELS)
TO THE BIMCO STANDARD SHIP MANAGEMENT AGREEMENT
CODE NAME:  SHIPMAN 2009

Date of Agreement:  August 8, 2021

Name of Vessel(s):

One or more of the following purchased from the Bouchard Transportation Co. auction sale in Case No. 20-34682, subject to court approved transfer of title to Owners.

TUG BOUCHARD GIRLS/ B. 295
TUG BRENDAN J. BOUCHARD/ B. 210
TUG DANIELLE M. BOUCHARD/ B. 245
TUG EVENING BREEZE/ B. 252
TUG EVENING STAR/ B. 250
TUG JANE A. BOUCHARD/ B. 225
TUG KIM M. BOUCHARD/ B. 270
TUG MORTON S. BOUCHARD IV/ B. 242
B. NO. 260 (n/t)
B. NO. 262 (n/t)

ANNEX "B" (DETAILS OF CREW)
TO THE BIMCO STANDARD SHIP MANAGEMENT AGREEMENT
CODE NAME:  SHIPMAN 2009

Date of Agreement:  August 8, 2021

Details of Crew:

Crew complement will be in compliance with applicable law and regulation and will be either (i) crew complement required by COI or (ii) mutual agreement on crew complement required or appropriate for (1) commercial vessel operations, for vessels in commercial operations, or (2) dock-side stand-by service, lay up, or preparation for commercial operations, as the case may be, and as permitted by COI or United States Coast Guard.  Managers will provide crewing information as requested by Owners on a regular basis.

ANNEX "C" (BUDGET)
TO THE BIMCO STANDARD SHIP MANAGEMENT AGREEMENT
CODE NAME: SHIPMAN 2009

Date of Agreement: August 8, 2021

        (a)    Owner shall reimburse Manager, on a direct pass-through basis, and without markup, for the actual direct expenses incurred by Manager for performance of the Crewing and Technical Management Services provided for the Vessels pursuant to Clauses 4, 5, and 7 of this Agreement, which, without limiting the generality of the preceding phrase and so long as incurred pursuant to Clauses 4, 5 or 7 or the advance written consent of Owner, shall include: (i) inspection and maintenance of the Vessels, (ii) parts, supplies, and repairs for Vessels (iii) Vessel dry docking, (iii) fuel, lubes, and grease, (iv) insurance premiums and broker fees; (v) crewing costs; (vi) dockage fees and port charges; (vii) lay up costs; (viii) security costs; (ix) costs of professional services approved in advance by Owner (accounting, tax, legal), and (x) reimbursable pass through costs of the foregoing services performed and charged by a subcontractor approved in advance by Owner ("_Management Reimbursement_").

        (b)    Management Reimbursement shall not include those costs intended to be compensated by the Variable Commission Fees nor the costs of administrative overhead (including office space, utilities, office equipment, office supplies, and office and shore-side employees).

        (c)    As soon as practicable following execution of this Agreement Manager shall prepare and provide to Owner an initial start-up budget projected to be approximately            which has previously been advanced) for the first six (6) months of this Agreement (the "_On-boarding Period_"), for agreed upon itemized on-boarding and one-time items ("_On-boarding Items_"). Upon Manager's request, Owner will pay Manager during the On-boarding Period for additional requested On-boarding Items over the initial projected budget acceptable to and approved by Owner in its sole discretion. Such requests shall be supported by appropriate explanation, itemization, and supporting documentation.

        (d)    As soon as practicable following execution of this Agreement and thereafter on or before October 1 of each year for the upcoming calendar year (January 1–December 31), Manager shall prepare and deliver to Owner a budget of anticipated Management Reimbursement (an "_Annual Budget_"). Each Annual Budget shall be subject to review and approval by Owner. In the event an Annual Budget is not approved prior to the commencement of the applicable calendar year, the Annual Budget in effect for the prior year shall continue to apply for a period of up to six (6) months so long as the parties continue to negotiate in good faith.

        (e)    After the date of execution of this Agreement, and prior to the Commencement Date, Owner shall make an initial deposit into the Vessel Operating Account of an amount approximating sixty (60) days of estimated Management Reimbursement (the "_Initial Deposit_"). The Initial Deposit shall be two (2) times the sum of one twelfth of the initial Annual Budget, or such other sum mutually agreed by the parties. Subsequent to the Initial Deposit period, it is the intent of the parties that the funds in the Vessel Operating Account at the time each Estimated Reimbursement Payment is made as described below should approximate sixty (60) days of estimated Management Reimbursement based the average of the most recent Actual Reimbursable Expenses and current Estimated Reimbursement, or such other formula from time to time mutually agreeable to the parties. No fewer than five (5) Business Days prior to the first day of each calendar month of this Agreement, Manager shall prepare and furnish to Owner a funding request (each, a "_Monthly Funding Request_") of estimated Management Reimbursement for the upcoming month (the "_Estimated Reimbursement_"). On or before the first day of each calendar month following each Monthly Funding Request, Owner shall deposit the Estimated Reimbursement requested in each Monthly Funding Request into the Vessel Operating Account for disbursement by Manager in accordance with the Monthly Funding Request and in compliance with this Section (each payment an "_Estimated Reimbursement Payment_").]

        Vessel Operating Account
        [Dedicated Account Information to be provided
        by Managers to Owners prior to
        Commencement Date]
        [_____]
        [_____]

(f)     Manager shall have no authority to, nor shall it spend or commit to spend, an amount in excess of the Monthly Funding Request without the express written authority of Owner unless in the event of an emergency. Any extraordinary expenses not anticipated by the Monthly Funding Request shall, if approved by Owner in advance, shall be reimbursed to Manager promptly upon receipt of invoice, and, if desired by Owner, such amounts may be funded by Owner directly to the payee with respect thereto.

(g)     As promptly as possible (but not more than five (5) Business Days) after the end of each calendar month Manager shall render to Owner a written statement for the preceding month showing actual expenses for the preceding month together with all supporting invoices or documents, with a true up of the actual expenses versus the Estimated Reimbursement ("_Actual Reimbursable Expenses_" and  each such statement, a "_Reimbursement Statement_"). The next Monthly Funding Request shall also include a reconciliation of each prior month's activity.

(h)     Each Monthly Funding Request shall include a certification signed by a Responsible Officer of the Manager that any invoices submitted for reimbursement have been paid when due; a statement listing the Manager's accounts payable for items that are at that time overdue in excess of thirty (30) days (and if applicable, each item outstanding more than sixty (60) days, and so forth for each 30 day period thereafter, specifically identified as such); and the certification that Manager is in material compliance this Agreement. If any item of disbursement is questioned by Owner, Owner shall reimburse or credit Manager for the portion not in dispute, and the parties shall diligently set about to resolve the questioned item(s) in good faith for a period of up to three months.

(i)     Within 30 days of the end of each fiscal quarter of Manager during this Agreement, Manager shall prepare and deliver to Owner a certification signed by a Responsible Officer of the Manager that:

(i)     in the course of the performance by such Responsible Officer of his or her duties as an officer of Manager, such Responsible Officer would normally obtain knowledge of any default by Manager of its obligations under this Agreement or any agreement between Manager and another party pertaining to the Vessels ("_Management Agreements_");

(ii)     the Manager is in compliance in all material respects with its obligations under all Management Agreements to which it is a party;

(iii)     such Responsible Officer of the Manager has no knowledge of any event of default under any Management Agreement to which it is a party, or of the occurrence of any default under any Management Agreement to which it is a party that, with the passage of time and the failure to cure, would be reasonably likely to breach or become an event of default hereunder or under any Management Agreement to which it is a party; and

(iv)     there are no outstanding Liens on the Vessels other than Permitted Liens, so long as paid within the period provided for Permitted Liens; and

(j)     Manager shall keep proper and detailed books and records of Manager sufficient to demonstrate compliance with the terms of this Agreement, and in compliance bookkeeping and/or accounting standards applicable to Manager as of the date of this Agreement.

(k)     Owner shall have the right to examine and audit the books and records of Manager at any reasonable time, which shall include Vessel records and all records sufficient to substantiate and audit the Manager's compliance with its obligations under this Agreement and any Management Agreement, and to make copies (including electronic copies of computer records) and obtain print-outs of such books and records.

(l)     The Manager shall give Owner reasonably prompt notice and copies of all tax notices, reports or inquiries, claims of liens, and of any damage, loss, seizure, attachment or judicial process which may affect the use, maintenance, operation, possession or ownership of the Vessels; provided, however, that no such notice need be given for any damage or loss which is not required to be reported to the U.S. Coast Guard or other federal or state authority, does not materially affect the use, maintenance or operation of a Vessel and which is repaired or remediated in the ordinary course of business of the Manager.

6

ANNEX "D" (ASSOCIATED VESSELS)
TO THE BIMCO STANDARD SHIP MANAGEMENT AGREEMENT
CODE NAME:  SHIPMAN 2009

NOTE: PARTIES SHOULD BE AWARE THAT BY COMPLETING THIS ANNEX "D" THEY WILL BE SUBJECT TO
THE PROVISIONS OF SUB-CLAUSE 22(b)(i) OF THIS AGREEMENT.

Date of Agreement:  August 8, 2021

Details of Associated Vessels:


N/A

ANNEX " E" (FEE SCHEDULE)
TO THE BIMCO STANDARD SHIP MANAGEMENT AGREEMENT
CODE NAME:  SHIPMAN 2009

Owners shall pay Managers (or its designee if permitted pursuant to  in paragraph (4)(e)) for the Management
Services provided under this Agreement in accordance with Clause 12, comprised of the following four (4)
components (Annex E component parts):

(1) Fixed Management Fee

▮▮▮▮ per month, per ATB tug/barge set, but no less than the greater of the number of tugs or barges in the
managed fleet. (As an example, provided for illustration purposes only, Annex A shows that there are ten barges and
eight tugs. Managers monthly fee would be ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and an annual total fee of
▮▮▮▮▮▮▮ Such monthly payments shall be made in advance, with an annual inflation adjustment factor of CPI-W,
U.S. City Average, All Items, standard reference base, not seasonally adjusted, but not greater than ▮▮ calculated
annually to apply on the first monthly payment following the anniversary date of this Agreement.  The minimum
annual aggregate Fixed Management Fee shall be ▮▮▮▮▮▮ provided, however, that in the event that Pennantia
owns four (4) or fewer pairs of vessels, after three (3) months the minimum annual aggregate Fixed Management Fee
shall not apply, and the parties shall use good faith efforts to reduce the aggregate Fixed Management Fee.

(2) Variable Commission Fees

In addition to the Fixed Management Fee, Owner's shall pay Managers for certain vessel chartering and vessel sales
services:

    a) Chartering Fees:

    b) Vessel Sale Fees:

    Chartering Fees and Vessel Sale Fees apply only to arms-length transactions with non-affiliates of either
party.

(3) Profit Sharing Incentives

    Managers shall be entitled to receive profit sharing incentive payments, calculated annually in arrears, in
accordance with the following Investment Rate of Return (IRR) thresholds:

    •
    •
    •

(4) Equity Incentive Awards

    Managers shall be entitled to receive equity incentive awards, in accordance with the following thresholds:

    a) Initial Equity Award Incentive Fee:

    b) Management Equity Awards:



Each hurdle, along with its corresponding equity award, shall be "one-time" in nature such that the equity award will be granted following the first year the hurdle is clear.  By way of examples:

Pennantia will use reasonable commercial efforts to discuss optimizing the tax and depreciation considerations of Managers.

c) So long as no Manager's event of default has occurred and is continuing,

d) Owners shall provide Managers with no less than the same disclosures and reports as provided to Contrarian investors related to the Pennantia investment.

e) Managers shall have the right to designate an entity other than Rose Cay Maritime, LLC to receive and hold any [Profit Sharing Incentives or Pennantia Class B equity, so long as such entity holding or receiving any Profit Sharing Incentives or such Class B equity is and remains for the duration of this Agreement an affiliate of Rose Cay Maritime, LLC under common control of the holders of the equity interests of Rose Cay Maritime, LLC as of the Commencement Date.  Subject to the requirements of the preceding sentence, upon the award and issuance of Profit Sharing Incentives or Class B equity pursuant to this Agreement, such equity shall be fully vested in the designated holder without regard to any future termination of this Agreement.  Notwithstanding Managers' designation of a holder of Profit Sharing Incentives or Class B equity, Managers agree that Pennantia shall not be required to provide any reporting information concerning the Pennantia investment to any person or entity other than Rose Cay Maritime, LLC.  Managers may provide information provided by Pennantia to such designated holder provided that Managers and such designated holder are parties to a confidentiality and non-disclosure agreement concerning such information on terms materially similar to the confidentiality and non-disclosure obligations of Managers under this Agreement.

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

## Section 1 – Basis of the Agreement

1.    **Definitions**
      In this Agreement save where the context otherwise requires, the following words and expressions shall
      have the meanings hereby assigned to them:

      "Company" (with reference to the ISM Code and the ISPS Code) means the organization identified in Box 5
      or any replacement organization appointed by the Owners from time to time (see Sub-clauses 9(b)(i) or 9(c)
      (ii), whichever is applicable).

      "Crew" means the personnel of the numbers, rank and nationality specified in Annex "B" hereto.

      "Crew Insurances" means insurance of liabilities in respect of crew risks which shall include but not be
      limited to death, permanent disability, sickness, injury, repatriation, shipwreck unemployment indemnity and
      loss of personal effects (see Sub-clause 5(b) (Crew Insurances) and Clause 7 (Insurance Arrangements)
      and Clause 10 (Insurance Policies) and Boxes 10 and 11).

      "Crew Support Costs" means all expenses of a general nature which are not particularly referable to any
      individual vessel for the time being managed by the Managers and which are incurred by the Managers for
      the purpose of providing an efficient and economic management service and, without prejudice to the
      generality of the foregoing, shall include the cost of crew standby pay, training schemes for officers and
      ratings, cadet training schemes, sick pay, study pay, recruitment and interviews.

      "Flag State" means the State whose flag the Vessel is flying.

      "ISM Code" means the International Management Code for the Safe Operation of Ships and for Pollution
      Prevention and any amendment thereto or substitution therefor.

      "ISPS Code" means the International Code for the Security of Ships and Port Facilities and the relevant
      amendments to Chapter XI of SOLAS and any amendment thereto or substitution therefor.

      "Managers" means the party identified in Box 4.

      "Management Services" means the services specified in SECTION 2 - Services (Clauses 4 through 7) as
      indicated affirmatively in Boxes 6 through 8, 10 and 11, and all other functions performed by the Managers
      under the terms of this Agreement.

      "Owners" means the party identified in Box 3.

      "Severance Costs" means the costs which are legally required to be paid to the Crew as a result of the early
      termination of any contracts for service on the Vessel.

      "SMS" means the Safety Management System (as defined by the ISM Code).

      "STCW 95" means the International Convention on Standards of Training, Certification and Watchkeeping
      for Seafarers, 1978, as amended in 1995 and any amendment thereto or substitution therefor.

      "Vessel" means the vessel or vessels, details of which are set out in Annex "A" attached hereto, and shall
      be, for purposes of Clause 17(b)(i), 1) each combination of tug and barge (which pairing may be changed at
      Managers' discretion); and 2) the individual barges not paired with a tug.

2.    **Commencement and Appointment**
      (a) With effect from the date stated in Box 2 for the commencement of the Management Services and
      continuing unless and until terminated as provided herein, the Owners hereby appoint the Managers and the
      Managers hereby agree to act as the Managers of the Vessels in respect of the Management Services. It is
      the intent of the Owners and Managers that this Agreement and the services hereunder will commence on at
      the date and time upon which the Owners obtain court approval and transfer of title to one or more vessels
      from the Bouchard Transportation Co. auction sale in Case No. 20-34682 (or such earlier time that the

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

Owners are required to take delivery or become responsible for care or risk of loss of such vessels and Owners request commencement in writing) (the "*Commencement Date*"), to the extent possible pursuant to the scope of services under this Agreement, taking possession, custody and care directly from the prior title holder and/or custodial manager. without any gap in time or possession.

(b) It is an express condition precedent to the commencement of this agreement that Owners take title to at least one (1) vessel from the Bouchard Transportation Co. auction sale in Case No. 20-34682 on or before September 1, 2021, and in the event that does not occur, this agreement shall be null and void and have no further effect.

(c) In the event that Owners have one or more winning and accepted bids in Case No. 20-34682, upon the written request of Owners, Managers are authorized as agents of Owners to take such advance actions as requested by Owners as may be reasonably required for arranging and procuring Management Services for the Vessel(s) required to be effective as of the Commencement Date, including, but not limited to, arrangements to price and place insurances to become effective as of the Commencement Date, and make provisional arrangements for Crew to take possession of the Vessel on the Commencement Date ("*Pre-commencement Authorizations*").

3.    **Authority of the Managers**
Subject to the terms and conditions herein provided, during the period of this Agreement the Managers shall carry out the Management Services in respect of the Vessel as agents for and on behalf of the Owners.  The Managers shall have authority to take such actions as they may from time to time in their absolute discretion consider to be necessary to enable them to perform the Management Services in accordance with sound ship management practice, including but not limited to compliance with all relevant rules and regulations.

During the term of this Agreement, the Managers shall have and maintain full control of the Vessels and shall be responsible to ensure the safety and maintenance of the Vessels, its crew, and operations of the Vessels conducted pursuant to this Agreement.

To the extent international or other referenced standards, such as ISM Code, ISPS Code, SMS Code, STCW 95, and the Maritime Labor Convention (Cl. 28), etc. referenced in this Agreement, are not applicable to the Vessels or the operation and trading area of the Vessel, such standards shall not apply; provided, however, that the Vessels shall comply with its Certificate of Documentation, Certificate of Inspection, and laws and regulations applicable to U.S. coastwise vessels in the area of operation of the Vessels.

**Section 2 – Services**

4.    **Technical Management**
(only applicable if agreed according to Box 6).
The Managers shall provide technical management which includes, but is not limited to, the following services:

(a)    ensuring that the Vessel complies with the requirements of the law of the Flag State;

(b)    ensuring compliance with the ISM Code;

(c)    ensuring compliance with the ISPS Code;

(d)    providing competent personnel to supervise the maintenance and general efficiency of the Vessel;

(e)    arranging and supervising dry-docking, repairs, alterations and the maintenance of the Vessel to the standards agreed with the Owners to ensure that the Vessel will comply with all requirements and recommendations of the classification society, and with the law of the Flag State and of the places where the Vessel is required to trade;

(f)    arranging the supply of necessary fuel, stores, spares and lubricating oil;

(g)    appointing surveyors and technical consultants as the Managers may consider from time to time to be necessary;

11

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

(h)     arranging for the supply of provisions unless provided by the Owners; and

(i)     arranging for the sampling and testing of bunkers.

(j)     Arranging for other provisions or services pertaining to the Vessel or Vessel operations as requested by Owners.

## 5.     Crew Management and Crew Insurances

(a)     *Crew Management*
(only applicable if agreed according to Box 7)
The Managers shall provide suitably qualified Crew who shall comply with applicable USCG requirements. The provision of such crew management services includes, but is not limited to, the following services:

(i)     selecting, engaging and providing for the administration of the Crew, including, as applicable, payroll arrangements, pension arrangements, tax, social security contributions and other mandatory dues related to their employment payable in each Crew member's country of domicile;

(ii)    ensuring that the applicable requirements of the law of the Flag State in respect of rank, qualification and certification of the Crew and employment regulations, such as Crew's tax and social insurance, are satisfied;

(iii)   ensuring that all Crew have passed a medical examination with a qualified doctor certifying that they are fit for the duties for which they are engaged and are in possession of valid medical certificates issued in accordance with appropriate Flag State requirements or such higher standard of medical examination as may be agreed with the Owners. In the absence of applicable Flag State requirements the medical certificate shall be valid at the time when the respective Crew member arrives on board the Vessel and shall be maintained for the duration of the service on board the Vessel;

(iv)    ensuring that the Crew shall have a common working language and a command of the English language of a sufficient standard to enable them to perform their duties safely;

(v)     arranging transportation of the Crew, including repatriation;

(vi)    training of the Crew;

(vii)   conducting union negotiations; and

(viii)  if the Managers are the Company, ensuring that the Crew, on joining the Vessel, are given proper familiarization with their duties in relation to the Vessel's SMS and that instructions which are essential to the SMS are identified, documented and given to the Crew prior to sailing.

(ix)    if the Managers are **not** the Company:

(1)     ensuring that the Crew, before joining the Vessel, are given proper familiarization with their duties in relation to the ISM Code; and

(2)     instructing the Crew to obey all reasonable orders of the Company in connection with the operation of the SMS.

(x)     Where Managers are **not** providing technical management services in accordance with Clause 4 (Technical Management):

(1)     ensuring that no person connected to the provision and the performance of the crew management services shall proceed to sea on board the Vessel without the prior consent of the Owners (such consent not to be unreasonably withheld); and

(2)     ensuring that in the event that the Owners' drug and alcohol policy requires measures to be taken prior to the Crew joining the Vessel, implementing such measures;

12

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

(b)     Crew Insurances
*(only applicable if Sub-clause 5(a) applies* **and** *if agreed according to Box 10)*
The Managers shall throughout the period of this Agreement provide the following services:

(i)      arranging Crew Insurances in accordance with the best practice of prudent managers of vessels of a similar type to the Vessel, with sound and reputable insurance companies, underwriters or associations. Insurances for any other persons proceeding to sea onboard the Vessel may be separately agreed by the Owners and the Managers (see Box 10);

(ii)     ensuring that the Owners are aware of the terms, conditions, exceptions and limits of liability of the insurances in Sub-clause 5(b)(i);

(iii)    ensuring that all premiums or calls in respect of the insurances in Sub-clause 5(b)(i) are paid by their due date;

(iv)    if obtainable at no additional cost, ensuring that insurances in Sub-clause 5(b)(i) name the Owners as a joint assured with full cover and, unless otherwise agreed, on terms such that Owners shall be under no liability in respect of premiums or calls arising in connection with such insurances.

(v)     providing written evidence, to the reasonable satisfaction of the Owners, of the Managers' compliance with their obligations under Sub-clauses 5(b)(ii), and 5(b)(iii) within a reasonable time of the commencement of this Agreement, and of each renewal date and, if specifically requested, of each payment date of the insurances in Sub-clause 5(b)(i).

**6.     Commercial Management**
*(only applicable if agreed according to Box 8).*
The Managers shall provide the following services for the Vessel in accordance with the Owners' instructions, which shall include but not be limited to:

(a)     seeking and negotiating employment for the Vessel and the conclusion (including the execution thereof) of charter parties or other contracts relating to the employment of the Vessel. If such a contract exceeds the period stated in Box 9, consent thereto in writing shall first be obtained from the Owners;

(b)     arranging for the provision of bunker fuels of the quality specified by the Owners as required for the Vessel's trade;

(c)     voyage estimating and accounting and calculation of hire, freights, demurrage and/or despatch monies due from or due to the charterers of the Vessel; assisting in the collection of any sums due to the Owners related to the commercial operation of the Vessel in accordance with Clause 11 (Income Collected and Expenses Paid on Behalf of Owners);

*If any of the services under Sub-clauses 6(a), 6(b) and 6(c) are to be excluded from the Management Fee, remuneration for these services must be stated in Annex E (Fee Schedule). See Sub-clause 12(e).*

(d)     issuing voyage instructions;

(e)     appointing agents;

(f)     appointing stevedores; and

(g)     arranging surveys associated with the commercial operation of the Vessel.

Manager shall meet the following minimum performance standards for Commercial Management:

        Calendar year 2022:  Minimum charter revenue of ▮▮▮▮

        Calendar year 2023:  Minimum vessel EBITDA of ▮▮▮▮

**7.     Insurance Arrangements**

13

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

*(only applicable if agreed according to Box 11).*
The Managers shall arrange insurances in accordance with Clause 10 (Insurance Policies), on such terms as the Owners shall have instructed or agreed, in particular regarding conditions, insured values, deductibles, franchises and limits of liability.

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

**Section 3 – Obligations**

8.    **Managers' Obligations**
(a)     The Managers undertake to use their best endeavours to provide the Management Services as agents for and on behalf of the Owners in accordance with sound ship management practice and to protect and promote the interests of the Owners in all matters relating to the provision of services hereunder.

Provided however, that in the performance of their management responsibilities under this Agreement, the Managers shall be entitled to have regard to their overall responsibility in relation to all vessels as may from time to time be entrusted to their management and in particular, but without prejudice to the generality of the foregoing, the Managers shall be entitled to allocate available supplies, manpower and services in such manner as in the prevailing circumstances fair and reasonable. With respect to management services or business dealings with respect to vessels not affiliated with Pennantia, Manager: (i) shall all times undertake to avoid conflicts of interest with Pennantia vessels and business, (ii), shall not discriminate against or treat Pennantia vessels or business any less favorably than any other managed vessel or business, and (iii) with respect to vessel business commercially suitable to be performed by Pennantia vessels, shall give Pennantia vessels and business first priority for such business.

(b)     Where the Managers are providing technical management services in accordance with Clause 4 (Technical Management), they shall procure that the requirements of the Flag State are satisfied and they shall agree to be appointed as the Company, assuming the responsibility for the operation of the Vessel and taking over the duties and responsibilities imposed by the ISM Code and the ISPS Code, if applicable.

9.    **Owners' Obligations**
(a)     The Owners shall pay all sums due to the Managers punctually in accordance with the terms of this Agreement.  In the event of payment after the due date of any outstanding sums the Manager shall be entitled to charge interest at the rate stated in Box 13.

(b)     Where the Managers are providing technical management services in accordance with Clause 4 (Technical Management), the Owners shall:

(i)     report (or where the Owners are not the registered owners of the Vessel procure that the registered owners report) to the Flag State administration the details of the Managers as the Company as required to comply with the ISM and ISPS Codes;

(ii)    procure that any officers and ratings supplied by them or on their behalf comply with the requirements of STCW 95; and

(iii)   instruct such officers and ratings to obey all reasonable orders of the Managers (in their capacity as the Company) in connection with the operation of the Managers' safety management system.

(c)     Where the Managers are **not** providing technical management services in accordance with Clause 4 (Technical Management), the Owners shall:

(i)     procure that the requirements of the Flag State are satisfied and notify the Managers upon execution of this Agreement of the name and contact details of the organization that will be the Company by completing Box 5;

(ii)    if the Company changes at any time during this Agreement, notify the Managers in a timely manner of the name and contact details of the new organization;

(iii)   procure that the details of the Company, including any change thereof, are reported to the Flag State administration as required to comply with the ISM and ISPS Codes.  The Owners shall advise the Managers in a timely manner when the Flag State administration has approved the Company; and

(iv)    unless otherwise agreed, arrange for the supply of provisions at their own expense.

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

(d)     Where the Managers are providing crew management services in accordance with Sub-clause 5(a) the Owners shall:

(i)     inform the Managers prior to ordering the Vessel to any excluded or additional premium area under any of the Owners' Insurances by reason of war risks and/or piracy or like perils and pay whatever additional costs may properly be incurred by the Managers as a consequence of such orders including, if necessary, the costs of replacing any member of the Crew. Any delays resulting from negotiation with or replacement of any member of the Crew as a result of the Vessel being ordered to such an area shall be for the Owners' account. Should the Vessel be within an area which becomes an excluded or additional premium area the above provisions relating to cost and delay shall apply;

(ii)    agree with the Managers prior to any change of flag of the Vessel and pay whatever additional costs may properly be incurred by the Managers as a consequence of such change. If agreement cannot be reached then either party may terminate this Agreement in accordance with Sub-clause 22(e); and

(iii)   provide, at no cost to the Managers, in accordance with the requirements of the law of the Flag State, or higher standard, as mutually agreed, adequate Crew accommodation and living standards.

(e)     Where the Managers are **not** the Company, the Owners shall ensure that Crew are properly familiarized with their duties in accordance with the Vessel's SMS and that instructions which are essential to the SMS are identified, documented and given to the Crew prior to sailing.

16

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

Section 4 - Insurance, Budgets, Income, Expenses and Fees

10. **Insurance Policies**
The Owners shall procure, whether by instructing the Managers under Clause 7 (Insurance Arrangements) or otherwise, that throughout the period of this Agreement:

(a)     at the Owners' expense, the Vessel is insured for not less than its sound market value or entered for its full gross tonnage, as the case may be for:

(i)     hull and machinery marine risks (including but not limited to crew negligence) and excess liabilities;

(ii)     protection and indemnity risks (including but not limited to pollution risks, diversion expenses and, except to the extent insured separately by the Managers in accordance with Sub-clause 5(b)(i), Crew Insurances;

*NOTE: If the Managers are not providing crew management services under Sub -clause 5(a) (Crew Management) or have agreed not to provide Crew Insurances separately in accordance with Sub -clause 5(b)(i), then such insurances must be included in the protection and indemnity risks cover for the Vessel (see Sub-clause 10(a)(ii) above).*

(iii)     war risks (including but not limited to blocking and trapping, protection and indemnity, terrorism and crew risks); and

(iv)     such optional insurances as may be agreed (such as piracy, kidnap and ransom, loss of hire and FD & D) (see Box 12)

Sub-clauses 10(a)(i) through 10(a)(iv) all in accordance with the best practice of prudent owners of vessels of a similar type to the Vessel, with sound and reputable insurance companies, underwriters or associations ("the Owners' Insurances");

(b)     all premiums and calls on the Owners' Insurances are paid by their due date;

(c)     the Owners' Insurances name the Owners, the Managers and, subject to underwriters' agreement, any third party designated by the Managers as a joint assured, with full cover. It is understood that in some cases, such as protection and indemnity, the normal terms for such cover may impose on the Managers and any such third party a liability in respect of premiums or calls arising in connection with the Owners' Insurances. If obtainable at no additional cost, however, the Owners shall procure such insurances on terms such that neither the Managers nor any such third party shall be under any liability in respect of premiums or calls arising in connection with the Owners' Insurances. In any event, on termination of this Agreement in accordance with Clause 21 (Duration of the Agreement) and Clause 22 (Termination), the Owners shall procure that the Managers and any third party designated by the Managers as joint assured shall cease to be joint assured and, if reasonably achievable, that they shall be released from any and all liability for premiums and calls that may arise in relation to the period of this Agreement; and

(d)     written evidence is provided, to the reasonable satisfaction of the Managers, of the Owners' compliance with their obligations under this Clause 10 within a reasonable time of the commencement of the Agreement, and of each renewal date and, if specifically requested, of each payment date of the Owners' Insurances.

11. **Income Collected and Expenses Paid on Behalf of Owners**
(a)     Except as provided in Sub-clause 11(c) all monies collected by the Managers under the terms of this Agreement (other than monies payable by the Owners to the Managers) and any interest thereon shall be held to the credit of the Owners in a separate bank account (the "*Vessel Revenue Account*") designated by Owners.

(b)     All monies collected by the Managers under Clause 6 (Commercial Management) shall be paid into the Vessel Revenue Account in the name of the Owners or as may be otherwise advised by the Owners in writing.

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

12. **Management Fee (Annex E component parts)**

(a)     The Owners shall pay to the Managers (or its designee if permitted pursuant to  Annex E (4)(e)) the management fees and any true ups as stated in Box 14/Annex E for their services as Managers under this Agreement, which shall be payable in accordance with the terms, time and frequency set forth in Annex E. Payments to the Mangers shall be payable to the Managers' nominated account stated in Box 15, or to such different account as Managers may nominate in writing to Owners from time to time, and payments to a permitted designee pursuant to Annex E(4)(e) shall be to such account as designated by Managers to Owners from time to time.

(b)     The management fee shall be subject to review and audit of expenditures and supporting documentation upon the reasonable request of Owners pursuant to Clause 13.

(c)     The Managers shall, at no extra cost to the Owners, provide their own office accommodation, office staff, facilities and stationery.

(d)     [Intentionally Omitted]

(e)     Save as otherwise provided in this Agreement, all discounts and commissions obtained by the Managers in the course of the performance of the Management Services shall be credited to the Owners.

13. **Management of Funds**

(a)     The Managers shall at all times maintain and keep true and correct accounts, as detailed in Clause 11, *supra*,  in respect of the Management Services in accordance with GAAP or such other standard as the parties may agree, including records of all costs and expenditure incurred, and produce a summary or breakdown of actual expenditure of the Vessel in such form and at such intervals as shall be mutually agreed. The Managers shall make such accounts available for inspection and auditing by the Owners and/or their representatives in the Managers' offices or by electronic means, provided reasonable notice is given by the Owners.

(b)     Except as expressly provided for herein, the Managers use or commitment of their own funds to finance the provision of the Management Services shall in no circumstances relieve the Owners of their obligations hereunder to reimburse the Managers.

(c)     Managers shall not commingle funds in the respective accounts required under this Agreement. Excepting the Management Fee Account, all accounts required under this agreement shall be subject to account control agreements at the discretion of Owner and or any lender of Owner.

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

Section 5 – Legal General and Duration of Agreement

14. **Trading Restrictions**
If the Managers are providing crew management services in accordance with Sub-clause 5(a) (Crew Management), the Owners and the Managers will, prior to the commencement of this Agreement, agree on any trading restrictions to the Vessel that may result from the terms and conditions of the Crew's employment.

15. **Replacement**
If the Managers are providing crew management services in accordance with Sub-clause 5(a) (Crew Management), the Owners may require the replacement, at their own expenditure, at the next reasonable opportunity, of any member of the Crew found on reasonable grounds to be unsuitable for service. If the Managers have failed to fulfil their obligations in providing suitable qualified replacement Crew within the meaning of Sub-clause 5(a) (Crew Management), then such replacement shall be at the Managers' expense.

16. **Managers' Right to Sub-Contract**
The Managers may not assign this Agreement without the prior written consent of the Owners, which may be withheld or granted in Owners' sole discretion. The Managers may subcontract Management Services or obligations hereunder with the prior written consent of the Owners, which may be withheld or granted in Owners' reasonable discretion. In the event of such a sub-contract the Managers shall not be relieved of their obligations to perform under this Agreement.

17. **Responsibilities**
    *(a)    Force Majeure*
Neither party shall be liable for any loss, damage or delay due to any of the following force majeure events and/or conditions to the extent that the party invoking force majeure is prevented or hindered from performing any or all of their obligations under this Agreement, provided they have made all reasonable efforts to avoid, minimize or prevent the effect of such events and/or conditions:

    (i)     acts of God;

    (ii)    any Government requisition, control, intervention, requirement or interference;

    (iii)   any circumstances arising out of war, threatened act of war or warlike operations, acts of terrorism, sabotage or piracy, or the consequences thereof;

    (iv)    riots, civil commotion, blockades or embargoes;

    (v)     epidemics/pandemics, including COVID-19;

    (vi)    earthquakes, landslides, floods or other extraordinary weather conditions;

    (vii)   strikes, lockouts or other industrial action, unless limited to the employees (which shall not include the Crew) of the party seeking to invoke force majeure;

    (viii)  fire, accident, explosion except where caused by negligence of the party seeking to invoke force majeure; and

    (ix)    any other similar cause beyond the reasonable control of either party.

    *(b)    Liability to Owners*

    (i)     Without prejudice to Sub-clause 17(a), the Managers shall be under no liability whatsoever to the Owners for any loss, damage, delay or expense of whatsoever nature, whether direct or indirect, (including but not limited to loss of profit arising out of or in connection with detention of or delay to the Vessel) and howsoever arising in the course of performance of the Management Services UNLESS same is proved to have resulted solely from the negligence, gross negligence or willful default of the Managers or their

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

employees or agents, or sub-contractors employed by them in connection with the Vessel, in which case (save where loss, damage, delay or expense has resulted from the Managers' personal act or omission committed with the intent to cause same or recklessly and with knowledge that such loss, damage, delay or expense would probably result) the Managers' liability for each incident or series of incidents giving rise to a claim or claims shall never exceed the total of three (3) times the monthly management fee payable hereunder for the individual Vessel involved in the incident.

(ii)    *Acts or omissions of the Crew* - Notwithstanding anything that may appear to the contrary in this Agreement, the Managers shall not be liable for any acts or omissions of the Crew, even if such acts or omissions are negligent, grossly negligent or willful, except only to the extent that they are shown to have resulted from a failure by the Managers to discharge their obligations under Clause 5(a) (Crew Management), in which case their liability shall be limited in accordance with the terms of this Clause 17 (Responsibilities).

(c)    Indemnity
Except to the extent and solely for the amount therein set out that the Managers would be liable under Sub-clause 17(b), the Owners hereby undertake to keep the Managers and their employees, agents and sub-contractors indemnified and to hold them harmless against all actions, proceedings, claims, demands or liabilities whatsoever or howsoever arising which may be brought against them or incurred or suffered by them arising out of or in connection with the performance of this Agreement, and against and in respect of all costs, loss, damages and expenses (including legal costs and expenses on a full indemnity basis) which the Managers may suffer or incur (either directly or indirectly) in the course of the performance of this Agreement.

(d)    "Himalaya"
It is hereby expressly agreed that no employee or agent of the Managers (including every sub-contractor from time to time employed by the Managers) shall in any circumstances whatsoever be under any liability whatsoever to the Owners for any loss, damage or delay of whatsoever kind arising or resulting directly or indirectly from any act, neglect or default on his part while acting in the course of or in connection with his employment and, without prejudice to the generality of the foregoing provisions in this Clause 17 (Responsibilities), every exemption, limitation, condition and liberty herein contained and every right, exemption from liability, defense and immunity of whatsoever nature applicable to the Managers or to which the Managers are entitled hereunder shall also be available and shall extend to protect every such employee or agent of the Managers acting as aforesaid and for the purpose of all the foregoing provisions of this Clause 17 (Responsibilities) the Managers are or shall be deemed to be acting as agent or trustee on behalf of and for the benefit of all persons who are or might be their servants or agents from time to time (including sub-contractors as aforesaid) and all such persons shall to this extent be or be deemed to be parties to this Agreement.

(e) Shipyard Liability
Managers shall not be liable whatsoever to Owners for claims (including attorneys' fees and costs), and Owners shall indemnify Managers against such claims (including attorneys' fees and costs), arising from pollution, damage to, or loss or destruction of, any vessel or property, as well as for any personal injuries, including death, suffered when a vessel managed under the terms of this Agreement is at a shipyard or other vessel maintenance facility under the control of the operator of such facility.

18.    **General Administration**
(a)    The Managers shall keep the Owners and, if appropriate, the Company informed in a timely manner of any incident of which the Managers become aware which gives or may give rise to delay to the Vessel or claims or disputes involving third parties.

(b)    The Managers shall handle and settle all claims and disputes arising out of the Management Services hereunder, unless the Owners instruct the Managers otherwise. The Managers shall keep the Owners appropriately informed in a timely manner throughout the handling of such claims and disputes.

(c)    The Owners may request the Managers to bring or defend other actions, suits or proceedings related to the Management Services, on terms to be agreed.

(d)    The Managers shall have power to obtain appropriate legal or technical or other outside expert advice in relation to the handling and settlement of claims in relation to Sub-clauses 18(a) and 18(b) and

20

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

disputes and any other matters affecting the interests of the Owners in respect of the Vessel, unless the Owners instruct the Managers otherwise.

(e)       On giving reasonable notice, the Owners may request, and the Managers shall in a timely manner make available, all documentation, information and records in respect of the matters covered by this Agreement either related to mandatory rules or regulations or other obligations applying to the Owners in respect of the Vessel (including but not limited to STCW 95, the ISM Code and ISPS Code) to the extent permitted by relevant legislation.

On giving reasonable notice, the Managers may request, and the Owners shall in a timely manner make available, all documentation, information and records reasonably required by the Managers to enable them to perform the Management Services.

(f)       The Owners shall arrange for the provision of any necessary guarantee bond or other security.

(g)       Any direct costs incurred by the Managers in carrying out their obligations according to this Clause 18 (General Administration) shall be reimbursed by the Owners.

19.   **Inspection of Vessel**
The Owners may at any time after giving reasonable notice to the Managers inspect the Vessel for any reason they consider necessary.

20.   **Compliance with Laws and Regulations**
The parties will not do or permit to be done anything which might cause any breach or infringement of the laws and regulations of the Flag State, or of the places where the Vessel trades.

21.   **Duration of the Agreement**
(a)       This Agreement shall come into effect at the date stated in Box 2 and shall continue for so long as Pennantia owns a vessel(s) under management on the Commencement Date, absent the occurrence and continuation of an event of default, unless terminated earlier, in accordance with Clause 22 (Termination).

(b)       Where the Vessel is not at a mutually convenient port or place on the expiry of such period, this Agreement shall terminate on the subsequent arrival of the Vessel at the next mutually convenient port or place.

22.   **Termination**
(a)       *Owners' or Managers' default*
If either party fails to meet their obligations under this Agreement, the other party may give notice to the party in default requiring them to remedy it.  In the event that the party in default fails to remedy it within a reasonable time to the reasonable satisfaction of the other party, that party shall be entitled to terminate this Agreement with immediate effect by giving notice to the party in default.

(b)       *Notwithstanding Sub-clause 22(a):*

(i)       The Managers shall be entitled to terminate the Agreement with immediate effect by giving notice to the Owners if any monies payable by the Owners and/or the owners of any associated vessel, details of which are listed in Annex "D", shall not have been received in the Managers' nominated account within ten days (10) of receipt by the Owners of the Managers' written request, or if the Vessel is repossessed by the Mortgagee(s).

(ii)       If the Owners proceed with the employment of or continue to employ the Vessel in the carriage of contraband, blockade running, or in an unlawful trade, or on a voyage which in the reasonable opinion of the Managers is unduly hazardous or improper, the Managers may give notice of the default to the Owners, requiring them to remedy it as soon as practically possible.  In the event that the Owners fail to remedy it within a reasonable time to the satisfaction of the Managers, the Managers shall be entitled to terminate the Agreement with immediate effect by notice.

(iii)       If either party fails to meet their respective obligations under Sub-clause 5(b) (Crew Insurances) and Clause 10 (Insurance Policies), the other party may give notice to the party in default requiring them to

## PART II
## SHIPMAN 2009
### Standard ship management agreement

remedy it within ten (10) days, failing which the other party may terminate this Agreement with immediate effect by giving notice to the party in default.

(iv)    In the event of a Liquidity Event or a termination of this Agreement within the first twelve (12) months of this Agreement, Managers shall be paid the balance of the Fixed Management Fee that would have been payable through the 12th month of this Agreement absent such Liquidity Event or termination.    .

*(c)    Extraordinary Termination*
This Agreement shall be deemed to be terminated as to any one vessel in the case of the sale of such Vessel or, if the Vessel becomes a total loss or is declared as a constructive or compromised or arranged total loss or is requisitioned or has been declared missing.

*(d)    For the purpose of Sub-clause 22(c) hereof:*

(i)    the date upon which the Vessel is to be treated as having been sold or otherwise disposed of shall be the date on which the Vessel's owners cease to be the registered owners of the Vessel;

(ii)    the Vessel shall be deemed to be lost either when it has become an actual total loss or agreement has been reached with the Vessel's underwriters in respect of its constructive total loss or if such agreement with the Vessel's underwriters is not reached it is adjudged by a competent tribunal that a constructive loss of the Vessel has occurred; and

(iii)    the date upon which the Vessel is to be treated as declared missing shall be ten (10) days after the Vessel was last reported or when the Vessel is recorded as missing by the Vessel's underwriters, whichever occurs first.  A missing vessel shall be deemed lost in accordance with the provisions of Sub-clause 22(d)(ii).

(e)    This Agreement shall terminate on the sale of Pennantia, or the sale of all or substantially all of the assets of Pennantia (a "*Liquidity Event*").  In the event of a Liquidity Event, and notwithstanding the termination of this Agreement upon such Liquidity Event, the Owner shall calculate and pay Management Fees (including Profit Sharing Incentives) to the extent due and owing as a result of the Liquidity Event.

(f)    This Agreement shall terminate forthwith in the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of the Owner or Manager (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver or administrator is appointed, or if it suspends payment, ceases to carry on business or makes any special arrangement or composition with its creditors.

(g)    In the event of an Owners' default of its obligations under this Agreement resulting in termination, Owners shall pay Managers a sum equivalent to twelve (12) months of the Fixed Management Fee.

(h)    In addition, where the Managers provide Crew for the Vessel in accordance with Clause 5(a) (Crew Management):

(i) the Owners shall continue to pay Crew Support Costs during the said further period of the number of months stated in Box 19; and (ii) except in the case of termination resulting from default of the Managers, the Owners shall pay Severance Costs which may be incurred.  The Managers shall use their reasonable endeavors to minimize such Severance Costs.

(i)    On the termination, for whatever reason, of this Agreement, the Managers shall release to the Owners, if so requested, the originals where possible, or otherwise certified copies, of all accounts and all documents specifically relating to the Vessel and its operation, per the Severance Costs referenced in Box 20.

(j)    The termination of this Agreement shall be without prejudice to all rights accrued due between the parties prior to the date of termination.

23.    **Dispute Resolution Clause (See Box 21)**

This Agreement shall be construed and enforced in accordance with and governed by the General Maritime Law of the United States to the extent applicable and by the laws of the state of New York without giving effect to the conflicts of laws provisions thereof.  Any action or proceeding arising from, related to, under, or

22

### PART II
### SHIPMAN 2009
### Standard ship management agreement

in connection with this Agreement must be brought solely and exclusively in the federal courts, and state courts only when federal courts are not available for such action or proceeding, located in the County of New York in the State of New York. Each party hereto irrevocably (i) submits to the exclusive jurisdiction of such New York courts, and (ii) waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in such court or that such court is an inconvenient forum. The parties irrevocably and unconditionally waive any right they have to a trial by jury in respect of any legal action arising out of or relating to this Agreement.

The parties may agree, however, at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Agreement:

(i)      In the case of a dispute in respect of which litigation has been commenced the following shall apply:

(ii)     Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.

(iii)    The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator may be appointed promptly by the court ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, in New York County in the State of New York.

(iv)     If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal.

(v)      The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

(vi)     Either party may advise the Tribunal that they have agreed to mediation. The litigation procedure shall continue during the conduct of the mediation, subject to the discretion of the Tribunal, and the Tribunal may take the mediation timetable into account when setting the timetable for steps in the litigation.

(vii)    Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.

(viii)   The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the litigation.

*(Note: The parties should be aware that the mediation process may not necessarily interrupt time limits.)*

24.   **Notices**
(a)      All notices given by either party or their agents to the other party or their agents in accordance with the provisions of this Agreement shall be in writing and shall, unless specifically provided in this Agreement to the contrary, be sent to the address for that other party as set out in Boxes 22 and 23 or as appropriate or to such other address as the other party may designate in writing.

A notice may be sent by registered or recorded mail, facsimile, electronically or delivered by hand in accordance with this Sub-clause 24(a).

(b)      Any notice given under this Agreement shall take effect on receipt by the other party and shall be deemed to have been received:

(i)      if posted, on the third (3rd) day after posting;

(ii)     if sent by facsimile or electronically, on the day of transmission; and

23

### PART II
### SHIPMAN 2009
### Standard ship management agreement

(iii)     if delivered by hand, on the day of delivery.

And in each case proof of posting, handing in or transmission shall be proof that notice has been given, unless proven to the contrary.

**25.  Entire Agreement**
This Agreement constitutes the entire agreement between the parties and no promise, undertaking, representation, warranty or statement by either party prior to the date stated in Box 2 shall affect this Agreement. Any modification of this Agreement shall not be of any effect unless in writing signed by or on behalf of the parties.

**26.  Third Party Rights**
Except to the extent provided in Sub-clauses 17(c) (Indemnity) and 17(d) (Himalaya), no third parties may enforce any term of this Agreement.

**27.  Partial Validity**
If any provision of this Agreement is or becomes or is held by any arbitrator or other competent body to be illegal, invalid or unenforceable in any respect under any law or jurisdiction, the provision shall be deemed to be amended to the extent necessary to avoid such illegality, invalidity or unenforceability, or, if such amendment is not possible, the provision shall be deemed to be deleted from this Agreement to the extent of such illegality, invalidity or unenforceability, and the remaining provisions shall continue in full force and effect and shall not in any way be affected or impaired thereby.

**28.  Interpretation**
In this Agreement:

*(a)      Singular/Plural*
The singular includes the plural and vice versa as the context admits or requires.

*(b)      Headings*
The index and headings to the clauses and appendices to this Agreement are for convenience only and shall not affect its construction or interpretation.

*(c)      Day*
"Day" means a calendar day unless expressly stated to the contrary.

**29.  MLC Clause for SHIPMAN 2009**
For the purposes of this Clause:

"MLC" means the International Labour Organisation (ILO) Maritime Labour Convention (MLC 2006) and any amendment thereto or substitution thereof.

"Shipowner" shall mean the party named as "shipowner" on the Maritime Labour Certificate for the Vessel.

(a)      Subject to Clause 3 (Authority of the Managers), the Managers shall, to the extent of their Management Services, assume the Shipowner's duties and responsibilities imposed by the MLC for the Vessel, on behalf of the Shipowner.

(b)      The Owners shall ensure compliance with the MLC in respect of any crew members supplied by them or on their behalf.

(c)      The Owners shall procure, whether by instructing the Managers under Clause 7 (Insurance Arrangements) or otherwise, insurance cover or financial security to satisfy the Shipowner's financial security obligations under the MLC.

**30.  MISCELLANEOUS RIDER PROVISIONS**

(a)      Each of Owners and Managers represent and warrant that it is a citizen of the United States for the purpose of engaging in Coastwise Trade within the meaning of 46 U.S.C. § 50501 (a "Coastwise

24

### PART II
### SHIPMAN 2009
### Standard ship management agreement

Citizen"), and covenants that during the term of this Agreement it shall remain a Coastwise Citizen, qualified (as to citizenship) for the purpose of operation of Vessels in the Coastwise Trade, and Manager shall not suffer or permit anything to be done which might injuriously affect the entitlement of the Vessels under the laws and regulations of the United States to be so documented for use in the Coastwise Trade.

(b)    Publicity and Confidentiality

(i)    Release of Information.  Manager agrees it will not divulge information concerning this Agreement to anyone without the Owners' prior written consent, which shall not be unreasonably withheld, provided that Manager may disclose information as necessary to the appropriate governmental authority in an application for a permit, approval or clearance.  Manager will retain all information belonging to Owners in the strictest confidence and will neither use it nor disclose it to others without the prior written consent of Owners. Manager will require any sub consultant engaged by it pursuant to this Agreement to comply with the terms and provisions of this Clause.  These requirements will survive the termination or expiration of this Agreement.

(ii)    Confidentiality/No Promotion.  Manager agrees that it or its employees may, in the course of performing its responsibilities under this Agreement, be exposed to or acquire information which is proprietary or confidential to Owner.  Any and all non-public information of any form obtained by Manager and its subcontractors, and their respective employees, in the performance of this Agreement will be deemed confidential and proprietary information.

(iii)    Confidentiality. Each party agrees to hold such information in strict confidence and not to disclose such information to third parties or to use such information for any purpose whatsoever during the Term of this Agreement and for a period of five (5) years thereafter without the written consent of the other party except as necessary for: (a) the performance of the services under this Agreement; (b) to advise each of its employees who may be exposed to such proprietary and confidential information of their obligations to keep such information confidential; (c) compliance with professional standards of conduct for the performance of the services and/or related matters; (d) compliance with any law, regulation, ordinance, court order or governmental directive or other legal mandate; and/or (e) protection of the parties against claims or liabilities arising from the performance of services under this Agreement.  In the event of any disclosure by a party under subparagraphs (c), (d) or (e), the disclosing party will give the other party fourteen (14) days advance notice of such disclosure.  This obligation will not apply to information previously in a party's possession or in the public domain, or information lawfully acquired on a non-confidential basis from others.  This provision will survive termination of this Agreement.

(iv)    Manager agrees that it will review the terms and conditions of Clause 30(b) of this Agreement with all subcontractors it engages and that it will obtain the written agreement of each subcontractor to comply with the terms of this Clause.

25

# EXHIBIT 2

Case 3:25-cv-00137     Document 24-1     Filed 12/18/25 in TXSD     Page 52 of 140
Case 1:25-cv-01711-OEM-M.     *SEALED*     Document 1     Fil.     3/27/25     Page 1 of 46
PageID #: 1

**HOLLAND & KNIGHT LLP**
Michael J. Frevola
Chiara Kalogjera-Sackellares
787 Seventh Avenue
New York, New York 10019
michael.frevola@hklaw.com
Telephone: 212.513.3200
Fax: 212.385.9010

File Date: March 27, 2025
Case Number: 25-cv-1711
Judge Orelia E. Merchant
Magistrate Judge Marcia M. Henry

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Pennantia, LLC,<br>RCM 252, LLC,<br>Susan Rose, LLC,<br>RCM 250, LLC,<br>Jordan Rose, LLC,<br>RCM 260, LLC, and<br>RCM 262, LLC,<br><br>       Plaintiffs,<br><br>  v.<br><br>*Tank Barge RCM 252* (Official #1292046),<br>*Tug SUSAN ROSE* (Official #1282121),<br>*Tank Barge RCM 250* (Official #1235496),<br>*Tug JORDAN ROSE* (Official #1234828),<br>*Tank Barge RCM 260* (Official #1210060), and<br>*Tank Barge RCM 262* (Official #1216336),<br>their engines, tackle, appurtenances, etc., *in rem*,<br><br>       Defendants. | In Admiralty<br><br>Case No.  - CV - _____<br><br>**VERIFIED**<br>**COMPLAINT** |

Plaintiffs Pennantia, LLC ("Pennantia"), RCM 252, LLC, Susan Rose, LLC, RCM 250,

LLC, Jordan Rose, LLC, RCM 260, LLC, and RCM 262, LLC (each a "Plaintiff" and collectively

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 53 of 140
Case 1:25-cv-01711-OEM-M.    *SEALED*    Document 1    Fil.    .3/27/25    Page 2 of 46
PageID #: 2

"Plaintiffs"), by and through their attorneys Holland & Knight LLP, file this Verified Complaint against *Tank Barge RCM 252* (Official #1292046), *Tug SUSAN ROSE* (Official #1282121), *Tank Barge RCM 250* (Official #1235496), *Tug JORDAN ROSE* (Official #1234828), *Tank Barge RCM 260* (Official #1210060), and *Tank Barge RCM 262* (Official #1216336), their engines, tackle, appurtenances, etc. (collectively, the "Vessel Defendants"), *in rem*, seeking to exercise Plaintiffs' rights of possession as title owners of the Vessel Defendants to (1) conduct inspections of the Vessel Defendants, and (2) obtain copies of certain documents, records and information of the Vessel Defendants, which constitute appurtenances of the Vessel Defendants and/or constitute Plaintiffs' maritime property. Plaintiffs have been wrongfully deprived of their rights of possession of the Vessel Defendants by the contracted vessel manager, Rose Cay Maritime, LLC ("RCM"). Plaintiffs respectfully allege as follows:

## JURISDICTION AND THE PARTIES

1.      This is a case of admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333, arising from maritime tort and breach of maritime contract claims by RCM, and this case is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, and Plaintiffs seek relief from this Court pursuant to Rule D of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

2.      At all times material herein, Pennantia was and is a business entity organized and existing under the laws of the State of Delaware with a principal place of business located at 411 West Putnam Avenue, Suite 425, Greenwich, CT 06830.

3.      At all times material herein, RCM 252, LLC, was and is a business entity organized and existing under the laws of the State of Delaware with a principal place of business located at

2

Case 3:25-cv-00137   Document 24-1   Filed 12/18/25 in TXSD   Page 54 of 140
Case 1:25-cv-01711-OEM-M.   *SEALED*   Document 1   Fi.   /3/27/25   Page 3 of 46
PageID #: 3

411 West Putnam Avenue, Suite 425, Greenwich, CT 06830, and is the registered owner of the *Tank Barge RCM 252.*

4. At all times material herein, Susan Rose, LLC, was and is a business entity organized and existing under the laws of the State of Delaware with a principal place of business located at 411 West Putnam Avenue, Suite 425, Greenwich, CT 06830, and is the registered owner of the *Tug SUSAN ROSE.*

5. At all times material herein, RCM 250, LLC, was and is a business entity organized and existing under the laws of the State of Delaware with a principal place of business located at 411 West Putnam Avenue, Suite 425, Greenwich, CT 06830, and is the registered owner of the *Tank Barge RCM 250.*

6. At all times material herein, Jordan Rose, LLC, was and is a business entity organized and existing under the laws of the State of Delaware with a principal place of business located at 411 West Putnam Avenue, Suite 425, Greenwich, CT 06830, and is the registered owner of the *Tug JORDAN ROSE*

7. At all times material herein, RCM 260, LLC, was and is a business entity organized and existing under the laws of the State of Delaware with a principal place of business located at 411 West Putnam Avenue, Suite 425, Greenwich, CT 06830, and is the registered owner of the *Tank Barge RCM 260.*

8. At all times material herein, RCM 262, LLC, was and is a business entity organized and existing under the laws of the State of Delaware with a principal place of business located at 411 West Putnam Avenue, Suite 425, Greenwich, CT 06830, and is the registered owner of the *Tank Barge 262.*

3

Case 3:25-cv-00137     Document 24-1     Filed 12/18/25 in TXSD     Page 55 of 140
Case 1:25-cv-01711-OEM-M.     .*SEALED*     Document 1     Fil. J3/27/25     Page 4 of 46
PageID #: 4

9.     At all times material herein, RCM was and is a business entity organized and existing under the laws of the State of Texas with a principal place of business located at 800 Capitol Street, Suite 2400, Houston, TX 77002-2925.

10.     The Vessel Defendants are currently, or during the pendency of this action will be, located within the jurisdiction of this Honorable Court.

## PENNANTIA BUYS THE DEFENDANT VESSELS

11.     In 2021, the fleet of Bouchard Transportation ("Bouchard") was sold as part of that company's administration in the U.S. Bankruptcy Court for the Southern District of Texas.

12.     Pennantia purchased approximately half the Bouchard fleet, which vessels consisted of ten (10) barges and eight (8) tugs. The eight tugs and eight of the barges were mated as articulated tug/barge (ATB) pairings, with two additional stand-alone wire barges. The Vessel Defendants are six of the eighteen vessels. All of these vessels had at that time been out of service for between 12 and 24 months as a result of the financial and managerial difficulties arising under prior ownership.

13.     The membership interests of Pennantia consist of one class of voting membership interests "Class A" and three classes of non-voting membership interests, "Class B", "Class D", and "Class P". The entirety of the issued and outstanding Class A membership interests are held by Carioca Partners, LLC ("Carioca"), which is managed by Contrarian Capital Management, L.L.C. ("CCM"). The Class B, Class C and Class P non-voting membership interests are held by RCM and affiliates of RCM. The Class A membership interests represent approximately ▮▮▮▮▮ of the aggregate beneficial membership interests of Pennantia.

14.     Full voting control, management and decision making is controlled by the Class A Managing Member. The minority, non-voting membership interests held by RCM (and/or its

4

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 56 of 140
Case 1:25-cv-01711-OEM-N.    .*SEALED*    Document 1    Fil.    J3/27/25    Page 5 of 46
PageID #: 5

affiliates) in Classes B, D and P are passive investments and do not provide any rights or involvement in management or decision making of Pennantia.

15.     The eighteen vessels purchased by Pennantia (the "Pennantia Fleet")[1] are each owned by individual, wholly-owned and controlled subsidiaries of Pennantia, including Plaintiffs RCM 252, LLC, Susan Rose, LLC, RCM 250, LLC, Jordan Rose, LLC, RCM 260, LLC, and RCM 262, LLC, which are the owners of record of the respective Vessel Defendants.

16.     The Pennantia Fleet, including the Vessel Defendants, appurtenances thereto, and other maritime property associated therewith, are owned by Plaintiffs.

## THE SHIP MANAGEMENT AGREEMENT

17.     To manage the Pennantia Fleet, Pennantia entered into a ship management agreement with RCM, dated August 8, 2021 (the "Ship Management Agreement"). A true and correct copy of the Ship Management Agreement is annexed as Exhibit 1.

18.     Pursuant to the Ship Management Agreement, Pennantia contracted with RCM to provide technical management (which, amongst other things, entailed supervising maintenance, upkeep, documentation and provisioning of the vessels), crew management (which, amongst other things, entailed procuring, training, paying, and caring for the vessels' crews), and commercial management (which, amongst other things, entailed procuring engagements for the vessels, supervising the financial performance of the vessels, and managing the loading and discharging operations of the vessels) for the Pennantia Fleet, including the Vessel Defendants. *See* Ex. 1, Part I, Boxes 6, 7 & 8.

---

[1] Of the 18 vessels in the Pennantia Fleet, currently seven barges and five tugs (including all of the Vessel Defendants) are in commercial service, while three barges and three tugs remain in layup status.

5

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 57 of 140
Case 1:25-cv-01711-OEM-M.    *SEALED*    Document 1    Fil␃    ͎3/27/25    Page 6 of 46
PageID #: 6

19.     Under Part II, Clause 18 ("General Administration") of the Ship Management

Agreement, RCM is required to provide to Pennantia with documents concerning vessels in the

Pennantia Fleet:

> On giving reasonable notice, *[Pennantia] may request, and [RCM] shall in a
> timely manner make available, all documentation, information and records in
> respect of the matters covered by this Agreement* either related to mandatory rules
> or regulations or other obligations applying to [Pennantia] in respect of the Vessel
> (including but not limited to STCW 95, the ISM Code and ISPS Code) to the extent
> permitted by relevant legislation.

Ex. 1, Part II, Clause 18(e) (emphasis added).

20.     Under Annex A, Clauses (j) and (k), of the Ship Management Agreement, RCM is

required to maintain financial records for the Pennantia Fleet and to make them available to

Pennantia upon request:

> (j)     *[RCM] shall keep proper and detailed books and records of [RCM]
> sufficient to demonstrate compliance with the terms of this Agreement*, and in
> compliance [with] bookkeeping and/or accounting standards applicable to [RCM]
> as of the date of this Agreement.
>
> (k)     *[Pennantia] shall have the right to examine and audit the books and
> records of [RCM] at any reasonable time, which shall include Vessel records and
> all records sufficient to substantiate and audit [RCM]'s compliance with its
> obligations under this Agreement* and any Management Agreement, and to make
> copies (including electronic copies of computer records) and obtain print-outs of
> such books and records.

Ex. 1, Annex A, Clauses (j) & (k) (emphasis added).

21.     Under Part II, Clause 19 ("Inspection of Vessel") of the Ship Management

Agreement, Pennantia has the right to inspect any of the vessels in the Pennantia Fleet as Pennantia

may see fit:

> [Pennantia] *may at any time* after giving reasonable notice to [RCM] inspect the
> Vessel *for any reason they consider necessary*.

Ex. 1, Part II, Clause 19 (emphasis added).

6

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 58 of 140
Case 1:25-cv-01711-OEM-M.   .*SEALED*    Document 1    Fil   3/27/25    Page 7 of 46
PageID #: 7

22.    The Ship Management Agreement is not a bareboat charter, time charter, or any form of charter.

23.    RCM's possession and control of the Pennantia Fleet pursuant to the Ship Management Agreement is for the purpose of "carry[ing] out the Management Services in respect of the Vessel as agents for and on behalf of the [Pennantia]." Ex. 1, Part II, Clause 3 ("Authority of Managers").

24.    Regarding commercial management, RCM's authority as owner's agent is to provide commercial management services "in accordance with the Owners' instructions." Ex. 1, Part II, Clause 8 ("Commercial Management").

25.    Nothing in the Ship Management Agreement restricts Pennantia from selling vessels in the Pennantia Fleet, or selling Pennantia itself, both of which are expressly contemplated and permitted in the agreement: In the event that a vessel is sold, the Ship Management Agreement terminates as to such vessel (Ex. 1, Part II, Clause 22(c)) and in the event of a sale of Pennantia, or all or substantially all of the assets of Pennantia, the Ship Management Agreement also terminates (Ex. 1, Part II, Clause 22(e)).

## SHIP MANAGEMENT PERFORMANCE

26.    At the commencement of the Ship Management Agreement, RCM did not have the internal personnel to carry out its ship manager duties internally.  Upon information and belief, RCM initially was comprised of two persons: ███████████████████

27.    To perform its duties under the Ship Management Agreement, RCM intended to sub-contract crewing services and technical management, the latter of which contemplated substantial capital investments to return the vessels to service.

7

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 59 of 140
Case 1:25-cv-01711-OEM-N.    *SEALED*    Document 1    Fil.    3/27/25    Page 8 of 46
                                        PageID #: 8

28.    The Pennantia Fleet improvement/return to service project far exceeded its budget, fell far behind the originally contemplated schedule, and in March 2022, the sub-contracted technical and crewing manager ceased performing its services for RCM.

29.    RCM was responsible for finding a new crewing and technical management sub-contractor. RCM claimed to Pennantia that none of the sub-contractors that it interviewed would be the best solution for their technical and crewing manager needs. RCM instead started its own technical and crewing company called Dove Cay ("DC"), which Pennantia understands is a subsidiary or affiliate of RCM. Despite multiple requests from CCM on behalf Pennantia's majority stockholder Carioca, RCM has never produced the operating agreement between RCM and DC.

30.    RCM and its sub-contracted subsidiary/affiliate DC undertook crewing and technical management of the Pennantia Fleet, including oversight of the return of the Pennantia Fleet vessels to active service.

31.    In approximately March 2024, Pennantia engaged an investment banker to market the sale of Pennantia.

32.    Between July and October 2024 indications of interest were received and evaluated, and it was determined that sale of the entire company was not desirable at that time.

33.    In contrast, however, Pennantia received indications of interest and bids to purchase and/or to long term bareboat charter individual vessels and groups of vessels.

34.    All of the indications and bids from interested third-parties required inspections of and/or surveying of the vessels, and review of vessel documents, which is typical in vessel sale and purchase (or long-term bareboat charter) transactions.

8

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 60 of 140
Case 1:25-cv-01711-OEM-M.    *SEALED*    Document 1    Fil.    3/27/25    Page 9 of 46
PageID #: 9

35.    RCM refused to permit Pennantia access to any vessels in the Pennantia Fleet for

inspections, citing a variety rationales running the gamut from purported safety concerns, fear of

the visitors poaching crew members, and otherwise not responding to numerous requests to inspect

vessels, and RCM failed to materially provide requested vessel documents, citing, among other

rationales concerns about confidentiality.

36.    In about November 2024, another bidder – a large, well-capitalized industry

participant – expressed interest in purchasing the *Tank Barge RCM 250*, the *Tank Barge RCM 252*,

the *Tank Barge RCM 260*, the *Tank Barge RCM 262*, the *Tug JORDAN ROSE*, and the *Tug SUSAN

ROSE*, a group of vessels that comprises the Vessel Defendants.

37.    On or about December 11, 2024, Pennantia sent RCM a request for copies of

specific vessel documents (the "Diligence Request List"), and a request to access the vessels for

inspection (including the Vessel Defendants), for Pennantia's use in connection with the

contemplated sales.

38.    RCM has refused to provide Pennantia access to any vessel for inspection in

response to repeated oral and written requests providing reasonable notice.[2]

39.    As for vessel documents, RCM has materially refused to provide Pennantia access

to the vessel documents identified on the Diligence Request List.

40.    Nearly all of the vessel documents sought on the Diligence Request List are the

***Plaintiffs' property***, either as appurtenances to the vessels, or as maritime property. These include

basic vessel documents, such as the U.S. Coast Guard ("USCG") Certificate of Documentation

---

[2] RCM may claim that Plaintiffs' lack of access representations are disingenuous as RCM hired a surveyor
(DLS) at the end of December 2024 to perform a survey on one of the Vessel Defendants. That survey,
however, was inadequate for purposes of a vessel sale (it was an appraisal-type survey that did not provide
nearly enough detail for a prospective buyer). Pennantia advised RCM that the Vessel Defendants needed
to be surveyed using the prospective purchaser's inspector of choice and with representatives of the
prospective purchaser on board. RCM has refused to permit such an inspection.

9

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 61 of 140
Case 1:25-cv-01711-OEM-M.    *SEALED*    Document 1    Fil    3/27/25    Page 10 of 46
                                        PageID #: 10

("COD"), the vessel Load Line Certificate, the vessels American Bureau of Shipping ("ABS")

Class Certificates,[3] a host of other regulatory and operational certificates, vessel plans, records of

prior surveys, maintenance records, and other similar documents and certificates.

      41.     *All* of the documents and information sought on the Diligence Request List are also

vessel documents and vessel information possessed and/or used by RCM in connection with its

performance of the Ship Management Agreement for which Pennantia has the right to access

without limitation or restriction, excepting only making such requests in a reasonably timely

manner, e.g. "*[Pennantia] may request, and [RCM] shall in a timely manner make available, all*

*documentation, information and records in respect of the matters covered by this Agreement.*"

Ex. 1, Part II, Clause 18(e) (emphasis added); *see also* Ex. 1, Annex A, Clause (k) ("*[Pennantia]*

*shall have the right to examine and audit the books and records of [RCM] at any reasonable*

*time, which shall include Vessel records and all records sufficient to substantiate and audit*

*[RCM]'s compliance with its obligations under this Agreement* and any Management Agreement,

and to make copies (including electronic copies of computer records) and obtain print-outs of such

books and records.") (emphasis added).

      42.     RCM's refusals to provide access to the vessels and materially incomplete access

to vessel documents and information, including with respect to the Vessel Defendants, continued

between October 2024 and to the date of this Complaint, and included another litany of rationales

and excuses, including:

---

[3] A COD is like to a vehicle registration. Although the original CODs were issued to, and in the name of, the registered owners of the vessels (i.e., the vessel owning Plaintiffs), the original CODs are in the constructive possession of RCM, and pursuant to regulatory requirements, are required to be kept onboard the relevant Vessel Defendant. CODs are one of the most basic and commonly required vessel documents in any vessel-related transaction, and are in fact public documents that can be obtained from the Coast Guard for a fee. Nevertheless, RCM refused to provide access to copies of the CODs, during which time Plaintiff paid to obtain certified copies from the Coast Guard. RCM did not provide copies of the CODs until recently on March 19, 2025, when a small number of vessel documents were provided.

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 62 of 140
Case 1:25-cv-01711-OEM-M.    *SEALED*    Document 1    File 3/27/25    Page 11 of 46
PageID #: 11

a. In November 2024, alleging that RCM and/or DC was owed allegedly past due reimbursable payments (and alleged interest thereon) and refusing to provide access until its improper, unilateral self-help payment demands were met;

b. Claiming that staff vacation schedules in December 2024 through early January 2025 precluded RCM from providing access to vessel documents;

c. Demanding non-disclosure agreements from third-parties; and

d. Claiming in February 2025 that access to vessel documents was beyond the scope of the Ship Management Agreement, and that would require hiring, at Pennantia's expense, a separate consultant to vet Plaintiffs' requests to access their own vessels and those vessels' documents.

43.    RCM's improper retention of possession of the vessel and vessel documents, including with respect to the Vessel Defendants, has wrongfully prevented Pennantia from progressing with its contemplated sale of the Vessel Defendants, and continues to do so.

44.    Approximately five weeks ago, RCM revealed its ulterior motive for wrongfully retaining of possession of the vessel and vessel documents. RCM had been separately negotiating to purchase the Pennantia Fleet.

45.    On February 19, 2025, RCM delivered to Pennantia a short indication of interest setting forth RCM's interest in purchasing the Pennantia Fleet, which was contingent on, among other things, support of other financing parties (without any firm commitment for sources of capital), customary diligence, and demanding exclusivity for its proposed transaction.

46.    RCM has no authority – under the Ship Management Agreement or otherwise – to sell Pennantia or any assets of Pennantia.

Case 3:25-cv-00137   Document 24-1   Filed 12/18/25 in TXSD   Page 63 of 140
Case 1:25-cv-01711-OEM-M.   *SEALED*   Document 1   File   3/27/25   Page 12 of 46
PageID #: 12

47.     RCM's past and continued refusal to provide access to the vessels and vessel documents (including the Vessel Defendants) hindered (and continues to hinder) Pennantia from advancing its negotiations to sell vessels, and the Vessel Defendants.

48.     Based on information and belief, RCM's past and continued refusal to provide access to the vessels and vessel documents (including the Vessel Defendants) was intended (and is intended) to facilitate RCM's negotiation of its own, unauthorized, proposed purchase of Pennantia and/or assets of Pennantia.

49.     From October 2024 through March 12, 2025, Pennantia, RCM, and others engaged in no less than twelve weekly calls to discuss the lack of progress on access to the vessels and documents. In every call, RCM was asked about delivery of the vessel information on the Diligence Request List, and updates on the scheduling of inspections and surveys, without material compliance by RCM.

50.     From October 2024 through March 16, 2025, no less than ten emails were sent directing RCM to share the diligence information that belonged to Pennantia without compliance by RCM.

51.     On March 19, 2025, the consultant allegedly hired by RCM, allegedly at Pennantia's expense, to vet Plaintiffs' requests to access their own vessels and those vessels' documents, provided a small set of vessel documents to Pennantia, consisting of CODs, Class certificates, Load Line certificates and Tonnage certificates for the Pennantia Fleet, but no other requested vessel documents.

52.     From October 2024 through March 16, 2025, no less than ten emails were sent to RCM directing RCM to provide access to vessels in the Pennantia Fleet for inspections and surveys. RCM refused to comply with all of those directions from Pennantia.

12

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 64 of 140
Case 1:25-cv-01711-OEM-M.    *SEALED*    Document 1    File   .3/27/25    Page 13 of 46
PageID #: 13

53.     On March 18, 2025, in response to Pennantia's most recent request to arrange vessel inspections, RCM represented that it would not provide access to the Defendant Vessels for inspection unless any personnel onboard for inspections sign confidentiality and non-solicitation agreements _**with RCM**_ (which are not permissible conditions for Plaintiffs to access their own vessels, either pursuant to law or contract).  RCM also refused access to the Defendant Vessels unless (a) all RCM and or DC crew and personnel vacated the vessel (which would render an inspection ineffective without knowledge operational crew onboard), and (b) RCM/DC removed any allegedly "proprietary" vessel documents (which is inconsistent with inspection of the vessel and rights of inspection of documents used in connection with management of the Defendant Vessels).

54.     Under Part II, Clause 8(e) of the Ship Management Agreement – the Management Obligations Clause – RCM was obligated to "undertake to use their best endeavors to provide the Management Services as agents for and on behalf of [Pennantia] in accordance with sound ship management practice and to protect and promote the interests of [Pennantia] in all matters relating to the provision of services hereunder."  As set forth above, RCM has failed to follow the lawful directions and instructions of Pennantia and failed to protect and promote Pennantia's interests.

55.     Under Part II, Clause 18 of the Ship Management Agreement – the General Administration Clause – RCM "shall in a timely manner make available, all documentation, information and records in respect of the matters covered by this Agreement either related to mandatory rules or regulations or other obligations applying to [Pennantia] in respect of the Vessel . . . ."  As set forth above, RCM has refused to provide documentation, information and records to Pennantia in response to numerous reasonable requests for access, including with respect to the

Case 3:25-cv-00137   Document 24-1   Filed 12/18/25 in TXSD   Page 65 of 140
Case 1:25-cv-01711-OEM-M.   *SEALED*   Document 1   Fil.   3/27/25   Page 14 of 46
PageID #: 14

Vessel Defendants, thereby wrongfully retaining possession of the vessel documents and information.

56.    Under Part II, Clause 19 of the Ship Management Agreement – the Inspection of Vessel Clause – Pennantia "may at any time after giving reasonable notice to [RCM] inspect the Vessel for any reason they consider necessary." As set forth above, RCM has multiple times denied Pennantia access to vessels in the Pennantia Fleet, including Vessel Defendants, and thereby wrongfully retaining possession of the vessels.

57.    Under Part II, Clause 8 of the Ship Management Agreement – the Commercial Management Clauses – RCM's authority as owner's agent is to provide commercial management services "in accordance with the Owners' instructions." As set forth above, RCM has multiple times refused to follow Pennantia's instruction pertaining to commercial management, including refusing to provide information or copies of all current charters, and refusing instructions to obtain consent from Pennantia before undertaking any new charters.

58.    The foregoing actions and inactions of RCM, specifically including wrongfully retaining possession of the Vessel Defendants to prevent Pennantia from exercising its rights as owner to inspect the vessels, and wrongfully retaining possession of the vessel documents and information has, and continues to, materially disrupt Pennantia's business plans for the Pennantia Fleet and the Vessel Defendants.

14

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 66 of 140
Case 1:25-cv-01711-OEM-M    .*SEALED*    Document 1    File   3/27/25    Page 15 of 46
PageID #: 15

## COUNT I

### TORT – CONVERSION

59.     Pennantia repeats and realleges Paragraphs 1 thorough 58 as if set forth fully herein.

60.     Vessel owning Plaintiffs are the registered, titled owners of the Vessel Defendants.

61.     Plaintiffs provided to RCM possession of the vessels in the Pennantia Fleet as their agent to perform ship management services for the Pennantia Fleet, including the Vessel Defendants.

62.     Pennantia has instructed that RCM allow Pennantia access the Vessel Defendants for inspections.

63.     Pennantia likewise has demanded that RCM provide Pennantia access to, or copies of, vessel documents, records and information of and pertaining to the Vessel Defendants.

64.     RCM has wrongfully retained possession of the Vessel Defendants by refusing to provide access to the Vessel Defendants for inspections and refusing to provide vessel documents and information without any legal justification for doing so.

65.     By wrongfully retaining possession and refusing access to the Vessel Defendants and documents and information of the Vessel Defendants, RCM has committed the tort of conversion, for which tort it should be found liable.

66.     Pennantia requests that this Court direct that RCM provide access to the Vessel Defendants for Pennantia to arrange for inspections of the vessels, and for RCM to provide access to or copies of the requested vessel documents, records and information.[4]

_____

[4] For the sake of good order, Plaintiffs wish to make clear that the relief that they seek merely is to obtain access to the Vessel Defendants so that they might be inspected by prospective purchasers, gain access to the records, documents, and information related to each of the Vessel Defendants for use during prospective buyer inquiries, and then to return the Vessel Defendants to their usual service. In light of RCM's behavior, Plaintiffs anticipate that such access likely will require an initial visit by the U.S. Marshal to arrest the Vessel Defendants in company with the representative of the substitute custodian, followed by the

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 67 of 140
Case 1:25-cv-01711-OEM-M_    *SEALED*    Document 1    Fil__ _3/27/25    Page 16 of 46
PageID #: 16

## COUNT II

### BREACH OF CONTRACT

67.    Pennantia repeats and realleges Paragraphs 1 thorough 58 as if set forth fully herein.

68.    In the alternative, should this Court not award Pennantia access to the Vessel Defendants under Count I, this Court should order RCM to:

    a.    Provide specific performance of RCM's obligations under Part II, Clause 18 of the Ship Management Agreement – the General Administration Clause – which provides that RCM "shall in a timely manner make available, all documentation, information and records in respect of the matters covered by this Agreement either related to mandatory rules or regulations or other obligations applying to [Pennantia] in respect of the Vessel . . . .";

    b.    Provide Plaintiffs with access – pursuant to Annex A, Clause (k) of the Ship Management Agreement – to "the books and records of [RCM] at any reasonable time, which shall include Vessel records and all records sufficient to substantiate and audit [RCM]'s compliance with its obligations under [the] [Ship Management] Agreement and any Management Agreement," and to allow Plaintiffs "to make copies (including electronic copies of computer records) and obtain print-outs of such books and records"; and

    c.    Provide Pennantia immediate access to the Defendant Vessels as set forth under Part II, Clause 19 of the Ship Management Agreement – the Inspection of Vessel

---

prospective buyer inspections while the Vessel Defendants are in the custody of the substitute custodian. Once each of the Vessel Defendants has underwent the intended inspection process, Plaintiffs will approach the Court to lift the arrest on that particular Vessel Defendant to return it to its usual service.

16

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 68 of 140
Case 1:25-cv-01711-OEM-M    *SEALED*    Document 1    Fil    3/27/25    Page 17 of 46
PageID #: 17

Clause – which provides that Pennantia "may at any time after giving reasonable

notice to [RCM] inspect the Vessel for any reason they consider necessary."

## COUNT III

## REQUEST FOR COURT TO AWARD PLAINTIFFS POSSESSION OF
## THE VESSEL DEFENDANTS UNDER SUPPLEMENTAL RULE D

69.    Pennantia repeats and realleges Paragraphs 1 thorough 58 as if set forth fully herein.

70.    Pennantia is the registered owner of all vessels in the Pennantia Fleet.

71.    Vessel owning Plaintiffs are the registered, titled owners of the Vessel Defendants,

and as such Plaintiffs had prior possession or constructive possession of the Vessel Defendants.

72.    Plaintiffs are entitled to demand possession of the Vessel Defendants for the

purpose of inspecting the Vessel Defendants and to demand possession of the vessel documents,

records and information appurtenant thereto, or otherwise constituting maritime property.

73.    RCM does not have any legal right to retain possession of the Vessel Defendants

and related documents and maritime property against the rightful demand of Plaintiffs for

possession and access to the Vessel Defendants and related documents, records and information.

74.    Plaintiffs therefore make this claim under Rule D of the Supplemental Rules for

Admiralty or Maritime Claims and Asset Forfeiture Actions for a final judgment granting the

requested possession of the Vessel Defendants and related documents, records and information.

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 69 of 140
Case 1:25-cv-01711-OEM-M.  . *SEALED*   Document 1    Fil  3/27/25    Page 18 of 46
PageID #: 18

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray:

1.    That process and due form of law according to the practices of this Court in admiralty and maritime jurisdiction be issued against the Vessel Defendants, *Tank Barge RCM 252* (Official #1292046), *Tug SUSAN ROSE* (Official #1282121), *Tank Barge RCM 250* (Official #1235496), *Tug JORDAN ROSE* (Official #1234828), *Tank Barge RCM 260* (Official #1210060), and *Tank Barge RCM 262* (Official #1216336), their engines, tackle, appurtenances, and related maritime property, etc., *in rem*;

2.    That this Court order Plaintiffs unfettered access to the Vessel Defendants and to all documents, records and information appurtenant to, or constituting maritime property, related to the Vessel Defendants;

3.    That after due proceedings, judgment be entered in favor of Plaintiffs and due awarding of costs, attorneys' fees, *custodia legis* expenses, and disbursements for this case; and

4.    That this Court grant Plaintiffs such other and further relief as may be just and proper.


Dated: New York, New York
          March 26, 2025

                              HOLLAND & KNIGHT LLP

                              *Chiara D Kalogjera-Sackellares*

                              Chiara Kalogjera-Sackellares
                              Michael J. Frevola
                              787 Seventh Avenue
                              New York, New York 10019
                              michael.frevola@hklaw.com
                              chiara.sackellares@hklaw.com
                              Telephone: 212.513.3200
                              Fax: 212.385.9010

                              *Attorneys for Plaintiffs*

18

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 70 of 140
Case 1:25-cv-01711-OEM-M.    .*SEALED*    Document 1    Fil.  ,3/27/25    Page 19 of 46
PageID #: 19

## VERIFICATION

I, Joshua Trump, declare as follows:

1.      I am an Authorized Representative of Pennantia LLC.

2.      I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, except as to these matters stated to be alleged upon information and belief, and as to those matters I believe them to be true.

3.      The source of my information is my personal knowledge and my review of Pennantia, LLC's records or documents on file.

I declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief.

Executed at Greenwich, Connecticut on March 26, 2025.

Joshua Trump, Managing Director,
Contrarian Capital Management, L.L.C.,
Non-Member Manager of Carioca Partners, LLC,
Class A Managing Member of Pennantia, LLC

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 71 of 140
Case 1:25-cv-01711-OEM-M    *SEALED*    Document 1    Fil    3/27/25    Page 20 of 46
PageID #: 20

Aldine ™ Enviro-Tab ™ 

# EXHIBIT 1

Case 3:25-cv-00137   Document 24-1   Filed 12/18/25 in TXSD   Page 73 of 140
Case 1:25-cv-01711-OEM-M.   .*SEALED*   Document 1   Fil.   J3/27/25   Page 22 of 46
PageID #: 22

# SHIPMAN 2009

Based on the BIMCO STANDARD SHIP
MANAGEMENT AGREEMENT

PART I

| | |
|---|---|
| 1. Place and date of Agreement<br><br>New York, New York, August 8, 2021 | 2. Date of commencement of Agreement (Cls. 2, 12, 21 and 25)<br>The first date on which the Owners obtain court approval and title to one or more vessels from the Bouchard Transportation Co. auction sale in Case No. 20-34682. See also Cl. 2 for conditions precedent to commencement and certain pre-commencement authorizations. |
| 3. Owners (name, place of registered office and law of registry) (Cl. 1)<br><br>(i) Name: Pennantia, LLC<br><br>(ii) Place of registered office: Greenwich, CT<br><br>(iii) Law of registry: Delaware, United States | 4. Managers (name, place of registered office and law of registry) (Cl. 1)<br><br>(i) Name: Rose Cay Maritime, LLC<br><br>(ii) Place of registered office: Houston, TX<br><br>(iii) Law of registry: Delaware, United States |
| 5. The Company (with reference to the ISM/ISPS Codes) (state name and IMO Unique Company Identification number. If the Company is a third party then also state registered office and principal place of business) (Cls 1 and 9(c)(i))<br><br>(i) Name: Foss Maritime Company, LLC<br><br>(ii) IMO Unique Company Identification number: [TO BE PROVIDED]<br><br>(iii) Place of registered office:<br>450 Alaskan Way S., Suite 706<br>Seattle, WA 98104<br><br>(iv) Principal place of business: Seattle, WA | 6. Technical Management (state "yes" or "no" as agreed) (Cl. 4)<br>YES |
| | 7. Crew Management (state "yes" or "no" as agreed) (Cl. 5(a))<br>YES |
| | 8. Commercial Management (state "yes" or "no" as agreed) (Cl. 6)<br>YES |
| 9. Chartering Services period (only to be filled in if "yes" stated in Box 8) (Cl.6(a))<br><br>One (1) Year | 10. Crew Insurance arrangements (state "yes" or "no" as agreed)<br><br>(i)    Crew Insurances* (Cl. 5(b)): YES<br><br>(ii)    Insurance for persons proceeding to sea onboard (Cl. 5(b)(i)):YES<br><br>*only to apply if Crew Management (Cl. 5(a)) agreed (see Box 7) |

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 74 of 140
Case 1:25-cv-01711-OEM-M.    *SEALED*    Document 1    Fil.  3/27/25    Page 23 of 46
PageID #: 23

| 11. Insurance arrangements (state "yes" or "no" as agreed) (Cl. 7)<br>YES | 12. Optional insurances (state optional insurance(s) as agreed, such as piracy, kidnap and ransom, loss of hire and FD & D) (Cl. 10(a)(iv))<br>None |
|---|---|
| 13. Interest (state rate of interest to apply after due date to outstanding sums) (Cl. 9(a))<br><br>███ per month | 14. Management fee (Cl. 12(a))<br><br>See Annex E |
| 15. Manager's nominated account (Cl.12(a))<br><br>**Account Details:**<br>Rose Cay Maritime LLC<br>Account Number: 80009924772<br><br>**Wire Instructions:**<br>Bank Name ███████████<br>Bank Routing/ABA: ███████<br>Bank Swift: (for international wires) ███████ | 16. Daily rate (state rate for days in excess of those agreed in budget) (Cl. 12(c))<br>N/A |
|  | 17. Lay-up period / number of months (Cl.12(d))<br>N/A |
| 18. Minimum contract period (state number of months) (Cl. 21(a))<br><br>See Clause 21 and 22 | 19. Management fee on termination (state number of months to apply)<br><br>See Clause 22(b)(iv) |
| 20. Severance Costs (state maximum amount) (Cl. 22(h)(ii))<br><br>At cost (per agreed terms of subcontracting crewing agreement) | 21. Dispute Resolution<br><br>See Clause 23 |
| 22. Notices (state full style contact details for serving notice and communication to the Owners) (Cl. 24)<br><br>Pennantia LLC<br><br>411 West Putnam Avenue<br>Greenwich, CT 06830 Suite 425<br><br>Attention: Josh Trump<br>Email: jtrump@contrariancapital.com<br>Attention: Counsel<br>Email: jweisser@contrariancapital.com | 23. Notices (state full style contact details for serving notice and communication to the Managers) (Cl. 24)<br><br>Rose Cay Maritime, LLC<br><br>800 Capitol Street<br>Suite 2400<br>Houston, TX 77002-2925<br><br>Attention: ███████<br>Email: ███████████<br>Attention: ███████<br>Email: ███████████<br>Attention: ███████<br>Email: ███████████ |

It is mutually agreed between the party stated in Box 3 and the party stated in Box 4 that this Agreement consisting of PART I and PART II as well as Annexes " A" (Details of Vessel or Vessels), " B" (Details of Crew), " C" (Budget), " D" (Associated Vessels) and " E" (Fee Schedule) attached hereto, shall be performed subject to the conditions contained herein. In the event of a conflict of conditions, the provisions of PART I and Annexes " A" , "B", "C", "D" and "E" shall prevail over those of PART II to the extent of such conflict but no further.

| Signature(s) (Owners) | Signature(s) (Managers) |
|---|---|

2

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 75 of 140
Case 1:25-cv-01711-OEM-M.    .*SEALED*    Document 1    Fil. .3/27/25    Page 24 of 46
PageID #: 24

ANNEX "A" (DETAILS OF VESSEL OR VESSELS)
TO THE BIMCO STANDARD SHIP MANAGEMENT AGREEMENT
CODE NAME:  SHIPMAN 2009

Date of Agreement:  August 8, 2021

Name of Vessel(s):

One or more of the following purchased from the Bouchard Transportation Co. auction sale in Case No. 20-34682, subject to court approved transfer of title to Owners.

TUG BOUCHARD GIRLS/ B. 295
TUG BRENDAN J. BOUCHARD/ B. 210
TUG DANIELLE M. BOUCHARD/ B. 245
TUG EVENING BREEZE/ B. 252
TUG EVENING STAR/ B. 250
TUG JANE A. BOUCHARD/ B. 225
TUG KIM M. BOUCHARD/ B. 270
TUG MORTON S. BOUCHARD IV/ B. 242
B. NO. 260 (n/t)
B. NO. 262 (n/t)

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 76 of 140
Case 1:25-cv-01711-OEM-M.  . *SEALED*    Document 1    Fik  /3/27/25    Page 25 of 46
PageID #: 25

**ANNEX "B" (DETAILS OF CREW)**
**TO THE BIMCO STANDARD SHIP MANAGEMENT AGREEMENT**
**CODE NAME:  SHIPMAN 2009**

Date of Agreement:  August 8, 2021

Details of Crew:

Crew complement will be in compliance with applicable law and regulation and will be either (i) crew complement required by COI or (ii) mutual agreement on crew complement required or appropriate for (1) commercial vessel operations, for vessels in commercial operations, or (2) dock-side stand-by service, lay up, or preparation for commercial operations, as the case may be, and as permitted by COI or United States Coast Guard.  Managers will provide crewing information as requested by Owners on a regular basis.

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 77 of 140
Case 1:25-cv-01711-OEM-M.    *SEALED*    Document 1    Fil  J3/27/25    Page 26 of 46
PageID #: 26

ANNEX "C" (BUDGET)
TO THE BIMCO STANDARD SHIP MANAGEMENT AGREEMENT
CODE NAME: SHIPMAN 2009

Date of Agreement: August 8, 2021

      (a)     Owner shall reimburse Manager, on a direct pass-through basis, and without markup, for the actual direct expenses incurred by Manager for performance of the Crewing and Technical Management Services provided for the Vessels pursuant to Clauses 4, 5, and 7 of this Agreement, which, without limiting the generality of the preceding phrase and so long as incurred pursuant to Clauses 4, 5 or 7 or the advance written consent of Owner, shall include: (i) inspection and maintenance of the Vessels, (ii) parts, supplies, and repairs for Vessels (iii) Vessel dry docking, (iii) fuel, lubes, and grease, (iv) insurance premiums and broker fees; (v) crewing costs; (vi) dockage fees and port charges; (vii) lay up costs; (viii) security costs; (ix) costs of professional services approved in advance by Owner (accounting, tax, legal), and (x) reimbursable pass through costs of the foregoing services performed and charged by a subcontractor approved in advance by Owner ("_Management Reimbursement_").

      (b)     Management Reimbursement shall not include those costs intended to be compensated by the Variable Commission Fees nor the costs of administrative overhead (including office space, utilities, office equipment, office supplies, and office and shore-side employees).

      (c)     As soon as practicable following execution of this Agreement Manager shall prepare and provide to Owner an initial start-up budget projected to be approximately ███████ which has previously been advanced) for the first six (6) months of this Agreement (the "_On-boarding Period_"), for agreed upon itemized on-boarding and one-time items ("_On-boarding Items_"). Upon Manager's request, Owner will pay Manager during the On-boarding Period for additional requested On-boarding Items over the initial projected budget acceptable to and approved by Owner in its sole discretion. Such requests shall be supported by appropriate explanation, itemization, and supporting documentation.

      (d)     As soon as practicable following execution of this Agreement and thereafter on or before October 1 of each year for the upcoming calendar year (January 1–December 31), Manager shall prepare and deliver to Owner a budget of anticipated Management Reimbursement (an "_Annual Budget_"). Each Annual Budget shall be subject to review and approval by Owner. In the event an Annual Budget is not approved prior to the commencement of the applicable calendar year, the Annual Budget in effect for the prior year shall continue to apply for a period of up to six (6) months so long as the parties continue to negotiate in good faith.

      (e)     After the date of execution of this Agreement, and prior to the Commencement Date, Owner shall make an initial deposit into the Vessel Operating Account of an amount approximating sixty (60) days of estimated Management Reimbursement (the "_Initial Deposit_"). The Initial Deposit shall be two (2) times the sum of one twelfth of the initial Annual Budget, or such other sum mutually agreed by the parties. Subsequent to the Initial Deposit period, it is the intent of the parties that the funds in the Vessel Operating Account at the time each Estimated Reimbursement Payment is made as described below should approximate sixty (60) days of estimated Management Reimbursement based the average of the most recent Actual Reimbursable Expenses and current Estimated Reimbursement, or such other formula from time to time mutually agreeable to the parties. No fewer than five (5) Business Days prior to the first day of each calendar month of this Agreement, Manager shall prepare and furnish to Owner a funding request (each, a "_Monthly Funding Request_") of estimated Management Reimbursement for the upcoming month (the "_Estimated Reimbursement_"). On or before the first day of each calendar month following each Monthly Funding Request, Owner shall deposit the Estimated Reimbursement requested in each Monthly Funding Request into the Vessel Operating Account for disbursement by Manager in accordance with the Monthly Funding Request and in compliance with this Section (each payment an "_Estimated Reimbursement Payment_").]

      Vessel Operating Account
      [Dedicated Account Information to be provided
      by Managers to Owners prior to
      Commencement Date]
      [           ]
      [           ]

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 78 of 140
Case 1:25-cv-01711-OEM-N    *SEALED*    Document 1    Fi.    03/27/25    Page 27 of 46
PageID #: 27



(f)    Manager shall have no authority to, nor shall it spend or commit to spend, an amount in excess of the Monthly Funding Request without the express written authority of Owner unless in the event of an emergency. Any extraordinary expenses not anticipated by the Monthly Funding Request shall, if approved by Owner in advance, shall be reimbursed to Manager promptly upon receipt of invoice, and, if desired by Owner, such amounts may be funded by Owner directly to the payee with respect thereto.

(g)    As promptly as possible (but not more than five (5) Business Days) after the end of each calendar month Manager shall render to Owner a written statement for the preceding month showing actual expenses for the preceding month together with all supporting invoices or documents, with a true up of the actual expenses versus the Estimated Reimbursement ("*Actual Reimbursable Expenses*" and each such statement, a "*Reimbursement Statement*"). The next Monthly Funding Request shall also include a reconciliation of each prior month's activity.

(h)    Each Monthly Funding Request shall include a certification signed by a Responsible Officer of the Manager that any invoices submitted for reimbursement have been paid when due; a statement listing the Manager's accounts payable for items that are at that time overdue in excess of thirty (30) days (and if applicable, each item outstanding more than sixty (60) days, and so forth for each 30 day period thereafter, specifically identified as such); and the certification that Manager is in material compliance this Agreement. If any item of disbursement is questioned by Owner, Owner shall reimburse or credit Manager for the portion not in dispute, and the parties shall diligently set about to resolve the questioned item(s) in good faith for a period of up to three months.

(i)    Within 30 days of the end of each fiscal quarter of Manager during this Agreement, Manager shall prepare and deliver to Owner a certification signed by a Responsible Officer of the Manager that:

(i)    in the course of the performance by such Responsible Officer of his or her duties as an officer of Manager, such Responsible Officer would normally obtain knowledge of any default by Manager of its obligations under this Agreement or any agreement between Manager and another party pertaining to the Vessels ("*Management Agreements*");

(ii)    the Manager is in compliance in all material respects with its obligations under all Management Agreements to which it is a party;

(iii)    such Responsible Officer of the Manager has no knowledge of any event of default under any Management Agreement to which it is a party, or of the occurrence of any default under any Management Agreement to which it is a party that, with the passage of time and the failure to cure, would be reasonably likely to breach or become an event of default hereunder or under any Management Agreement to which it is a party; and

(iv)    there are no outstanding Liens on the Vessels other than Permitted Liens, so long as paid within the period provided for Permitted Liens; and

(j)    Manager shall keep proper and detailed books and records of Manager sufficient to demonstrate compliance with the terms of this Agreement, and in compliance bookkeeping and/or accounting standards applicable to Manager as of the date of this Agreement.

(k)    Owner shall have the right to examine and audit the books and records of Manager at any reasonable time, which shall include Vessel records and all records sufficient to substantiate and audit the Manager's compliance with its obligations under this Agreement and any Management Agreement, and to make copies (including electronic copies of computer records) and obtain print-outs of such books and records.

(l)    The Manager shall give Owner reasonably prompt notice and copies of all tax notices, reports or inquiries, claims of liens, and of any damage, loss, seizure, attachment or judicial process which may affect the use, maintenance, operation, possession or ownership of the Vessels; provided, however, that no such notice need be given for any damage or loss which is not required to be reported to the U.S. Coast Guard or other federal or state authority, does not materially affect the use, maintenance or operation of a Vessel and which is repaired or remediated in the ordinary course of business of the Manager.

6

Case 3:25-cv-00137  Document 24-1  Filed 12/18/25 in TXSD  Page 79 of 140
Case 1:25-cv-01711-OEM-K  *SEALED*  Document 1  Fi.  03/27/25  Page 28 of 46
PageID #: 28

ANNEX "D" (ASSOCIATED VESSELS)
TO THE BIMCO STANDARD SHIP MANAGEMENT AGREEMENT
CODE NAME:  SHIPMAN 2009

NOTE: PARTIES SHOULD BE AWARE THAT BY COMPLETING THIS ANNEX "D" THEY WILL BE SUBJECT TO
THE PROVISIONS OF SUB-CLAUSE 22(b)(i) OF THIS AGREEMENT.

Date of Agreement:  August 8, 2021

Details of Associated Vessels:


N/A

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 80 of 140
Case 1:25-cv-01711-OEM-... .H *SEALED*    Document 1    F.. 03/27/25    Page 29 of 46
PageID #: 29

ANNEX " E" (FEE SCHEDULE)
TO THE BIMCO STANDARD SHIP MANAGEMENT AGREEMENT
CODE NAME:  SHIPMAN 2009

Owners shall pay Managers (or its designee if permitted pursuant to  in paragraph (4)(e)) for the Management
Services provided under this Agreement in accordance with Clause 12, comprised of the following four (4)
components (Annex E component parts):

(1) Fixed Management Fee

███████ per month, per ATB tug/barge set, but no less than the greater of the number of tugs or barges in the
managed fleet.  (As an example, provided for illustration purposes only, Annex A shows that there are ten barges and
eight tugs. Managers monthly fee would be ██████████████████████████ and an annual total fee of
█████████  Such monthly payments shall be made in advance, with an annual inflation adjustment factor of CPI-W,
U.S. City Average, All Items, standard reference base, not seasonally adjusted, but not greater than ███ calculated
annually to apply on the first monthly payment following the anniversary date of this Agreement.  The minimum
annual aggregate Fixed Management Fee shall be ██████████ provided, however, that in the event that Pennantia
owns four (4) or fewer pairs of vessels, after three (3) months the minimum annual aggregate Fixed Management Fee
shall not apply, and the parties shall use good faith efforts to reduce the aggregate Fixed Management Fee.

(2) Variable Commission Fees

In addition to the Fixed Management Fee, Owner's shall pay Managers for certain vessel chartering and vessel sales
services:

            a) Chartering Fees:       ████████████████████████████████████

            b) Vessel Sale Fees:      ████████████████████████████████████

            Chartering Fees and Vessel Sale Fees apply only to arms-length transactions with non-affiliates of either
party.

(3) Profit Sharing Incentives

            Managers shall be entitled to receive profit sharing incentive payments, calculated annually in arrears, in
accordance with the following Investment Rate of Return (IRR) thresholds:

   •    ████████████████████████████████
   •    ████████████████████████████████
   •    ████████████████████████████████

(4) Equity Incentive Awards

            Managers shall be entitled to receive equity incentive awards, in accordance with the following thresholds:

            a) Initial Equity Award Incentive Fee:   ████████████████████████████████████████

            b) Management Equity Awards:   ████████████████████████████████████████

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 81 of 140
Case 1:25-cv-01711-OEM-╷.    .-I *SEALED*    Document 1    F.    03/27/25    Page 30 of 46
PageID #: 30



Each hurdle, along with its corresponding equity award, shall be "one-time" in nature such that the equity award will be granted following the first year the hurdle is clear.  By way of examples:



Pennantia will use reasonable commercial efforts to discuss optimizing the tax and depreciation considerations of Managers.

c) So long as no Manager's event of default has occurred and is continuing,

d) Owners shall provide Managers with no less than the same disclosures and reports as provided to Contrarian investors related to the Pennantia investment.

e) Managers shall have the right to designate an entity other than Rose Cay Maritime, LLC to receive and hold any [Profit Sharing Incentives or Pennantia Class B equity, so long as such entity holding or receiving any Profit Sharing Incentives or such Class B equity is and remains for the duration of this Agreement an affiliate of Rose Cay Maritime, LLC under common control of the holders of the equity interests of Rose Cay Maritime, LLC as of the Commencement Date.  Subject to the requirements of the preceding sentence, upon the award and issuance of Profit Sharing Incentives or Class B equity pursuant to this Agreement, such equity shall be fully vested in the designated holder without regard to any future termination of this Agreement.  Notwithstanding Managers' designation of a holder of Profit Sharing Incentives or Class B equity, Managers agree that Pennantia shall not be required to provide any reporting information concerning the Pennantia investment to any person or entity other than Rose Cay Maritime, LLC.  Managers may provide information provided by Pennantia to such designated holder provided that Managers and such designated holder are parties to a confidentiality and non-disclosure agreement concerning such information on terms materially similar to the confidentiality and non-disclosure obligations of Managers under this Agreement.

9

Case 3:25-cv-00137   Document 24-1   Filed 12/18/25 in TXSD   Page 82 of 140
Case 1:25-cv-01711-OEM-...   ...H *SEALED*   Document 1   Filed 03/27/25   Page 31 of 46
PageID #: 31

PART II
SHIPMAN 2009
Standard ship management agreement

### Section 1 – Basis of the Agreement

1.  **Definitions**
    In this Agreement save where the context otherwise requires, the following words and expressions shall have the meanings hereby assigned to them:

    "Company" (with reference to the ISM Code and the ISPS Code) means the organization identified in Box 5 or any replacement organization appointed by the Owners from time to time (see Sub-clauses 9(b)(i) or 9(c) (ii), whichever is applicable).

    "Crew" means the personnel of the numbers, rank and nationality specified in Annex "B" hereto.

    "Crew Insurances" means insurance of liabilities in respect of crew risks which shall include but not be limited to death, permanent disability, sickness, injury, repatriation, shipwreck unemployment indemnity and loss of personal effects (see Sub-clause 5(b) (Crew Insurances) and Clause 7 (Insurance Arrangements) and Clause 10 (Insurance Policies) and Boxes 10 and 11).

    "Crew Support Costs" means all expenses of a general nature which are not particularly referable to any individual vessel for the time being managed by the Managers and which are incurred by the Managers for the purpose of providing an efficient and economic management service and, without prejudice to the generality of the foregoing, shall include the cost of crew standby pay, training schemes for officers and ratings, cadet training schemes, sick pay, study pay, recruitment and interviews.

    "Flag State" means the State whose flag the Vessel is flying.

    "ISM Code" means the International Management Code for the Safe Operation of Ships and for Pollution Prevention and any amendment thereto or substitution therefor.

    "ISPS Code" means the International Code for the Security of Ships and Port Facilities and the relevant amendments to Chapter XI of SOLAS and any amendment thereto or substitution therefor.

    "Managers" means the party identified in Box 4.

    "Management Services" means the services specified in SECTION 2 - Services (Clauses 4 through 7) as indicated affirmatively in Boxes 6 through 8, 10 and 11, and all other functions performed by the Managers under the terms of this Agreement.

    "Owners" means the party identified in Box 3.

    "Severance Costs" means the costs which are legally required to be paid to the Crew as a result of the early termination of any contracts for service on the Vessel.

    "SMS" means the Safety Management System (as defined by the ISM Code).

    "STCW 95" means the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978, as amended in 1995 and any amendment thereto or substitution therefor.

    "Vessel" means the vessel or vessels, details of which are set out in Annex "A" attached hereto, and shall be, for purposes of Clause 17(b)(i), 1) each combination of tug and barge (which pairing may be changed at Managers' discretion); and 2) the individual barges not paired with a tug.

2.  **Commencement and Appointment**
    (a) With effect from the date stated in Box 2 for the commencement of the Management Services and continuing unless and until terminated as provided herein, the Owners hereby appoint the Managers and the Managers hereby agree to act as the Managers of the Vessels in respect of the Management Services. It is the intent of the Owners and Managers that this Agreement and the services hereunder will commence on at the date and time upon which the Owners obtain court approval and transfer of title to one or more vessels from the Bouchard Transportation Co. auction sale in Case No. 20-34682 (or such earlier time that the

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 83 of 140
Case 1:25-cv-01711-OEM-┐.    ┐ *SEALED*    Document 1    Fil    03/27/25    Page 32 of 46
PageID #: 32

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

Owners are required to take delivery or become responsible for care or risk of loss of such vessels and Owners request commencement in writing) (the "*Commencement Date*"), to the extent possible pursuant to the scope of services under this Agreement, taking possession, custody and care directly from the prior title holder and/or custodial manager. without any gap in time or possession.

(b) It is an express condition precedent to the commencement of this agreement that Owners take title to at least one (1) vessel from the Bouchard Transportation Co. auction sale in Case No. 20-34682 on or before September 1, 2021, and in the event that does not occur, this agreement shall be null and void and have no further effect.

(c) In the event that Owners have one or more winning and accepted bids in Case No. 20-34682, upon the written request of Owners, Managers are authorized as agents of Owners to take such advance actions as requested by Owners as may be reasonably required for arranging and procuring Management Services for the Vessel(s) required to be effective as of the Commencement Date, including, but not limited to, arrangements to price and place insurances to become effective as of the Commencement Date, and make provisional arrangements for Crew to take possession of the Vessel on the Commencement Date ("*Pre-commencement Authorizations*").

3.    **Authority of the Managers**

Subject to the terms and conditions herein provided, during the period of this Agreement the Managers shall carry out the Management Services in respect of the Vessel as agents for and on behalf of the Owners. The Managers shall have authority to take such actions as they may from time to time in their absolute discretion consider to be necessary to enable them to perform the Management Services in accordance with sound ship management practice, including but not limited to compliance with all relevant rules and regulations.

During the term of this Agreement, the Managers shall have and maintain full control of the Vessels and shall be responsible to ensure the safety and maintenance of the Vessels, its crew, and operations of the Vessels conducted pursuant to this Agreement.

To the extent international or other referenced standards, such as ISM Code, ISPS Code, SMS Code, STCW 95, and the Maritime Labor Convention (Cl. 28), etc. referenced in this Agreement, are not applicable to the Vessels or the operation and trading area of the Vessel, such standards shall not apply; provided, however, that the Vessels shall comply with its Certificate of Documentation, Certificate of Inspection, and laws and regulations applicable to U.S. coastwise vessels in the area of operation of the Vessels.

**Section 2 – Services**

4.    **Technical Management**
(only applicable if agreed according to Box 6).
The Managers shall provide technical management which includes, but is not limited to, the following services:

(a)    ensuring that the Vessel complies with the requirements of the law of the Flag State;

(b)    ensuring compliance with the ISM Code;

(c)    ensuring compliance with the ISPS Code;

(d)    providing competent personnel to supervise the maintenance and general efficiency of the Vessel;

(e)    arranging and supervising dry-docking, repairs, alterations and the maintenance of the Vessel to the standards agreed with the Owners to ensure that the Vessel will comply with all requirements and recommendations of the classification society, and with the law of the Flag State and of the places where the Vessel is required to trade;

(f)    arranging the supply of necessary fuel, stores, spares and lubricating oil;

(g)    appointing surveyors and technical consultants as the Managers may consider from time to time to be necessary;

11

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 84 of 140
Case 1:25-cv-01711-OEM-MM...  SEALED*    Document 1    Filed 03/27/25    Page 33 of 46
PageID #: 33

PART II
SHIPMAN 2009
Standard ship management agreement

(h)    arranging for the supply of provisions unless provided by the Owners; and

(i)    arranging for the sampling and testing of bunkers.

(j)    Arranging for other provisions or services pertaining to the Vessel or Vessel operations as requested by Owners.

5.    **Crew Management and Crew Insurances**
    (a)    *Crew Management*
    (only applicable if agreed according to Box 7)
    The Managers shall provide suitably qualified Crew who shall comply with applicable USCG requirements. The provision of such crew management services includes, but is not limited to, the following services:

    (i)    selecting, engaging and providing for the administration of the Crew, including, as applicable, payroll arrangements, pension arrangements, tax, social security contributions and other mandatory dues related to their employment payable in each Crew member's country of domicile;

    (ii)    ensuring that the applicable requirements of the law of the Flag State in respect of rank, qualification and certification of the Crew and employment regulations, such as Crew's tax and social insurance, are satisfied;

    (iii)    ensuring that all Crew have passed a medical examination with a qualified doctor certifying that they are fit for the duties for which they are engaged and are in possession of valid medical certificates issued in accordance with appropriate Flag State requirements or such higher standard of medical examination as may be agreed with the Owners. In the absence of applicable Flag State requirements the medical certificate shall be valid at the time when the respective Crew member arrives on board the Vessel and shall be maintained for the duration of the service on board the Vessel;

    (iv)    ensuring that the Crew shall have a common working language and a command of the English language of a sufficient standard to enable them to perform their duties safely;

    (v)    arranging transportation of the Crew, including repatriation;

    (vi)    training of the Crew;

    (vii)    conducting union negotiations: and

    (viii)    if the Managers are the Company, ensuring that the Crew, on joining the Vessel, are given proper familiarization with their duties in relation to the Vessel's SMS and that instructions which are essential to the SMS are identified, documented and given to the Crew prior to sailing.

    (ix)    if the Managers are **not** the Company:

        (1)    ensuring that the Crew, before joining the Vessel, are given proper familiarization with their duties in relation to the ISM Code; and

        (2)    instructing the Crew to obey all reasonable orders of the Company in connection with the operation of the SMS.

    (x)    Where Managers are **not** providing technical management services in accordance with Clause 4 (Technical Management):

        (1)    ensuring that no person connected to the provision and the performance of the crew management services shall proceed to sea on board the Vessel without the prior consent of the Owners (such consent not to be unreasonably withheld); and

        (2)    ensuring that in the event that the Owners' drug and alcohol policy requires measures to be taken prior to the Crew joining the Vessel, implementing such measures;

12

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 85 of 140
Case 1:25-cv-01711-OEM-MM...    SEALED*    Document 1    Filed 3/27/25    Page 34 of 46
PageID #: 34

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

(b)    Crew Insurances
*(only applicable if Sub-clause 5(a) applies* **and** *if agreed according to Box 10)*
The Managers shall throughout the period of this Agreement provide the following services:

(i)    arranging Crew Insurances in accordance with the best practice of prudent managers of vessels of a similar type to the Vessel, with sound and reputable insurance companies, underwriters or associations. Insurances for any other persons proceeding to sea onboard the Vessel may be separately agreed by the Owners and the Managers (see Box 10);

(ii)    ensuring that the Owners are aware of the terms, conditions, exceptions and limits of liability of the insurances in Sub-clause 5(b)(i);

(iii)    ensuring that all premiums or calls in respect of the insurances in Sub-clause 5(b)(i) are paid by their due date;

(iv)    if obtainable at no additional cost, ensuring that insurances in Sub-clause 5(b)(i) name the Owners as a joint assured with full cover and, unless otherwise agreed, on terms such that Owners shall be under no liability in respect of premiums or calls arising in connection with such insurances.

(v)    providing written evidence, to the reasonable satisfaction of the Owners, of the Managers' compliance with their obligations under Sub-clauses 5(b)(ii), and 5(b)(iii) within a reasonable time of the commencement of this Agreement, and of each renewal date and, if specifically requested, of each payment date of the insurances in Sub-clause 5(b)(i).

6.    **Commercial Management**
*(only applicable if agreed according to Box 8).*
The Managers shall provide the following services for the Vessel in accordance with the Owners' instructions, which shall include but not be limited to:

(a)    seeking and negotiating employment for the Vessel and the conclusion (including the execution thereof) of charter parties or other contracts relating to the employment of the Vessel. If such a contract exceeds the period stated in Box 9, consent thereto in writing shall first be obtained from the Owners;

(b)    arranging for the provision of bunker fuels of the quality specified by the Owners as required for the Vessel's trade;

(c)    voyage estimating and accounting and calculation of hire, freights, demurrage and/or despatch monies due from or due to the charterers of the Vessel; assisting in the collection of any sums due to the Owners related to the commercial operation of the Vessel in accordance with Clause 11 (Income Collected and Expenses Paid on Behalf of Owners);

*If any of the services under Sub-clauses 6(a), 6(b) and 6(c) are to be excluded from the Management Fee, remuneration for these services must be stated in Annex E (Fee Schedule). See Sub-clause 12(e).*

(d)    issuing voyage instructions;

(e)    appointing agents;

(f)    appointing stevedores; and

(g)    arranging surveys associated with the commercial operation of the Vessel.

Manager shall meet the following minimum performance standards for Commercial Management:

Calendar year 2022:  Minimum charter revenue of ▮▮▮▮▮▮

Calendar year 2023:  Minimum vessel EBITDA of ▮▮▮▮

7.    **Insurance Arrangements**

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 86 of 140
Case 1:25-cv-01711-OEM-MN    SEALED*    Document 1    Filed 3/27/25    Page 35 of 46
PageID #: 35

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

*(only applicable if agreed according to Box 11).*
The Managers shall arrange insurances in accordance with Clause 10 (Insurance Policies), on such terms as the Owners shall have instructed or agreed, in particular regarding conditions, insured values, deductibles, franchises and limits of liability.

Case 3:25-cv-00137   Document 24-1   Filed 12/18/25 in TXSD   Page 87 of 140
Case 1:25-cv-01711-OEM-MM.   SEALED*   Document 1   Filed 3/27/25   Page 36 of 46
PageID #: 36

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

| Section 3 – Obligations |
| --- |

8. **Managers' Obligations**

   (a)     The Managers undertake to use their best endeavours to provide the Management Services as agents for and on behalf of the Owners in accordance with sound ship management practice and to protect and promote the interests of the Owners in all matters relating to the provision of services hereunder.

   Provided however, that in the performance of their management responsibilities under this Agreement, the Managers shall be entitled to have regard to their overall responsibility in relation to all vessels as may from time to time be entrusted to their management and in particular, but without prejudice to the generality of the foregoing, the Managers shall be entitled to allocate available supplies, manpower and services in such manner as in the prevailing circumstances fair and reasonable. With respect to management services or business dealings with respect to vessels not affiliated with Pennantia, Manager: (i) shall at all times undertake to avoid conflicts of interest with Pennantia vessels and business, (ii), shall not discriminate against or treat Pennantia vessels or business any less favorably than any other managed vessel or business, and (iii) with respect to vessel business commercially suitable to be performed by Pennantia vessels, shall give Pennantia vessels and business first priority for such business.

   (b)     Where the Managers are providing technical management services in accordance with Clause 4 (Technical Management), they shall procure that the requirements of the Flag State are satisfied and they shall agree to be appointed as the Company, assuming the responsibility for the operation of the Vessel and taking over the duties and responsibilities imposed by the ISM Code and the ISPS Code, if applicable.

9. **Owners' Obligations**

   (a)     The Owners shall pay all sums due to the Managers punctually in accordance with the terms of this Agreement. In the event of payment after the due date of any outstanding sums the Manager shall be entitled to charge interest at the rate stated in Box 13.

   (b)     Where the Managers are providing technical management services in accordance with Clause 4 (Technical Management), the Owners shall:

   (i)     report (or where the Owners are not the registered owners of the Vessel procure that the registered owners report) to the Flag State administration the details of the Managers as the Company as required to comply with the ISM and ISPS Codes.

   (ii)     procure that any officers and ratings supplied by them or on their behalf comply with the requirements of STCW 95; and

   (iii)     instruct such officers and ratings to obey all reasonable orders of the Managers (in their capacity as the Company) in connection with the operation of the Managers' safety management system.

   (c)     Where the Managers are **not** providing technical management services in accordance with Clause 4 (Technical Management), the Owners shall:

   (i)     procure that the requirements of the Flag State are satisfied and notify the Managers upon execution of this Agreement of the name and contact details of the organization that will be the Company by completing Box 5.

   (ii)     if the Company changes at any time during this Agreement, notify the Managers in a timely manner of the name and contact details of the new organization;

   (iii)     procure that the details of the Company, including any change thereof, are reported to the Flag State administration as required to comply with the ISM and ISPS Codes. The Owners shall advise the Managers in a timely manner when the Flag State administration has approved the Company; and

   (iv)     unless otherwise agreed, arrange for the supply of provisions at their own expense.

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 88 of 140
Case 1:25-cv-01711-OEM-MN.    SEALED*    Document 1    Filed  3/27/25    Page 37 of 46
PageID #: 37

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

(d)    Where the Managers are providing crew management services in accordance with Sub-clause 5(a) the Owners shall:

(i)    inform the Managers prior to ordering the Vessel to any excluded or additional premium area under any of the Owners' Insurances by reason of war risks and/or piracy or like perils and pay whatever additional costs may properly be incurred by the Managers as a consequence of such orders including, if necessary, the costs of replacing any member of the Crew.  Any delays resulting from negotiation with or replacement of any member of the Crew as a result of the Vessel being ordered to such an area shall be for the Owners' account.  Should the Vessel be within an area which becomes an excluded or additional premium area the above provisions relating to cost and delay shall apply;

(ii)    agree with the Managers prior to any change of flag of the Vessel and pay whatever additional costs may properly be incurred by the Managers as a consequence of such change.  If agreement cannot be reached then either party may terminate this Agreement in accordance with Sub-clause 22(e); and

(iii)    provide, at no cost to the Managers, in accordance with the requirements of the law of the Flag State, or higher standard, as mutually agreed, adequate Crew accommodation and living standards.

(e)    Where the Managers are not the Company, the Owners shall ensure that Crew are properly familiarized with their duties in accordance with the Vessel's SMS and that instructions which are essential to the SMS are identified, documented and given to the Crew prior to sailing.

16

Case 3:25-cv-00137   Document 24-1   Filed 12/18/25 in TXSD   Page 89 of 140
Case 1:25-cv-01711-OEM-MM...   SEALED*   Document 1   Filed 03/27/25   Page 38 of 46
PageID #: 38

PART II
SHIPMAN 2009
Standard ship management agreement

**Section 4 - Insurance, Budgets, Income, Expenses and Fees**

10. **Insurance Policies**

The Owners shall procure, whether by instructing the Managers under Clause 7 (Insurance Arrangements) or otherwise, that throughout the period of this Agreement:

(a)   at the Owners' expense, the Vessel is insured for not less than its sound market value or entered for its full gross tonnage, as the case may be for:

(i)   hull and machinery marine risks (including but not limited to crew negligence) and excess liabilities;

(ii)   protection and indemnity risks (including but not limited to pollution risks, diversion expenses and, except to the extent insured separately by the Managers in accordance with Sub-clause 5(b)(i), Crew Insurances;

*NOTE: If the Managers are not providing crew management services under Sub -clause 5(a) (Crew Management) or have agreed not to provide Crew Insurances separately in accordance with Sub -clause 5(b)(i), then such insurances must be included in the protection and indemnity risks cover for the Vessel (see Sub-clause 10(a)(ii) above).*

(iii)   war risks (including but not limited to blocking and trapping, protection and indemnity, terrorism and crew risks); and

(iv)   such optional insurances as may be agreed (such as piracy, kidnap and ransom, loss of hire and FD & D) (see Box 12)

Sub-clauses 10(a)(i) through 10(a)(iv) all in accordance with the best practice of prudent owners of vessels of a similar type to the Vessel, with sound and reputable insurance companies, underwriters or associations ("the Owners' Insurances");

(b)   all premiums and calls on the Owners' Insurances are paid by their due date;

(c)   the Owners' Insurances name the Owners, the Managers and, subject to underwriters' agreement, any third party designated by the Managers as a joint assured, with full cover. It is understood that in some cases, such as protection and indemnity, the normal terms for such cover may impose on the Managers and any such third party a liability in respect of premiums or calls arising in connection with the Owners' Insurances. If obtainable at no additional cost, however, the Owners shall procure such insurances on terms such that neither the Managers nor any such third party shall be under any liability in respect of premiums or calls arising in connection with the Owners' Insurances. In any event, on termination of this Agreement in accordance with Clause 21 (Duration of the Agreement) and Clause 22 (Termination), the Owners shall procure that the Managers and any third party designated by the Managers as joint assured shall cease to be joint assured and, if reasonably achievable, that they shall be released from any and all liability for premiums and calls that may arise in relation to the period of this Agreement; and

(d)   written evidence is provided, to the reasonable satisfaction of the Managers, of the Owners' compliance with their obligations under this Clause 10 within a reasonable time of the commencement of the Agreement, and of each renewal date and, if specifically requested, of each payment date of the Owners' Insurances.

11. **Income Collected and Expenses Paid on Behalf of Owners**

(a)   Except as provided in Sub-clause 11(c) all monies collected by the Managers under the terms of this Agreement (other than monies payable by the Owners to the Managers) and any interest thereon shall be held to the credit of the Owners in a separate bank account (the "*Vessel Revenue Account*") designated by Owners.

(b)   All monies collected by the Managers under Clause 6 (Commercial Management) shall be paid into the Vessel Revenue Account in the name of the Owners or as may be otherwise advised by the Owners in writing.

Case 3:25-cv-00137     Document 24-1     Filed 12/18/25 in TXSD     Page 90 of 140
Case 1:25-cv-01711-OEM-MM.     SEALED*     Document 1     Filed J/27/25     Page 39 of 46
PageID #: 39

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

12.    **Management Fee (Annex E component parts)**

(a)    The Owners shall pay to the Managers (or its designee if permitted pursuant to  Annex E (4)(e)) the management fees and any true ups as stated in <u>Box 14</u>/Annex E for their services as Managers under this Agreement, which shall be payable in accordance with the terms, time and frequency set forth in Annex E. Payments to the Mangers shall be payable to the Managers' nominated account stated in <u>Box 15</u>, or to such different account as Managers may nominate in writing to Owners from time to time, and payments to a permitted designee pursuant to Annex E(4)(e) shall be to such account as designated by Managers to Owners from time to time.

(b)    The management fee shall be subject to review and audit of expenditures and supporting documentation upon the reasonable request of Owners pursuant to Clause 13.

(c)    The Managers shall, at no extra cost to the Owners, provide their own office accommodation, office staff, facilities and stationery.

(d)    [Intentionally Omitted]

(e)    Save as otherwise provided in this Agreement, all discounts and commissions obtained by the Managers in the course of the performance of the Management Services shall be credited to the Owners.

13.    **Management of Funds**

(a)    The Managers shall at all times maintain and keep true and correct accounts, as detailed in Clause 11, *supra,* in respect of the Management Services in accordance with GAAP or such other standard as the parties may agree, including records of all costs and expenditure incurred, and produce a summary or breakdown of actual expenditure of the Vessel in such form and at such intervals as shall be mutually agreed.  The Managers shall make such accounts available for inspection and auditing by the Owners and/or their representatives in the Managers' offices or by electronic means, provided reasonable notice is given by the Owners.

(b)    Except as expressly provided for herein, the Managers use or commitment of their own funds to finance the provision of the Management Services shall in no circumstances relieve the Owners of their obligations hereunder to reimburse the Managers.

(c)    Managers shall not commingle funds in the respective accounts required under this Agreement. Excepting the Management Fee Account, all accounts required under this agreement shall be subject to account control agreements at the discretion of Owner and or any lender of Owner.

18

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 91 of 140
Case 1:25-cv-01711-OEM-MM... SEALED*    Document 1    Filed 03/27/25    Page 40 of 46
PageID #: 40

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

| Section 5 – Legal General and Duration of Agreement |
| --- |

14. **Trading Restrictions**
If the Managers are providing crew management services in accordance with Sub-clause 5(a) (Crew Management), the Owners and the Managers will, prior to the commencement of this Agreement, agree on any trading restrictions to the Vessel that may result from the terms and conditions of the Crew's employment.

15. **Replacement**
If the Managers are providing crew management services in accordance with Sub-clause 5(a) (Crew Management), the Owners may require the replacement, at their own expenditure, at the next reasonable opportunity, of any member of the Crew found on reasonable grounds to be unsuitable for service. If the Managers have failed to fulfil their obligations in providing suitable qualified replacement Crew within the meaning of Sub-clause 5(a) (Crew Management), then such replacement shall be at the Managers' expense.

16. **Managers' Right to Sub-Contract**
The Managers may not assign this Agreement without the prior written consent of the Owners, which may be withheld or granted in Owners' sole discretion. The Managers may subcontract Management Services or obligations hereunder with the prior written consent of the Owners, which may be withheld or granted in Owners' reasonable discretion. In the event of such a sub-contract the Managers shall not be relieved of their obligations to perform under this Agreement.

17. **Responsibilities**
    (a)    *Force Majeure*
Neither party shall be liable for any loss, damage or delay due to any of the following force majeure events and/or conditions to the extent that the party invoking force majeure is prevented or hindered from performing any or all of their obligations under this Agreement, provided they have made all reasonable efforts to avoid, minimize or prevent the effect of such events and/or conditions:

    (i)    acts of God;

    (ii)    any Government requisition, control, intervention, requirement or interference;

    (iii)    any circumstances arising out of war, threatened act of war or warlike operations, acts of terrorism, sabotage or piracy, or the consequences thereof;

    (iv)    riots, civil commotion, blockades or embargoes;

    (v)    epidemics/pandemics, including COVID-19;

    (vi)    earthquakes, landslides, floods or other extraordinary weather conditions;

    (vii)    strikes, lockouts or other industrial action, unless limited to the employees (which shall not include the Crew) of the party seeking to invoke force majeure;

    (viii)    fire, accident, explosion except where caused by negligence of the party seeking to invoke force majeure; and

    (ix)    any other similar cause beyond the reasonable control of either party.

    (b)    *Liability to Owners*

    (i)    Without prejudice to Sub-clause 17(a), the Managers shall be under no liability whatsoever to the Owners for any loss, damage, delay or expense of whatsoever nature, whether direct or indirect, (including but not limited to loss of profit arising out of or in connection with detention of or delay to the Vessel) and howsoever arising in the course of performance of the Management Services UNLESS same is proved to have resulted solely from the negligence, gross negligence or willful default of the Managers or their

Case 3:25-cv-00137     Document 24-1     Filed 12/18/25 in TXSD     Page 92 of 140
Case 1:25-cv-01711-OEM-MN     SEALED*     Document 1     Filed 3/27/25     Page 41 of 46
PageID #: 41

PART II
SHIPMAN 2009
Standard ship management agreement

employees or agents, or sub-contractors employed by them in connection with the Vessel, in which case
(save where loss, damage, delay or expense has resulted from the Managers' personal act or omission
committed with the intent to cause same or recklessly and with knowledge that such loss, damage, delay or
expense would probably result) the Managers' liability for each incident or series of incidents giving rise to a
claim or claims shall never exceed the total of three (3) times the monthly management fee payable
hereunder for the individual Vessel involved in the incident.

(ii)      *Acts or omissions of the Crew* - Notwithstanding anything that may appear to the contrary in this
Agreement, the Managers shall not be liable for any acts or omissions of the Crew, even if such acts or
omissions are negligent, grossly negligent or willful, except only to the extent that they are shown to have
resulted from a failure by the Managers to discharge their obligations under Clause 5(a) (Crew
Management), in which case their liability shall be limited in accordance with the terms of this Clause 17
(Responsibilities).

(c)      Indemnity
Except to the extent and solely for the amount therein set out that the Managers would be liable under Sub-
clause 17(b), the Owners hereby undertake to keep the Managers and their employees, agents and sub-
contractors indemnified and to hold them harmless against all actions, proceedings, claims, demands or
liabilities whatsoever or howsoever arising which may be brought against them or incurred or suffered by
them arising out of or in connection with the performance of this Agreement, and against and in respect of all
costs, loss, damages and expenses (including legal costs and expenses on a full indemnity basis) which the
Managers may suffer or incur (either directly or indirectly) in the course of the performance of this
Agreement.

(d)      "Himalaya"
It is hereby expressly agreed that no employee or agent of the Managers (including every sub-contractor
from time to time employed by the Managers) shall in any circumstances whatsoever be under any liability
whatsoever to the Owners for any loss, damage or delay of whatsoever kind arising or resulting directly or
indirectly from any act, neglect or default on his part while acting in the course of or in connection with his
employment and, without prejudice to the generality of the foregoing provisions in this Clause 17
(Responsibilities), every exemption, limitation, condition and liberty herein contained and every right,
exemption from liability, defense and immunity of whatsoever nature applicable to the Managers or to which
the Managers are entitled hereunder shall also be available and shall extend to protect every such employee
or agent of the Managers acting as aforesaid and for the purpose of all the foregoing provisions of this
Clause 17 (Responsibilities) the Managers are or shall be deemed to be acting as agent or trustee on behalf
of and for the benefit of all persons who are or might be their servants or agents from time to time (including
sub-contractors as aforesaid) and all such persons shall to this extent be or be deemed to be parties to this
Agreement.

(e) Shipyard Liability
Managers shall not be liable whatsoever to Owners for claims (including attorneys' fees and costs), and
Owners shall indemnify Managers against such claims (including attorneys' fees and costs), arising from
pollution, damage to, or loss or destruction of, any vessel or property, as well as for any personal injuries,
including death, suffered when a vessel managed under the terms of this Agreement is at a shipyard or
other vessel maintenance facility under the control of the operator of such facility.

18.      **General Administration**
(a)      The Managers shall keep the Owners and, if appropriate, the Company informed in a timely
manner of any incident of which the Managers become aware which gives or may give rise to delay to the
Vessel or claims or disputes involving third parties.

(b)      The Managers shall handle and settle all claims and disputes arising out of the Management
Services hereunder, unless the Owners instruct the Managers otherwise.  The Managers shall keep the
Owners appropriately informed in a timely manner throughout the handling of such claims and disputes.

(c)      The Owners may request the Managers to bring or defend other actions, suits or proceedings
related to the Management Services, on terms to be agreed.

(d)      The Managers shall have power to obtain appropriate legal or technical or other outside expert
advice in relation to the handling and settlement of claims in relation to Sub-clauses 18(a) and 18(b) and

20

Case 3:25-cv-00137     Document 24-1     Filed 12/18/25 in TXSD     Page 93 of 140
Case 1:25-cv-01711-OEM-MN.     SEALED*     Document 1     Filed 3/27/25     Page 42 of 46
PageID #: 42

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

disputes and any other matters affecting the interests of the Owners in respect of the Vessel, unless the Owners instruct the Managers otherwise.

(e)     On giving reasonable notice, the Owners may request, and the Managers shall in a timely manner make available, all documentation, information and records in respect of the matters covered by this Agreement either related to mandatory rules or regulations or other obligations applying to the Owners in respect of the Vessel (including but not limited to STCW 95, the ISM Code and ISPS Code) to the extent permitted by relevant legislation.

On giving reasonable notice, the Managers may request, and the Owners shall in a timely manner make available, all documentation, information and records reasonably required by the Managers to enable them to perform the Management Services.

(f)     The Owners shall arrange for the provision of any necessary guarantee bond or other security.

(g)     Any direct costs incurred by the Managers in carrying out their obligations according to this Clause 18 (General Administration) shall be reimbursed by the Owners.

19.     **Inspection of Vessel**
The Owners may at any time after giving reasonable notice to the Managers inspect the Vessel for any reason they consider necessary.

20.     **Compliance with Laws and Regulations**
The parties will not do or permit to be done anything which might cause any breach or infringement of the laws and regulations of the Flag State, or of the places where the Vessel trades.

21.     **Duration of the Agreement**
(a)     This Agreement shall come into effect at the date stated in Box 2 and shall continue for so long as Pennantia owns a vessel(s) under management on the Commencement Date, absent the occurrence and continuation of an event of default, unless terminated earlier, in accordance with Clause 22 (Termination).

(b)     Where the Vessel is not at a mutually convenient port or place on the expiry of such period, this Agreement shall terminate on the subsequent arrival of the Vessel at the next mutually convenient port or place.

22.     **Termination**
(a)     *Owners' or Managers' default*
If either party fails to meet their obligations under this Agreement, the other party may give notice to the party in default requiring them to remedy it.  In the event that the party in default fails to remedy it within a reasonable time to the reasonable satisfaction of the other party, that party shall be entitled to terminate this Agreement with immediate effect by giving notice to the party in default.

(b)     *Notwithstanding Sub-clause 22(a):*

(i)     The Managers shall be entitled to terminate the Agreement with immediate effect by giving notice to the Owners if any monies payable by the Owners and/or the owners of any associated vessel, details of which are listed in Annex "D", shall not have been received in the Managers' nominated account within ten days (10) of receipt by the Owners of the Managers' written request, or if the Vessel is repossessed by the Mortgagee(s).

(ii)     If the Owners proceed with the employment of or continue to employ the Vessel in the carriage of contraband, blockade running, or in an unlawful trade, or on a voyage which in the reasonable opinion of the Managers is unduly hazardous or improper, the Managers may give notice of the default to the Owners, requiring them to remedy it as soon as practically possible.  In the event that the Owners fail to remedy it within a reasonable time to the satisfaction of the Managers, the Managers shall be entitled to terminate the Agreement with immediate effect by notice.

(iii)     If either party fails to meet their respective obligations under Sub-clause 5(b) (Crew Insurances) and Clause 10 (Insurance Policies), the other party may give notice to the party in default requiring them to

21

Case 3:25-cv-00137     Document 24-1     Filed 12/18/25 in TXSD     Page 94 of 140
Case 1:25-cv-01711-OEM-MN.     SEALED*     Document 1     Filed 3/27/25     Page 43 of 46
PageID #: 43

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

remedy it within ten (10) days, failing which the other party may terminate this Agreement with immediate effect by giving notice to the party in default.

(iv)     In the event of a Liquidity Event or a termination of this Agreement within the first twelve (12) months of this Agreement, Managers shall be paid the balance of the Fixed Management Fee that would have been payable through the 12th month of this Agreement absent such Liquidity Event or termination.     .

(c)     *Extraordinary Termination*
This Agreement shall be deemed to be terminated as to any one vessel in the case of the sale of such Vessel or, if the Vessel becomes a total loss or is declared as a constructive or compromised or arranged total loss or is requisitioned or has been declared missing.

(d)     *For the purpose of Sub-clause 22(c) hereof:*

(i)     the date upon which the Vessel is to be treated as having been sold or otherwise disposed of shall be the date on which the Vessel's owners cease to be the registered owners of the Vessel;

(ii)     the Vessel shall be deemed to be lost either when it has become an actual total loss or agreement has been reached with the Vessel's underwriters in respect of its constructive total loss or if such agreement with the Vessel's underwriters is not reached it is adjudged by a competent tribunal that a constructive loss of the Vessel has occurred; and

(iii)     the date upon which the Vessel is to be treated as declared missing shall be ten (10) days after the Vessel was last reported or when the Vessel is recorded as missing by the Vessel's underwriters, whichever occurs first. A missing vessel shall be deemed lost in accordance with the provisions of Sub-clause 22(d)(ii).

(e)     This Agreement shall terminate on the sale of Pennantia, or the sale of all or substantially all of the assets of Pennantia (a "*Liquidity Event*"). In the event of a Liquidity Event, and notwithstanding the termination of this Agreement upon such Liquidity Event, the Owner shall calculate and pay Management Fees (including Profit Sharing Incentives) to the extent due and owing as a result of the Liquidity Event.

(f)     This Agreement shall terminate forthwith in the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of the Owner or Manager (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver or administrator is appointed, or if it suspends payment, ceases to carry on business or makes any special arrangement or composition with its creditors.

(g)     In the event of an Owners' default of its obligations under this Agreement resulting in termination, Owners shall pay Managers a sum equivalent to twelve (12) months of the Fixed Management Fee.

(h)     In addition, where the Managers provide Crew for the Vessel in accordance with Clause 5(a) (Crew Management):

(i) the Owners shall continue to pay Crew Support Costs during the said further period of the number of months stated in Box 19; and (ii) except in the case of termination resulting from default of the Managers, the Owners shall pay Severance Costs which may be incurred. The Managers shall use their reasonable endeavors to minimize such Severance Costs.

(i)     On the termination, for whatever reason, of this Agreement, the Managers shall release to the Owners, if so requested, the originals where possible, or otherwise certified copies, of all accounts and all documents specifically relating to the Vessel and its operation, per the Severance Costs referenced in Box 20.

(j)     The termination of this Agreement shall be without prejudice to all rights accrued due between the parties prior to the date of termination.

23.     **Dispute Resolution Clause (See Box 21)**

This Agreement shall be construed and enforced in accordance with and governed by the General Maritime Law of the United States to the extent applicable and by the laws of the state of New York without giving effect to the conflicts of laws provisions thereof. Any action or proceeding arising from, related to, under, or

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

in connection with this Agreement must be brought solely and exclusively in the federal courts, and state courts only when federal courts are not available for such action or proceeding, located in the County of New York in the State of New York. Each party hereto irrevocably (i) submits to the exclusive jurisdiction of such New York courts, and (ii) waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in such court or that such court is an inconvenient forum. The parties irrevocably and unconditionally waive any right they have to a trial by jury in respect of any legal action arising out of or relating to this Agreement.

The parties may agree, however, at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Agreement:

(i)     In the case of a dispute in respect of which litigation has been commenced the following shall apply:

(ii)     Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.

(iii)     The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator shall be appointed promptly by the court ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, in New York County in the State of New York.

(iv)     If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal.

(v)     The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

(vi)     Either party may advise the Tribunal that they have agreed to mediation. The litigation procedure shall continue during the conduct of the mediation, subject to the discretion of the Tribunal, and the Tribunal may take the mediation timetable into account when setting the timetable for steps in the litigation.

(vii)     Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.

(viii)     The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the litigation.

(Note: The parties should be aware that the mediation process may not necessarily interrupt time limits.)

24.     **Notices**
(a)     All notices given by either party or their agents to the other party or their agents in accordance with the provisions of this Agreement shall be in writing and shall, unless specifically provided in this Agreement to the contrary, be sent to the address for that other party as set out in Boxes 22 and 23 or as appropriate or to such other address as the other party may designate in writing.

A notice may be sent by registered or recorded mail, facsimile, electronically or delivered by hand in accordance with this Sub-clause 24(a).

(b)     Any notice given under this Agreement shall take effect on receipt by the other party and shall be deemed to have been received:

(i)     if posted, on the third (3rd) day after posting;

(ii)     if sent by facsimile or electronically, on the day of transmission; and

23

Case 3:25-cv-00137   Document 24-1   Filed 12/18/25 in TXSD   Page 96 of 140
Case 1:25-cv-01711-OEM-MM    SEALED*   Document 1   Filed 03/27/25   Page 45 of 46
PageID #: 45

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

(iii)    if delivered by hand, on the day of delivery.

And in each case proof of posting, handing in or transmission shall be proof that notice has been given, unless proven to the contrary.

25.    **Entire Agreement**
This Agreement constitutes the entire agreement between the parties and no promise, undertaking, representation, warranty or statement by either party prior to the date stated in Box 2 shall affect this Agreement. Any modification of this Agreement shall not be of any effect unless in writing signed by or on behalf of the parties.

26.    **Third Party Rights**
Except to the extent provided in Sub-clauses 17(c) (Indemnity) and 17(d) (Himalaya), no third parties may enforce any term of this Agreement.

27.    **Partial Validity**
If any provision of this Agreement is or becomes or is held by any arbitrator or other competent body to be illegal, invalid or unenforceable in any respect under any law or jurisdiction, the provision shall be deemed to be amended to the extent necessary to avoid such illegality, invalidity or unenforceability, or, if such amendment is not possible, the provision shall be deemed to be deleted from this Agreement to the extent of such illegality, invalidity or unenforceability, and the remaining provisions shall continue in full force and effect and shall not in any way be affected or impaired thereby.

28.    **Interpretation**
In this Agreement:

    (a)    Singular/Plural
The singular includes the plural and vice versa as the context admits or requires.

    (b)    Headings
The index and headings to the clauses and appendices to this Agreement are for convenience only and shall not affect its construction or interpretation.

    (c)    Day
"Day" means a calendar day unless expressly stated to the contrary.

29.    **MLC Clause for SHIPMAN 2009**
For the purposes of this Clause:

"MLC" means the International Labour Organisation (ILO) Maritime Labour Convention (MLC 2006) and any amendment thereto or substitution thereof.

"Shipowner" shall mean the party named as "shipowner" on the Maritime Labour Certificate for the Vessel.

    (a)    Subject to Clause 3 (Authority of the Managers), the Managers shall, to the extent of their Management Services, assume the Shipowner's duties and responsibilities imposed by the MLC for the Vessel, on behalf of the Shipowner.

    (b)    The Owners shall ensure compliance with the MLC in respect of any crew members supplied by them or on their behalf.

    (c)    The Owners shall procure, whether by instructing the Managers under Clause 7 (Insurance Arrangements) or otherwise, insurance cover or financial security to satisfy the Shipowner's financial security obligations under the MLC.

30.    **MISCELLANEOUS RIDER PROVISIONS**

    (a)    Each of Owners and Managers represent and warrant that it is a citizen of the United States for the purpose of engaging in Coastwise Trade within the meaning of 46 U.S.C. § 50501 (a "Coastwise

24

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 97 of 140
Case 1:25-cv-01711-OEM-MN.    SEALED*    Document 1    Filed 3/27/25    Page 46 of 46
PageID #: 46

**PART II**
**SHIPMAN 2009**
**Standard ship management agreement**

Citizen"), and covenants that during the term of this Agreement it shall remain a Coastwise Citizen, qualified (as to citizenship) for the purpose of operation of Vessels in the Coastwise Trade, and Manager shall not suffer or permit anything to be done which might injuriously affect the entitlement of the Vessels under the laws and regulations of the United States to be so documented for use in the Coastwise Trade.

(b)    Publicity and Confidentiality

(i)    Release of Information.  Manager agrees it will not divulge information concerning this Agreement to anyone without the Owners' prior written consent, which shall not be unreasonably withheld, provided that Manager may disclose information as necessary to the appropriate governmental authority in an application for a permit, approval or clearance.  Manager will retain all information belonging to Owners in the strictest confidence and will neither use it nor disclose it to others without the prior written consent of Owners.  Manager will require any sub consultant engaged by it pursuant to this Agreement to comply with the terms and provisions of this Clause.  These requirements will survive the termination or expiration of this Agreement.

(ii)    Confidentiality/No Promotion.  Manager agrees that it or its employees may, in the course of performing its responsibilities under this Agreement, be exposed to or acquire information which is proprietary or confidential to Owner.  Any and all non-public information of any form obtained by Manager and its subcontractors, and their respective employees, in the performance of this Agreement will be deemed confidential and proprietary information.

(iii)    Confidentiality. Each party agrees to hold such information in strict confidence and not to disclose such information to third parties or to use such information for any purpose whatsoever during the Term of this Agreement and for a period of five (5) years thereafter without the written consent of the other party except as necessary for: (a) the performance of the services under this Agreement; (b) to advise each of its employees who may be exposed to such proprietary and confidential information of their obligations to keep such information confidential; (c) compliance with professional standards of conduct for the performance of the services and/or related matters; (d) compliance with any law, regulation, ordinance, court order or governmental directive or other legal mandate; and/or (e) protection of the parties against claims or liabilities arising from the performance of services under this Agreement.  In the event of any disclosure by a party under subparagraphs (c), (d) or (e), the disclosing party will give the other party fourteen (14) days advance notice of such disclosure.  This obligation will not apply to information previously in a party's possession or in the public domain, or information lawfully acquired on a non-confidential basis from others.  This provision will survive termination of this Agreement.

(iv)    Manager agrees that it will review the terms and conditions of Clause 30(b) of this Agreement with all subcontractors it engages and that it will obtain the written agreement of each subcontractor to comply with the terms of this Clause.

25

# EXHIBIT 3

Case 1:25-cv-01711-OEM-MMH *SEALED*   Document 1-2   Filed 03/27/25   Page 1 of 1
PageID #: 49

**TO: Clerk's Office**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK



APPLICATION FOR LEAVE
TO FILE DOCUMENT UNDER SEAL

Sealed

-v-

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

_____
Docket Number

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

SUBMITTED BY: Plaintiff ☐ Defendant ☑ DOJ ☐
Name: Chiara D. Scalegria-Sockelloues
Firm Name: Holland Knight LLP
Address: 787 - Seventh Ave
New York N 10019
Phone Number: 219-513-3200
E-Mail Address: Chiara Scalegres@hklaw.com

INDICATE UPON THE PUBLIC DOCKET SHEET: YES ☐ NO ☑
If yes, state description of document to be entered on docket sheet:

**A) If pursuant to a prior Court Order:**
Docket Number of Case in Which Entered: _____
Judge/Magistrate Judge: _____
Date Entered: _____

**B) If a new application,** the statute, regulation, or other legal basis that
authorizes filing under seal
_____
_____

ORDERED SEALED AND PLACED IN THE CLERK'S OFFICE,
AND MAY NOT BE UNSEALED UNLESS ORDERED BY
THE COURT.

DATED: _____, NEW YORK

_____
U.S. DISTRICT JUDGE/U.S. MAGISTRATE JUDGE
RECEIVED IN CLERK'S
OFFICE _____ DATE _____

**MANDATORY CERTIFICATION OF SERVICE:**
A.) ☑ A copy of this application either has been or will be promptly served upon all parties to this action, **B.)** ☐ Service is excused by 31 U.S.C. 3730(b), or by
the following other statute or regulation:_____: or **C.)** ☐ This is a criminal document submitted, and flight public safety, or security are significant concerns.
(Check one)

3/27/25
DATE

_____
SIGNATURE

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 100 of 140
Case 1:25-cv-01711-OEM-M.   .*SEALED*   Document 3   Fil   J3/27/25   Page 1 of 3
PageID #: 53

**HOLLAND & KNIGHT LLP**
Michael J. Frevola
Chiara D. Kalogjera-Sackellares
787 Seventh Avenue
New York, New York 10019
michael.frevola@hklaw.com
chiara.sackellares@hklaw.com
Telephone: 212.513.3200
Fax: 212.385.9010

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Pennantia, LLC,<br>RCM 252, LLC,<br>Susan Rose, LLC,<br>RCM 250, LLC,<br>Jordan Rose, LLC,<br>RCM 260, LLC, and<br>RCM 262, LLC,<br><br>        Plaintiffs,<br><br>   v.<br><br>*Tank Barge RCM 252* (Official #1292046),<br>*Tug SUSAN ROSE* (Official #1282121),<br>*Tank Barge RCM 250* (Official #1235496),<br>*Tug JORDAN ROSE* (Official #1234828),<br>*Tank Barge RCM 260* (Official #1210060), and<br>*Tank Barge RCM 262* (Official #1216336),<br>their engines, tackle, appurtenances, etc., *in rem*,<br><br>        Defendants. | In Admiralty<br><br>Case No. - CV - _____<br><br>**PLAINTIFFS' EX PARTE MOTION TO FILE PAPERS UNDER TEMPORARY SEAL** |

Plaintiffs Pennantia, LLC ("Pennantia"), RCM 252, LLC, Susan Rose, LLC, RCM 250,

LLC, Jordan Rose, LLC, RCM 260, LLC, and RCM 262, LLC (collectively, "Plaintiffs"), by and

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 101 of 140
Case 1:25-cv-01711-OEM-M.    .*SEALED*    Document 3    Fil. J3/27/25    Page 2 of 3
PageID #: 54

through their attorneys Holland & Knight LLP, move this Court for a temporary order sealing this matter for approximately six weeks as requested in the accompanying motion papers, and restricting all access to the Case Docket, including to permit the filing of the following documents under temporary seal:

      (a) The Verified Complaint;

      (b) The Memorandum of Law in Support of Pennantia's motion to arrest the Vessel Defendants pursuant to Supplemental Rule D (the "Rule D Memorandum of Law"), as well as documents associated with the motion to arrest;

      (c) Any arrest order issued by the Court against the Vessel Defendants in this proceeding (the "Arrest Order") as well as the Warrant of Arrest issued thereafter by the Clerk of the Court;

      (d) Ancillary documents (such as the civil cover sheet, Rule 7.1 Statement, substitute custodian application and order, etc.) filed by Pennantia in support of its application to arrest the Vessel Defendants under Supplemental Rule D;

      (e) The documents filed by Pennantia in support of this sealing application (as well as any opposition papers filed by any party);

      (f) Any documents filed in opposition to Pennantia's arrest application, and, should such an opposition be filed,

      (g) Pennantia's reply to any opposition filed,

and to keep same confidential by instructing the Clerk of the Court to temporarily not create any entries on the docket for any documents filed in this proceeding until further order of this Court.

2

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 102 of 140
Case 1:25-cv-01711-OEM-M.   .*SEALED*   Document 3   Fil.   J3/27/25   Page 3 of 3
PageID #: 55

WHEREFORE, the Plaintiffs respectfully request that the Court enter an order in the form of the attached proposed order temporarily sealing the Case Docket from all access for approximately six weeks until further order of this Court, and instructing the Clerk to not create a docket entry for documents filed in this proceeding until further order of this Court, and for such other relief as the Court deems appropriate.

Dated:  New York, New York
        March 26, 2025

                              HOLLAND & KNIGHT LLP

                              Chiara D. Kalogjera-Sackellares

                              Michael J. Frevola
                              Chiara D. Kalogjera-Sackellares
                              787 Seventh Avenue
                              New York, New York 10019
                              michael.frevola@hklaw.com
                              chiara.sackellares@hklaw.com
                              Telephone: 212.513.3200
                              Fax: 212.385.9010

                              *Attorneys for Plaintiffs*

3

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 103 of 140
Case 1:25-cv-01711-OEM-M    *SEALED*    Document 4    Filed 03/27/25    Page 1 of 23
PageID #: 56

HOLLAND & KNIGHT LLP
Michael J. Frevola
Chiara Kalogjera-Sackellares
787 Seventh Avenue
New York, New York 10019
michael.frevola@hklaw.com
chiara.sackellares@hklaw,com
Telephone: 212.513.3200
Fax: 212.385.9010

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Pennantia, LLC,<br>RCM 252, LLC,<br>Susan Rose, LLC,<br>RCM 250, LLC,<br>Jordan Rose, LLC,<br>RCM 260, LLC, and<br>RCM 262, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>*Tank Barge RCM 252* (Official #1292046),<br>*Tug SUSAN ROSE* (Official #1282121),<br>*Tank Barge RCM 250* (Official #1235496),<br>*Tug JORDAN ROSE* (Official #1234828),<br>*Tank Barge RCM 260* (Official #1210060), and<br>*Tank Barge RCM 262* (Official #1216336),<br>their engines, tackle, appurtenances, etc., *in rem*,<br><br>Defendants. | In Admiralty<br><br>Case No. - CV - _____<br><br>**DECLARATION IN SUPPORT OF EX PARTE MOTION TO FILE PAPERS UNDER TEMPORARY SEAL** |

I, Joshua Trump, make the following declaration based on my personal knowledge:

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 104 of 140
Case 1:25-cv-01711-OEM-M.    *SEALED*    Document 4    File. 3/27/25    Page 2 of 23
PageID #: 57

1. I am the managing director of Contrarian Capital Management, LLC ("CCM"), the manager of Carioca Partners, LLC. Carioca Partners, LLC is the owner of approximately █████ of the aggregate beneficial membership interests of Pennantia, LLC ("Pennantia"), one of the plaintiffs in this proceeding.

2. As explained in the Verified Complaint, this proceeding has been commenced by the Plaintiffs for the purpose of gaining physical access to the *Tank Barge RCM 252* (Official #1292046), *Tug SUSAN ROSE* (Official #1282121), *Tank Barge RCM 250* (Official #1235496), *Tug JORDAN ROSE* (Official #1234828), *Tank Barge RCM 260* (Official #1210060), *Tank Barge RCM 262* (Official #1216336) (the "Defendant Vessels"), as well as various documents, records, and information of the Defendant Vessels, all of which are owned by the Plaintiffs but are managed by Rose Cay Maritime, LLC ("RCM"). The Defendant Vessels are managed by RCM under a ship management agreement between RCM and Pennantia dated August 8, 2021 (the "Ship Management Agreement"), which Ship Management Agreement is annexed to the Verified Complaint as Exhibit 1.

3. As explained in greater detail in the Verified Complaint, Pennantia purchased approximately half of the fleet of Bouchard Transportation ("Bouchard") when it was sold as part of that company's administration in the U.S. Bankruptcy Court for the Southern District of Texas.

4. At the time that Pennantia purchased the Bouchard vessels, they each had been out of service for between 12 and 24 months as a result of the financial and managerial difficulties arising out of the Bouchard bankruptcy.

5. Pennantia's business strategy with respect to the Bouchard vessels was to invest capital in their refurbishment, then ultimately sell them for a profit. In the interim between their refurbishment and their resale to new purchasers, Pennantia intended to operate them on charter.

2

Case 3:25-cv-00137   Document 24-1   Filed 12/18/25 in TXSD   Page 105 of 140
Case 1:25-cv-01711-OEM-MN   *SEALED*   Document 4   Filed 03/27/25   Page 3 of 23
PageID #: 58

6.      After significant investments of time and capital in this enterprise – both of which have been greater than anticipated by CCM – Pennantia finally is in a position to capitalize on its investment. Since last October, several different prospective purchasers of some (or all) of the Defendant Vessels have made inquiries as to their availability. As is standard in the industry, part of the due diligence to be carried out by a vessel purchaser is to (a) physically inspect/survey the vessel to be purchased, and (b) conduct a review of the documents, records, and information of the vessel to be purchased.

7.      As explained in greater detail in the Verified Complaint, rather than faithfully carrying out its duties as the manager of the Defendant Vessels, RCM has actively thwarted Pennantia's efforts to market and sell the Defendant Vessels. Pennantia recently has learned that the apparent reason for RCM's behavior is that RCM has an interest in selling the Defendant Vessels to another purchaser for RCM's own benefit.

8.      Specifically, despite numerous requests, RCM is refusing to allow Pennantia – and prospective purchasers – any access to the Defendant Vessels, citing a litany of excuses. Similarly, despite numerous requests, RCM has refused to provide the vast majority of documents, records, and information about the Defendant Vessels needed for prospective purchasers. RCM has acted in this fashion despite being specifically obligated to do so under the Ship Management Agreement.

9.      To obtain the physical access to the Defendant Vessels (and their documents, records, and information) to which Pennantia is entitled without a breach of the peace, Pennantia has sought this Court's assistance through an *in rem* vessel arrest action pursuant to Supplemental Rule D, which action will result in the U.S. Marshal arresting the Defendant Vessels and a substitute custodian (under this Court's orders) being placed in charge of the Defendant Vessels

3

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 106 of 140
Case 1:25-cv-01711-OEM-M.    *SEALED*    Document 4    Fil  3/27/25    Page 4 of 23
PageID #: 59

while those vessels are being surveyed and their documents, records, and information being reviewed. While this action is pending, Pennantia presumably would be able to seek this Court's assistance through contempt or other actions should RCM interfere with Pennantia's efforts to consummate the sale of the Defendant Vessels.

10.    Unfortunately, the very nature of Pennantia's obtaining this Court's assistance in accessing the Defendant Vessels might well generate adverse publicity regarding marketable title to the Defendant Vessels which would serve RCM's purposes in thwarting the sales of the Defendant Vessels.  In essence, Pennantia's "playing by the rules" in seeking this Court's assistance could inure to the benefit of RCM.

11.    For example, should information relating to this dispute become public knowledge to potential purchasers, those purchasers rightly will question whether Pennantia actually would be able to physically deliver the Defendant Vessels to the prospective purchaser.

12.    Similarly, those would-be purchasers learning of this dispute which are not scared off completely from offering to purchase the Defendant Vessels nearly certainly will devalue the Defendant Vessels, reducing the sale value of the Defendant Vessels to a point where Pennantia would not be able to recoup its investment in the Bouchard vessels merely because RCM refused to give Pennantia what it is entitled to under both common law and the Ship Management Agreement – physical access to its property.

13.    To give but one recent example of how this dispute could well become widely publicized, I refer the Court to the heavily-publicized ownership dispute related to the Eletson

4

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 107 of 140
Case 1:25-cv-01711-OEM-M    *SEALED*    Document 4    File  03/27/25    Page 5 of 23
PageID #: 60

Holdings Inc. shipping group that currently is playing itself out in the U.S. Bankruptcy Court for the Southern District of New York. True and correct copies of merely a few of many recent news articles relating to the Eletson proceedings are annexed as Exhibit 1. It is well known within the industry that maritime industry publications such as *Tradewinds* and *Lloyd's List* have reporters which specifically review the Courthouse News Service on a daily basis for reports of new maritime disputes that can be reported upon.

14.    All of the above may well come to pass even though Pennantia specifically built into the Ship Management Agreement – at Part II, Clause 30(b) – a "Publicity and Confidentiality" provision to avoid outside parties learning of Pennantia's business contemporaneously:

(b)    Publicity and Confidentiality

(i) Release of information.  Manager [RCM] agrees it will not divulge information concerning this Agreement to anyone without the Owners' [Pennantia's] prior written consent, which shall not be unreasonably withheld, provided that Manager may disclose information as necessary to the appropriate governmental authority in an application for a permit, approval or clearance. *Manager will retain all information belonging to Owners in the strictest confidence and will neither use it nor disclose it to others without the prior written consent of Owners.*  Manager will require any sub consultant engaged by it pursuant to this Agreement to comply with the terms and provisions of this Clause. These requirements will survive the termination or expiration of this Agreement.

(ii) Confidentiality/No Promotion.  Manager agrees that it or its employees may, in the course of performing its responsibilities under this Agreement, be exposed to or acquire information which is proprietary or confidential to Owner. *Any and all non-public information of any form obtained by Manager and its subcontractors, and their respective employees, in the performance of this Agreement will be deemed confidential and proprietary information.*

(iii) Confidentiality.  Each party agrees to hold such information in strict confidence and not to disclose such information to third parties or to use such information for any purpose whatsoever during the Term of this Agreement and for a period of five (5) years thereafter without the written consent of the other party except as necessary for: (a) the performance of the services under this Agreement; (b) to advise each of its employees who may be exposed to such proprietary and confidential information of their obligations to keep such information confidential; (c) compliance with professional standards of conduct for the performance of the

5

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 108 of 140
Case 1:25-cv-01711-OEM-M,    *SEALED*    Document 4    File_ J3/27/25    Page 6 of 23
PageID #: 61

services and/or related matters; (d) compliance with any law, regulation, ordinance, court order or governmental directive or other legal mandate; and/or (e) protection of the parties against claims or liabilities arising from the performance of services under this Agreement.    In the event of any disclosure by a party under subparagraphs (c), (d) or (e), the disclosing party will give the other party fourteen days advance notice of such disclosure.    This obligation will not apply to information previously in a party's possession or in the public domain, or information lawfully acquired on a non-confidential basis from others.    This provision will survive termination of this Agreement.

(iv)Manager agrees that it will review the terms and conditions of Clause 30(b) of this Agreement with all subcontractors it engages and that it will obtain the written agreement of each subcontractor to comply with the terms of this Clause.

*See* Verified Complaint, Exhibit 1 (Ship Management Agreement), Part II, Clause 30(b) (emphasis added).

15.    To avoid the commencement of this lawsuit potentially "poisoning the well" relating to sales of some (or all) of the Defendant Vessels, Pennantia respectfully requests that this Court keep the documents filed in this proceeding under seal until further order of this Court. To provide comfort to the Court as to what this may entail, Pennantia does not anticipate significant other filings in this proceeding by either Plaintiffs or the Vessel Defendants. This proceeding intentionally is limited to Plaintiffs seeking physical access to the Vessel Defendants and their records, documents, and information – nothing else. The only filing that conceivably could be filed in opposition one which seeks to preclude access to the Defendant Vessels and/or their records, documents, and information. Hence, the extent of the documents and information under seal would be limited.

16.    Furthermore, Pennantia intends for the temporal scope of the sealing order likewise to be limited in nature. As mentioned above, Pennantia's primary concern is that public notice of this lawsuit would harm Pennantia's ability to complete the sale of the Defendant Vessels which well may be imminent should the current interested purchasers obtain the needed physical access

6

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 109 of 140
Case 1:25-cv-01711-OEM-M    *SEALED*    Document 4    File  3/27/25    Page 7 of 23
PageID #: 62

to the Defendant Vessels as well as their records, documents, and information.  Once the sale of the Defendant Vessels is consummated, which Pennantia estimates would take place in approximately six weeks, Pennantia will file a motion with this Court to unseal the documents filed with this Court and file for public viewing – with suitable redactions to keep confidential proprietary information out of the public eye – all of the documents filed in this proceeding.[1]

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Greenwich, Connecticut on March 26, 2025.

Joshua Trump

---

[1] I further note that the "Publicity and Confidentiality" clause in the Ship Management Agreement has a notice provision that requires a party to provide 14 days' notice to its counterparty when disclosing information related to "compliance with any law, regulation, ordinance, court order or governmental directive or other legal mandate."  *See* Verified Complaint, Exhibit 1, Part II, Clause 30(b)(iii)(d).  By filing this proceeding under seal, it gives RCM the ability to intervene and request that this Court seek to redact information in this proceeding that it may wish to keep confidential before the Court orders documents in this proceeding to be unsealed.

Case 3:25-cv-00137 Document 24-1 Filed 12/18/25 in TXSD Page 110 of 140
Case 1:25-cv-01711-OEM-M. *SEALED* Document 4 File J3/27/25 Page 8 of 23
PageID #: 63

Aldine ™ Enviro-Tab ™ 

# EXHIBIT 1

Case 3:25-cv-00137   Document 24-1   Filed 12/18/25 in TXSD   Page 112 of 140
Case 1:25-cv-01711-OEM-MM... SEALED*   Document 4   Filed 03/27/25   Page 10 of 23
PageID #: 65

Home (https://financialregnews.com/) » News (https://financialregnews.com/news/) » Eletson bankruptcy judge hands shipping company and Reed Smith latest blow as Chapter 11 plan progresses

# Eletson bankruptcy judge hands shipping company and Reed Smith latest blow as Chapter 11 plan progresses

BY FINANCIAL REGULATION NEWS REPORTS | FEBRUARY 4, 2025 | FEATURED (HTTPS://FINANCIALREGNEWS.COM/FEATURED/)

In the most recent signal that the legal challenge to Eletson Holdings Inc.'s Chapter 11 plan may be running out of options, Reed Smith LLP, Eletson's former legal counsel, and the bankrupt shipping company's former shareholders, officers and directors were ordered by a New York bankruptcy judge on Jan. 24 to comply with its Chapter 11 plan.

The judge overseeing the shipping company's Chapter 11 case in New York's Southern District, John P. Mastando III, ordered former Eletson shareholders to take "all steps reasonably necessary" to assist the reorganized company in amending or updating corporate governance documents within seven days of the court's Jan. 24 ruling.



Judge Mastando warned that failure to do so would result in a hearing "on short notice" to determine whether any actions were taken to interfere with the implementation of Eletson's Chapter 11 plan. Mastando made it clear that the confirmed reorganization plan put new owners in control of the company and the former board of directors ceased to exist.



Case 3:25-cv-00137   Document 24-1   Filed 12/18/25 in TXSD   Page 113 of 140
Case 1:25-cv-01711-OEM-MM... -SEALED*   Document 4   Filed 03/27/25   Page 11 of 23
PageID #: 66

Reorganized Eletson Holdings had filed a motion for an order imposing sanctions on Eletson's former shareholders, officers, directors, and former debtor counsel Reed Smith for failure to comply with the Chapter 11 plan terms. Eletson said in court documents that its former owners, subsidiaries, affiliates, and personnel including directors and officers, principals, attorneys, and other professionals "attempted to subvert the confirmation order." The official committee of unsecured Eletson creditors filed a statement of support for Eletson's motion to sanction the company's former owners and their attorneys.

Eletson's case has been led by Louis M. Solomon of Reed Smith. According to Reed Smith's website, Mr. Solomon is the firm's Head of International Litigation (US). His listed practice areas focus on international litigation, trials, and complex commercial disputes, with no explicit mention of restructuring as a primary area of practice. Reed Smith's erratic litigation strategy failed to withstand judicial scrutiny.

Reed Smith most recently drew criticism in the court for failing to update certain corporate governance documents to transfer ownership to the rightful owners of Eletson in Liberia and for filing baseless litigation against the company's new owners using the debtor's funds and resources that was deemed a collateral attack on U.S. court orders.

Reorganized Eletson also asked the judge to compel the debtors and their counsel, Reed Smith, to comply with the confirmation order and effectuate the Chapter 11 plan by updating the Liberian International Ship and Corporate Registry to reflect the reorganized company as the new owner of the reorganized debtor.

Eletson's reorganization plan was approved by the U.S. Bankruptcy Court for the Southern District of New York on Oct. 25, 2024. Eletson announced on Nov. 19 that it completed its restructuring and emerged from Chapter 11 protection.

In Friday's hearing, Judge Mastando reiterated to the court that the confirmation order recognizes a new board of Eletson Holdings Inc. and the new board of directors can take whatever actions it deems appropriate on behalf of Eletson. Despite the confirmation order, former debtor counsel Reed Smith has refused "to exercise their corporate authority to effectuate the transfer of ownership the plan requires," according to a transcript of the Jan. 24 court hearing.

Eletson's restructuring plan gave control of the reorganized company to petitioning creditors led by Pach Shemen LLC. Adam Spears was appointed the reorganized company's new chief executive. New members of Eletson's board include Spears, Leonard Hoskinson, and Timothy Matthews.

In Friday's court hearing, the judge overseeing the case pointed out to the court that Eletson's Chapter 11 plan became effective on Nov. 19, 2024. And, "pursuant to the plan the Reorganized Eletson Holdings was created, and the former board was dissolved and terminated." Also, Judge Mastando noted that on the effective date, Reed Smith's representation of Eletson Holdings was terminated. "The confirmation order

Case 3:25-cv-00137   Document 24-1   Filed 12/18/25 in TXSD   Page 114 of 140
Case 1:25-cv-01711-OEM-MM...  SEALED*   Document 4   Filea J3/27/25   Page 12 of 23
PageID #: 67

and the Chapter 11 plan are binding on the former debtor's counsel as these parties actively appeared and participated in the bankruptcy case," the judge said. "These parties availed themselves of the Bankruptcy Court and are subject to enforcing the confirmation order and Chapter 11 plan."

Eletson is the parent company of subsidiaries that own and operate a fleet of medium-range double-hull product tankers that carry refined petroleum products.

The shipping company's bankruptcy is rooted in a dispute over Eletson Gas, a liquefied petroleum gas shipping venture that was the result of Eletson's partnership with Blackstone Tactical Opportunities. Blackstone sold its preferred shares in the venture in November 2021 to Murchinson, an alternative investment management firm. The shares were held in a special purpose entity created by Murchinson that was called Levona Holdings Ltd. After Levona acquired the shares, Levona and Eletson began negotiating how the debtors could buy the shares back; while there was a binding offer letter in Feb. 2022, a dispute arose which led to an arbitration. At the same time Murchinson and Lenova negotiated to buy a majority of $300 million in debt with noteholders who had not received interest payments since 2018. Murchinson formed a special purpose vehicle, Pach Shemen, in December 2022 to hold the new notes which were officially acquired in January 2023.

In March 2023 Pach Shemen and other entities filed an involuntary Chapter 7 bankruptcy against the debtor which was converted to a voluntary Chapter 11 in September 2023.

The dispute between Eletson and Levona has its roots in a 2022 agreement in which Levona provided cash to ensure five of the shipping company's 14 vessels would not be seized by creditors. As part of the agreement Levona held preferred interests that Eletson could buy back. The dispute, which went into arbitration, was over whether Eletson executed its option to buy the interests in a timely fashion. The shipping company said it did so within 30 days of a Feb. 22, 2022, deadline. The dispute flared up when Levona tried to sell nine of Eletson's ships to a competitor.

The pivotal question in arbitration was whether Eletson had exercised its right to buy the preferred interests in the company. Arbitration ruled in Eletson's favor but Levona learned about relevant documents contradicting it had exercised the purchase option. The documents were not shared in the arbitration proceedings even though the process required both parties to share all relevant documents.

From March 2024 until June 2024 Levona fought for relief from the bankruptcy court's protective order so they could present the documents to the court.

According to a Sept. 6, 2024, order and opinion from U.S. District Judge Lewis J. Liman, during the arbitration when Levona presented evidence the purchase option had not been exercised in the form of a July 13 email where Eletson's CFO sent a buyout proposal, "Eletson lied about it." And, "Eletson also ·· ··hheld documents necessary to establish the purchase option had not been exercised," according to a Liman's opinion and order.

Case 3:25-cv-00137   Document 24-1   Filed 12/18/25 in TXSD   Page 115 of 140
Case 1:25-cv-01711-OEM-MM... *SEALED*   Document 4   Filed 03/27/25   Page 13 of 23
PageID #: 68

Liman noted further that "Eletson constructed extraordinary obstacles to prevent Levona uncovering its fraud. Levona time and again asked for the documents that might show that Eletson had withheld material evidence from the arbitrator. And Eletson time and time again engaged in efforts to frustrate Levona from obtaining that evidence."

The judge also chastised Eletson for making meritless and "arguably frivolous arguments that the documents were not relevant" to the proceedings.

← SEC approves Intercontinental Exchange's ICE Swap Trade application (https://financialregnews.com/sec-approves-intercontinental-exchanges-ice-swap-trade-application/)
Majority of U.S companies experienced cyber fraud in 2024, research finds → (https://financialregnews.com/majority-of-u-s-companies-experienced-cyber-fraud-in-2024-research-finds/)

## Receive Weekly News Summary

| First Name * | Last Name * |
|---|---|

| Email Address * |
|---|

| Organization |
|---|

SUBSCRIBE!

## Cannabis Banking

New York State hits $1B in cannabis retail sales (https://financialregnews.com/new-york-state-hits-1b-in-cannabis-retail-sales/)

AICPA makes recommendations to IRS on cannabis businesses in advance of marijuana reclassification (https://financialregnews.com/aicpa-makes-recommendations-to-irs-on-cannabis-businesses-in-advance-of-marijuana-reclassification/)

CTrust launches credit scoring platform for cannabis businesses (https://financialregnews.com/ctrust-launches-credit-scoring-platform-for-cannabis-businesses/)

Senators push for legal cannabis businesses to have SBA access (https://financialregnews.com/senators-push-for-legal-cannabis-businesses-to-have-sba-access/)

Delaware to consider bill protecting financial businesses serving legal marijuana industry .ttps://financialregnews.com/delaware-to-consider-bill-protecting-financial-businesses-serving-legal-

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 116 of 140
Case 1:25-cv-01711-OEM-MM... -SEALED*    Document 4    Filed 03/27/25    Page 14 of 23
PageID #: 69

marijuana-industry/)

## Digital Currency

Sen. Lummis introduces bill to establish strategic Bitcoin reserve (https://financialregnews.com/sen-lummis-introduces-bill-to-establish-strategic-bitcoin-reserve/)

Senators introduce bill to establish regulatory framework for payment stablecoins (https://financialregnews.com/senators-introduce-bill-to-establish-regulatory-framework-for-payment-stablecoins/)

Rep. Hill urges SEC chair to remove hurdles for digital asset ecosystem (https://financialregnews.com/rep-hill-urges-sec-chair-to-remove-hurdles-for-digital-asset-ecosystem/)

OCC reaffirms permissible cryptocurrency activities for banks (https://financialregnews.com/occ-reaffirms-permissible-cryptocurrency-activities-for-banks/)

Legislation to benefit crypto currencies passes out of House committee (https://financialregnews.com/legislation-to-benefit-crypto-currencies-passes-out-of-house-committee/)

## Most Read Last 7 Days

Bipartisan Senate coalition moves to crack down on pharmacy benefit managers pricing practices (https://financialregnews.com/bipartisan-senate-coalition-moves-to-crack-down-on-pharmacy-benefit-managers-pricing-practices/)

Bipartisan bill would increase access to capital for small businesses (https://financialregnews.com/bipartisan-bill-would-increase-access-to-capital-for-small-businesses/)

Visa unveils new department to mitigate scams (https://financialregnews.com/visa-unveils-new-department-to-mitigate-scams/)

Rep. Perry seeks to repeal tax credit for carbon capture and sequestration (https://financialregnews.com/rep-perry-seeks-to-repeal-tax-credit-for-carbon-capture-and-sequestration/)

en. Lummis introduces bill to establish strategic Bitcoin reserve (https://financialregnews.com/sen-.ummis-introduces-bill-to-establish-strategic-bitcoin-reserve/)

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 117 of 140
Case 1:25-cv-01711-OEM-MN    SEALED*    Document 4    File... 3/27/25    Page 15 of 23
PageID #: 70

ICBA is urging federal policymakers to end tax subsidies for credit unions (https://financialregnews.com/icba-is-urging-federal-policymakers-to-end-tax-subsidies-for-credit-unions/)

Reps. Feenstra, Craig introduce bill to enhance crop insurance protections (https://financialregnews.com/reps-feenstra-craig-introduce-bill-to-enhance-crop-insurance-protections/)

Legislation introduced to lower housing costs, address housing crisis (https://financialregnews.com/legislation-introduced-to-lower-housing-costs-address-housing-crisis/)

Reps. Ocasio-Cortez, Luna introduce bill to cap credit card interest rates at 10 percent (https://financialregnews.com/reps-ocasio-cortez-luna-introduce-bill-to-cap-credit-card-interest-rates-at-10-percent/)

The SEC extends the compliance dates for its "names rule" (https://financialregnews.com/the-sec-extends-the-compliance-dates-for-its-names-rule/)

## News Archive

| 2025 | 2024 | 2023 | 2022 | 2021 | 2019 | 2018 | 2017 | 2016 |

Home    Regulation (https://financialregnews.com/regulation/)    Industry (https://financialregnews.com/industry/)

About (https://financialregnews.com/financial-regulation-news/)    Contact (https://financialregnews.com/contact-us/)

Privacy Policy (/privacy-policy/)    Terms of Use (/terms-of-use/)    Sitemap (/sitemap_index.xml)

Copyright © 2025 Financial Regulation News. All Rights Reserved.

Case 3:25-cv-00137   Document 24-1   Filed 12/18/25 in TXSD   Page 118 of 140
Case 1:25-cv-01711-OEM-MN   SEALED*   Document 4   File_ 3/27/25   Page 16 of 23
PageID #: 71

LAW   See all articles

LATEST JOBS   **Dry Bulk Chartering Broker**                    **Fleet Operator**



The 35,000-cbm LPG carrier Symi (built 2012) featured in a dispute between Eletson and Murchinson. Photo: Brian Kushner

## Eletson appeals bankruptcy judge's order and gains a win in Greek courts

Battle could be brewing between legal authorities in New York and Athens over private owner's future

10 February 2025 12:59 GMT   UPDATED 12 February 2025 9:04 GMT

By **Joe Brady**   in  Stamford

A long and bitter legal battle between the legacy owners of Greece's Eletson Holdings and a Toronto hedge fund seeking to gain control of the company seems to be growing more complex by the day.

The incumbent managers are now appealing against an order from a US bankruptcy judge that they in effect hand over control to representatives of the hedge fund, Murchinson.

# Stay a step ahead on shipping news

Save 95%

**Introductory offer**

Save over 95% on your first month and enjoy instant access

## 4 weeks for $4*

**Digital Annual subscription**

Get 12 months of full digital access to TradeWinds

## $1446*/year

Case 3:25-cv-00137     Document 24-1     Filed 12/18/25 in TXSD     Page 119 of 140
Case 1:25-cv-01711-OEM-MN     SEALED*     Document 4     Filed 3/27/25     Page 17 of 23
PageID #: 72



Subscribe now

Subscribe now

*4 USD / 4 EUR / 4 GBP / 40 NOK
Auto-renews at $143/month unless cancelled. New customers only.

*1184 EUR / 901 GBP / 10918 NOK / 1446 USD
Equal to $120.50/month. Auto-renews annually unless cancelled.

**Please note:** If this article is older than 2 weeks, you will need premium access to read it. Our introductory offer provides only basic access. See more subscription options or explore our group subscriptions.

Pay with   **VISA**   ●

TRENDING TODAY

**Insurance**



Judge orders six managers of Baltimore boxship disaster to travel to US

**Shipbroking**



'Star broker' Andi Case's pay package tops £12m at Clarksons after record year

**Regulation**



VLCC crew left adrift without fuel after sanctioned tanker abandoned for third time in two years

○ dn media group   TradeWinds is part of DN Media Group. To read more about DN Media Group, click here

Case 3:25-cv-00137　　Document 24-1　　Filed 12/18/25 in TXSD　　Page 120 of 140
Case 1:25-cv-01711-OEM-MN.　　SEALED*　　Document 4　　Filed 3/27/25　　Page 18 of 23
PageID #: 73

LAW　　See all articles

LATEST JOBS　Post Fixtures Officer　　　　　　　　Vessel Operator



The skyline of Toronto, home to hedge fund Murchinson and principal Marc Bistricer. Photo: Bloomberg

## Death threat? How Eletson legal battle just got uglier

Vasillis Kertsikoff tells judge of 'photo of a grave' while Murchinson cites 'desperate act of fabrication'

27 February 2025 11:57 GMT　　UPDATED 27 February 2026 20:47 GMT
By Joe Brady 🔔 in Stamford

A bitter legal fight that already contained counterclaims of bribery and fraud has moved to another level.

Longtime Eletson Corp chief executive Vassilis Kertsikoff has told a US federal bankruptcy court in New York that he has received a death threat from the backer of a Toronto hedge fund who is fighting him for control of the private Greek shipowner.

# Stay a step ahead on shipping news

Save 95%

### Introductory offer

Save over 95% on your first month and enjoy instant access

## 4 weeks for $4*

Subscribe now

### Digital Annual subscription

Get 12 months of full digital access to TradeWinds

## $1446*/year

Subscribe now

Case 3:25-cv-00137  Document 24-1  Filed 12/18/25 in TXSD  Page 121 of 140
Case 1:25-cv-01711-OEM-MN.  SEALED*  Document 4  Filed 3/27/25  Page 19 of 23
PageID #: 74

*4 USD / 4 EUR / 4 GBP / 40 NOK
Auto-renews at $143/month unless cancelled. New customers only.

*1184 EUR / 901 GBP / 10918 NOK / 1446 USD
Equal to $120.50/month. Auto-renews annually unless cancelled.

**Please note:** If this article is older than 2 weeks, you will need premium access to read it. Our introductory offer provides only basic access. See more subscription options or explore our group subscriptions.

Pay with  **VISA**  ⬤

## TRENDING TODAY

**Insurance**



### Judge orders six managers of Baltimore boxship disaster to travel to US

**Regulation**



### VLCC crew left adrift without fuel after sanctioned tanker abandoned for third time in two years

**Tankers**



### 'Desperate situation': joined-up action needed after kidnapping of 10 tanker crew members, ITF says

◌ dn media group   TradeWinds is part of DN Media Group. To read more about DN Media Group, click here

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 122 of 140
Case 1:25-cv-01711-OEM-MM...  SEALED*    Document 4    Filed 3/27/25    Page 20 of 23
PageID #: 75



**Portfolio Media, Inc. | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com**

# Ex-Eletson Owners Face $5K Daily Fine For Ch. 11 Challenge

**By Rick Archer**

Law360 (March 12, 2025, 4:16 PM EDT) -- A New York bankruptcy judge on Wednesday ordered the prebankruptcy shareholders of Greek shipping group Eletson Holdings to end their opposition to overseas recognition of the company's Chapter 11 plan or pay $5,000 a day in fines.

In a bench ruling, U.S. Bankruptcy Judge John P. Mastando III found the former Eletson shareholders, as well as the company's provisional board, in contempt for what he called "obstructionist" behavior. However, the judge declined to issue sanctions that Eletson's new owners requested against counsel for the old owners and the board, including attorneys from Reed Smith LLP.

Since Judge Mastando **approved an equity-swap plan** for the debtor in October, the case has been **mired in disputes** between former creditors that became Eletson's new owners and the prebankruptcy equity holders and the provisional board of directors, which a Greek court appointed.

The provisional board has argued it controls Eletson subsidiaries and is legally barred from taking actions demanded by the new shareholders, including updating the company's address with the Liberian International Ship and Corporate Registry.

Such changes cannot be made until the new owners are recognized as such by courts in Greece and Liberia, the board said. Meanwhile, the new owners contended that the plan confirmation in the U.S. put them in control of the shipping company and that the provisional board is deliberately stalling.

In January, Judge Mastando issued an order enforcing the confirmation order, and last week, he **denied the board's request** for a stay pending its appeal, saying the provisional board is not being asked to violate foreign law and that the new owners control Eletson.

Case 3:25-cv-00137   Document 24-1   Filed 12/18/25 in TXSD   Page 123 of 140
Case 1:25-cv-01711-OEM-MN.   SEALED*   Document 4   File. .3/27/25   Page 21 of 23
PageID #: 76

The reorganized Eletson urged the New York bankruptcy court to enter a contempt finding and issue $50,000-a-day fines against the provisional board, two groups of former Eletson shareholders — a majority stake group and a minority interest group — and their counsel.

Kyle Ortiz, an attorney representing Eletson, said that while the plan called for all parties to cooperate with the reorganization effort, the former minority shareholders sought the appointment of the provisional board in November, after the plan was confirmed, with the express purpose of challenging the confirmation.

Since then, Ortiz told the court, the shareholders and the board have argued that the plan can't go into effect until it is recognized in Greek and Liberian courts, while opposing the reorganized Eletson's attempts to seek recognition of its plan.

"We are well into the realm of farce, Your Honor," he said.

Ortiz also argued in favor of sanctions against Reed Smith, which is representing the provisional board and the former equity holders in the U.S. appeals of the plan confirmation.

Reed Smith's counsel, Louis Solomon, said the law firm is not involved in the overseas cases and there is no evidence the firm is involved in planning the Eletson board's overseas legal strategy.

"These are just irresponsible words of counsel," Solomon said.

Counsel for the former majority shareholders said none of them are parties to the overseas actions, and that they have no way to end them, but Judge Mastando found they did file papers opposing Liberian recognition and joined in opposition to Greek recognition. They were also capable of "influencing or attempting to influence" the provisional board or the minority interest group, but had not done so, the judge said.

He also said the overseas filings violated the terms of the plan and included "collateral attacks" on his confirmation order, with the parties contending that the bankruptcy was filed in bad faith and that the bankruptcy judge had no jurisdiction.

The case has been contentious since the company was placed in Chapter 7 liquidation in March 2023 by a group of creditors that alleged Eletson had fallen behind on repaying $354 million in debt. The debtor had long argued its bankruptcy was orchestrated by Canadian investment firm Murchinson Ltd. to gain advantage in litigation over the ownership of a $700 million liquefied natural gas joint venture.

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 124 of 140
Case 1:25-cv-01711-OEM-MN.    SEALED*    Document 4    File. .J/27/25    Page 22 of 23
PageID #: 77

The case was converted to Chapter 11, and three competing reorganization plans were filed. In October 2024, Judge Mastando concluded that the plan proposed by Eletson was unconfirmable, and approved the plan proposed by the Chapter 7 petitioning creditors, giving majority ownership of Eletson to Pach Shemen LLC, an affiliate of Murchinson.

The debtor is represented by Kyle J. Ortiz, Brian F. Shaughnessy, Bryan M. Kotliar, John C. McClain and Jared C. Borriello of Togut Segal & Segal LLP.

Reed Smith is represented in-house by Louis M. Solomon.

The former majority shareholders of Eletson Holdings Inc. are represented by William E. Curtin, Duston K. McFaul and Robert S. Velevis of Sidley Austin LLP.

The case is In re: Eletson Holdings Inc. et al., case number 1:23-bk-10322, in the U.S. Bankruptcy Court for the Southern District of New York.

--Additional reporting by Emily Lever and Vince Sullivan. Editing by Covey Son.

*For a reprint of this article, please contact* **reprints@law360.com.**

© 2025, Portfolio Media, Inc.

**Related Info**

View Article on Law360

Add to Briefcase

Case Information

Law Firms

Companies

Government Agencies

**Discover More**

Related Articles >

Editorial Contacts

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 125 of 140
Case 1:25-cv-01711-OEM-MM    SEALED*    Document 4    File    3/27/25    Page 23 of 23
PageID #: 78

**Rights/Reprints**

All Content © 2025, Portfolio Media, Inc.

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 126 of 140
Case 1:25-cv-01711-OEM-M.    *SEALED*    Document 5    Fil__  _3/27/25    Page 1 of 13
PageID #: 79

HOLLAND & KNIGHT LLP
Michael J. Frevola
Chiara D. Kalogjera-Sackellares
787 Seventh Avenue
New York, New York 10019
michael.frevola@hklaw.com
Telephone: 212.513.3200
Fax: 212.385.9010

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Pennantia, LLC,<br>RCM 252, LLC,<br>Susan Rose, LLC,<br>RCM 250, LLC,<br>Jordan Rose, LLC,<br>RCM 260, LLC, and<br>RCM 262, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>*Tank Barge RCM 252* (Official #1292046),<br>*Tug SUSAN ROSE* (Official #1282121),<br>*Tank Barge RCM 250* (Official #1235496),<br>*Tug JORDAN ROSE* (Official #1234828),<br>*Tank Barge RCM 260* (Official #1210060), and<br>*Tank Barge RCM 262* (Official #1216336),<br>their engines, tackle, appurtenances, etc., *in rem*,<br><br>Defendants. | In Admiralty<br><br>Case No.  - CV - _____<br><br>**MEMORANDUM OF LAW<br>IN SUPPORT OF EX PARTE<br>MOTION TO FILE PAPERS<br>UNDER TEMPORARY SEAL** |

Plaintiffs Pennantia, LLC ("Pennantia"), RCM 252, LLC, Susan Rose, LLC, RCM 250,

LLC, Jordan Rose, LLC, RCM 260, LLC, and RCM 262, LLC (each a "Plaintiff" and collectively

Case 3:25-cv-00137 Document 24-1 Filed 12/18/25 in TXSD Page 127 of 140
Case 1:25-cv-01711-OEM-M. *SEALED* Document 5 Fil. 3/27/25 Page 2 of 13
PageID #: 80

"Plaintiffs"), by and through their attorneys Holland & Knight LLP, move this Court for a temporary order of sealing this matter as discussed below and in the accompanying Declaration of Joshua Trump. Plaintiffs respectfully submit that the relief sought is appropriate and this Court should grant their application.

## INTRODUCTION

Plaintiff Pennantia owns a fleet of vessels managed by Rose Cay Maritime, LLC ("RCM") under a Ship Management Agreement dated August 8, 2021 (the "Ship Management Agreement").[1] RCM undertook to manage Pennantia's fleet competently and with transparency, and to provide Pennantia with access to its vessels and to documents, records, and information upon reasonable notice from Pennantia. Pennantia – having been approached to sell a portion of its fleet to an interested purchaser – requested that RCM make Pennantia's vessels and documents, records, and information available for inspection by the potential purchaser. RCM has refused to do so, apparently as it seeks to pursue a different purchase opportunity (which it has no legal right to pursue). RCM literally is obstructing Pennantia's ability to sell its own vessels by denying Pennantia access to those vessels.

Should information of this dispute between Pennantia and RCM come to light while Pennantia is seeking to complete the sale of some of its vessels, this information could well serve RCM's purposes by causing Pennantia to lose its potential purchaser. Hence, Pennantia seeks a temporary sealing order from this Court – only until the purchase opportunity currently available to Pennantia is consummated – to preclude RCM from being rewarded by its efforts to thwart the anticipated Pennantia sale.

---

[1] A true and correct copy of the Ship Management Agreement is annexed to the Verified Complaint as Exhibit 1.

2

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 128 of 140
Case 1:25-cv-01711-OEM-M.    *SEALED*    Document 5    Fil.  ,3/27/25    Page 3 of 13
PageID #: 81

## STATEMENT OF FACTS

Pennantia refers this Court to the Verified Complaint – the facts of which are verified by Joshua Trump – and the accompanying Declaration of Joshua Trump for the facts supporting this application. Pennantia will cite those documents as support for facts asserted below where pertinent.

## ARGUMENT

"[T]he Second Circuit has established a three-part test for determining whether documents may be placed under seal." *Tilebar v. Glazzio Tiles*, 723 F. Supp. 3d 164, 208-09 (E.D.N.Y. 2024) (quoting *In re IBM Arb. Agreement Litig.*, No. 21-CV-6296 (JMF), 2022 WL 3043220, at *1 (S.D.N.Y. Aug. 2, 2022)). To obtain a sealing order, the following issues must be examined by the Court:

(1)    Are the documents sought to be sealed "judicial documents" to which the presumption of access applies?

(2)    What is the weight to be accorded the presumption of access?

(3)    Are there factors which counsel against the disclosure of the documents sought to be sealed?

*Tilebar*, 723 F. Supp. 3d at 208-09 (citing, *inter alia*, *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) and *Mirlis v. Greer*, 952 F.3d 51, 59 (2d Cir. 2020)).

As shown below, consideration of these factors reveals that Pennantia's application should be granted.

3

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 129 of 140
Case 1:25-cv-01711-OEM-M..   *SEALED*    Document 5    Fil.. 3/27/25    Page 4 of 13
PageID #: 82

### 1. The Proposed Sealing Documents Likely Are Judicial Documents

Pennantia seeks to temporarily seal all filings in this proceeding. It is contemplated, however, that the entire universe of documents (the "Proposed Sealing Documents") filed in this proceeding will be the following:

(a) The Verified Complaint;

(b) The Memorandum of Law in Support of Pennantia's motion to arrest the Vessel Defendants pursuant to Supplemental Rule D (the "Rule D Memorandum of Law");

(c) Any arrest order issued by the Court against the Vessel Defendants in this proceeding (the "Arrest Order");

(d) Ancillary documents (such as the civil cover sheet, Rule 7.1 Statement, substitute custodian application and order, etc.) filed by Pennantia in support of its application to arrest the Vessel Defendants under Supplemental Rule D;

(e) The documents filed by Pennantia in support of this sealing application;

(f) Any documents filed in opposition to Pennantia's arrest application, and, should such an opposition be filed,

(g) Pennantia's reply to any opposition filed.

As Pennantia does seek for this Court to grant it some form of relief, and the documents referenced above are the submissions upon which that request for relief is based, these documents likely would be classified as judicial documents. *See, e.g., Lugosch*, 435 F.3d at 119 (categorizing a "judicial document" as an item that "must be relevant to the performance of the judicial function and useful in the judicial process."). As discussed in Point 3 below, however, none of the ultimate relief sought by Pennantia (the inspections/surveys of the Vessel Defendants or their records,

4

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 130 of 140
Case 1:25-cv-01711-OEM-M.    *SEALED*    Document 5    File  J3/27/25    Page 5 of 13
PageID #: 83

documents, and information) will be judicial documents as they will not be filed with this Court,

hence no right of public access should be granted.

### 2. The Weight to be Accorded the Presumption of Access on Most of the Proposed Sealing Documents Should not be Considered Significant

While Pennantia concedes that the Proposed Sealing Documents likely are "judicial

documents," it is Pennantia's view that the presumption of public access to most of the Proposed

Sealing Documents should not be given considerable weight.

> "[T]he weight to be given the presumption of access must be governed by the role
> of the material at issue in the exercise of Article III judicial power and the resultant
> value of such information to those monitoring the federal courts. Generally, the
> information will fall somewhere on a continuum from matters that directly affect
> an adjudication to matters that come within a court's purview solely to insure their
> irrelevance."

*Lugosch*, 435 F.3d at 119 (quoting *U.S. v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995)).

With the exception of the Verified Complaint, Pennantia's Rule D Memorandum of Law,

and the Arrest Order,[2] the Proposed Sealing Documents are not those to which substantial public

access weight should be given as they do not relate to this Court's adjudication of the issues before

the Court. Furthermore, as described in greater detail in Point 3, the ultimate relief sought by

Pennantia – specifically, the inspection/surveys of the Vessel Defendants and the records,

documents and information relating to the Vessel Defendants – even if they somehow were

considered judicial documents (which they should not), should not be considered as having

substantial weight, as these categories of information (a) will not be filed with the Court, and (b)

will not have any role in this Court making judicial determinations.

---

[2] As discussed below, if any opposition to Pennantia's arrest application (and reply from Pennantia) is filed
in this proceeding, those documents – as well as any decision issued by this Court deciding the issue –
likewise would be given moderate weight as they likewise would pertain to this Court's determination of
an issue (albeit not a dispositive issue) before it.

Case 3:25-cv-00137   Document 24-1   Filed 12/18/25 in TXSD   Page 131 of 140
Case 1:25-cv-01711-OEM-M.   *SEALED*   Document 5   Fil  3/27/25   Page 6 of 13
PageID #: 84

Turning to the three current Proposed Sealing Documents that _could_ be considered having some public access weight – specifically the Verified Complaint, the Pennantia's Rule D Memorandum of Law, and the Arrest Order – these documents essentially are the equivalent of a discovery application. Pennantia is seeking access to inspect/survey vessels and for their related documents. While the procedural posture of this proceeding is unique based on the parties' relative positions and the property/documents at issue, Pennantia largely seeks access to information in connection with the contemplated sale of the Vessel Defendants.

Unlike a dispositive motion such as a summary judgment motion or a motion to dismiss, which are core judicial documents regarding which the right to public access is paramount, _see, e.g., Lugosch_, 435 F.3d at 119 (stating "documents used by parties moving for, or opposing, summary judgment should not remain under seal absent the most compelling reasons") (quoting _Joy v. North_, 692 F.2d 880, 893 (2d Cir. 1982)), documents related to discovery disputes are considered to be carry only a moderate weight of public access. _See, e.g., In re Matter of Upper Brook Companies_, Case No. 22-mc-97 (PKC), 2023 WL 172003, at *5 (S.D.N.Y. Jan. 12, 2023) (presumption of public access in Section 1782 discovery application in aid of foreign proceedings was less than that in a dispositive motion) (citing _Brown v. Maxwell_, 929 F.3d 41, 53 (2d Cir. 2019); _U.S. v. Correia_, 19-Cr-725-3, 2020 WL 6683097, at *1 (S.D.N.Y. Nov. 12, 2020) (finding a "moderate" presumption where documents were related to authority "ancillary to the court's core role in adjudicating a case" and "closer in nature to filings associated with discovery . . . than to dispositive motions.")).

As the Verified Complaint makes clear, Pennantia seeks no relief other than access to the Vessel Defendants and their associated documents:

6

Case 3:25-cv-00137   Document 24-1   Filed 12/18/25 in TXSD   Page 132 of 140
Case 1:25-cv-01711-OEM-M..   *SEALED*   Document 5   Fil  J3/27/25   Page 7 of 13
PageID #: 85

For the sake of good order, Plaintiffs wish to make clear that the relief that they seek *merely is to obtain access to the Vessel Defendants so that they might be inspected by prospective purchasers, gain access to the records, documents, and information related to each of the Vessel Defendants for use during prospective buyer inquiries, and then to return the Vessel Defendants to their usual service.* In light of RCM's behavior, Plaintiffs anticipate that such access likely will require an initial visit by the U.S. Marshal to arrest the Vessel Defendants in company with the representative of the substitute custodian, followed by the prospective buyer inspections while the Vessel Defendants are in the custody of the substitute custodian. *Once each of the Vessel Defendants has underwent the intended inspection process, Plaintiffs will approach the Court to lift the arrest on that particular Vessel Defendant to return it to its usual service.*

Verified Complaint, ¶ 66 n.4 (emphasis added).

Hence, at present, Pennantia seeks the temporary sealing of three Proposed Sealing Documents that could be considered having moderate public access weight, with the remainder having little weight, and none of the relief ultimately sought by Pennantia (the Vessel Defendants' inspections/surveys and the associated documents, records, and information) should be considered judicial documents subject to public access.

## 3. Significant Factors Balance Against Immediate Access of the Documents Sought to be Sealed

Once this Court determines the weight of the presumption of access for particular documents, "the court must 'balance competing considerations against it.'" *Lugosch*, 435 F.3d at 120 (quoting *Amodeo*, 71 F.3d at 1050). In *Lugosch*, the Second Circuit explained that two different approaches have been used in determining whether access should be granted to the public: the "experience and logic" approach (as to whether the public traditionally has been afforded access to the documents at issue) and whether accessing the documents in essence paralleled the public's right to attend hearings. *See id.* (citations omitted). Here, as explained below, the relief sought by Pennantia typically is not initially afforded public access.

7

Case 3:25-cv-00137   Document 24-1   Filed 12/18/25 in TXSD   Page 133 of 140
Case 1:25-cv-01711-OEM-M.   *SEALED*   Document 5   Fil.  J3/27/25   Page 8 of 13
PageID #: 86

## A. Vessel Arrest Proceedings Typically Are Ex Parte

It is well-settled that a plaintiff's application to arrest property (under Supplemental Rule

C or D) or attach property (under Supplemental Rule B) traditionally is carried out *ex parte*.

Indeed, this process has survived constitutional due process challenge. As explained by the Ninth

Circuit:

> *Due process does not require pre-attachment notice. Such notice could readily*
> *defeat the whole proceeding.*   The ship, if it were being libelled under
> Supplemental Rule C, could depart beyond the jurisdiction; the other property, to
> be seized under Supplemental Rule C, or attached under Supplemental Rule B,
> could be shipped out, otherwise disposed of, or concealed; credits, such as are here
> involved, could be collected or transferred out of the jurisdiction.
>
>        *      *      *
>
> *Pre-attachment notice and hearing could, as we have explained, defeat both of*
> *the purposes of the [maritime] attachment – obtaining jurisdiction, and obtaining*
> *security.*

*Polar Shipping Ltd. v. Oriental Shipping Corp.*, 680 F.2d 627, 638 (9th Cir. 1982) (emphasis

added) (citing *Merchants Nat'l Bank v. Dredge GENERAL G.L. GILLESPIE*, 663 F.2d 1338, 1334

(5th Cir. Unit A 1981); *Amstar Corp. v. S/S ALEXANDROS T.*, 664 F.2d 904, 911 (4th Cir. 1981)).

Hence, the very nature of this type of proceeding is designed to proceed initially without

public notice, and only subsequently be (potentially) subject to public inquiry. Unlike most

maritime arrest and attachment proceedings, however, here Pennantia seeks very limited relief in

this proceeding (and relief which might not even be opposed). That relief simply is access to the

Vessel Defendants (so that Pennantia can have surveyors/inspectors of its potential vessel

purchasers conduct a survey/inspection of the Vessel Defendants) as well as access to documents,

records, and information related to the Vessel Defendants. As vessel arrests and attachments

typically are effected by the boarding of the vessel by the U.S. Marshal, here the full relief sought

by Pennantia literally ends at the point where traditional public access to arrest and attachment

8

Case 3:25-cv-00137   Document 24-1   Filed 12/18/25 in TXSD   Page 134 of 140
Case 1:25-cv-01711-OEM-M.   *SEALED*   Document 5   Fil.  3/27/25   Page 9 of 13
PageID #: 87

proceedings begin. And, as mentioned above, activities after the Vessel Defendants are arrested

(i.e., the inspections/surveys of the Vessel Defendants and their associated documents, records,

and information) (a) should not be considered judicial documents, (b) even if they were judicial

documents, they should have no weight in support of public access because they are irrelevant to

any issues before this Court, and (c) they are not the type of documents that satisfy either of the

public access rationales under *Lugosch*'s third prong.

### B. Premature Release of the Proposed Sealing Documents Would Injure Pennantia's Efforts to Sell the Vessel Defendants and Would Help RCM's Obstruction Efforts

Public release of trade secrets or other types of information that would injure a party's

competitive position in business against competitors is the type of harm which courts find to be a

legitimate basis for issuing a sealing order. *See, e.g., CT Espresso LLC v. Lavazza Premium

Coffees Corp.*, No. 1:22-cv-377-VSB, 2022 WL 443644, at *2 (S.D.N.Y. Feb. 14, 2022)

("Specific, narrowly tailored portions of contracts regarding proprietary commercial information

may qualify for sealing under the case law if disclosure would harm a litigant's ability to negotiate

with third parties, subject a party "to 'financial harm,'" or harm a litigant's "competitive

standing.") (citations omitted); *In re Accent Delight Int'l Ltd.*, 16-MC-125 (JMF), 18-MC-50

(JMF), 2018 WL 2849724, at *6 (S.D.N.Y. June 11, 2018) (noting, in upholding sealing request,

that "the interests of the parties in preventing the public disclosure of private sales figures and

communications are not insignificant"); *Encyclopedia Brown Productions, Ltd. v. Home Box

Office, Inc.*, 26 F. Supp. 2d 606, 612 (S.D.N.Y. 1998) ("Potential damage from release of trade

secrets is a legitimate basis for sealing documents and restricting public access during trial.")

(citations omitted).

"In essence, courts may deny access to records that contain 'sources of business

information that night harm a litigant's competitive standing.'" *CT Espresso*, 2022 WL 443644,

9

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 135 of 140
Case 1:25-cv-01711-OEM-MN    SEALED*    Document 5    File    3/27/25    Page 10 of 13
PageID #: 88

at *2 (citations omitted). In *CT Espresso*, the court granted a sealing order where Lavazza competitors were selling Lavazza products purchased overseas in the United States on Amazon for sharply discounted process. *Id.* Lavazza explained how information revealed in the lawsuit would hurt its ability to negotiate with third parties, who then could use that information to flood the U.S. market and cause Lavazza millions of dollars in revenue as well as hurt its reputation with its customers. *Id.* The court granted Lavazza's request for a sealing order. *Id.* at *3.

In *Encyclopedia Brown*, the defendants sought to protect certain business information which they contended was confidential, specifically: (1) detailed operations information; (2) HBO programming strategies and decision making; (3) HBO customer surveys; and (4) license fees paid by HBO to plaintiffs. *Encyclopedia Brown Productions*, 26 F. Supp. 2d at 608. The court ultimately granted a sealing order for the first three topics, only refusing the fourth because the defendants' own behavior had shown that they had not treated the information as confidential. *Id.* at 614. As "the harm from disclosure of such information outweighs the public's interest in access to it . . ., the information should be sealed." *Id.*

A private dispute with no media attention is a factor weighing in favor of sealing, *cf. In re Application of Telegraph Media Group Ltd.*, 23-MC-215 (JGLC), 2023 WL 5770115, at *5 (S.D.N.Y. Sept. 6, 2023) (noting that a factor favoring denial of sealing order was "the public interest in this dispute is heightened here because of the media attention the parties have garnered, with both [parties] making public statements."), whereas a dispute involving broad public impact (such as a class action) weighs more in favor of public access. *Allegra v. Luxottica Retail North America*, No. 17-CV-05216 (PKC)(RLM), 2021 WL 4799032, at *2 (E.D.N.Y. Oct. 14, 2021) (citations omitted). Similarly, requests seeking to seal older information are looked at with greater scrutiny than those seeking to restrict access to contemporaneous information. *Id.* at *4 (citing

10

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 136 of 140
Case 1:25-cv-01711-OEM-MN    SEALED*    Document 5    File    3/27/25    Page 11 of 13
PageID #: 89

numerous cases. 17-CV-05216 (PKC)(RLM), 2021 WL 4799032, at \*2 (E.D.N.Y. Oct. 14, 2021) (citations omitted). Finally, courts also consider whether the sealing request is narrowly tailored. *See, e.g., Brown v. Maxwell*, 929 F.3d 41, 47 (2d Cir. 2019); *Playtex Products, LLC v. Munchkin, Inc.*, No. 14-cv-1308 (RJS), 2016 WL 1276450, at \*11 (S.D.N.Y. Mar. 29, 2016).

Here, this Court should find that the balance of interests weighs in favor of Pennantia's sealing application. First, as discussed above in Sections 1 and 2, assuming that the Proposed Sealing Documents are judicial documents, even the three most central documents – the Verified Complaint, the Rule D Memorandum of Law, and the Arrest Order – should be afforded only moderate weigh in the balancing process.

Second, Pennantia's sealing application seeks to keep its dispute with RCM – the entity having physical control of the Vessel Defendants – out of public knowledge while Pennantia is in the process of selling the Vessel Defendants. As explained in the Trump Declaration, should news that Pennantia is in the midst of a dispute with RCM become public, that news will result in one of two unfavorable outcomes: (1) Pennantia's potential purchaser will end its interest in the Vessel Defendants as they are in the midst of a lawsuit; or (2) Pennantia's potential purchaser will reduce its purchase offer, perceiving that the Vessel Defendants are a distressed asset. *See* Declaration of Joshua Trump dated March 26, 2025 ("Trump Decl."), ¶¶ 8-13. In either case, Pennantia will suffer a tangible, serious, and immediate harm should the Proposed Sealing Documents become publicly available currently. *See id.* Moreover, as mentioned in the Trump Declaration, public access to the Proposed Sealing Documents likely would serve to further RCM's interests by further reducing or eliminating Pennantia's potential partners for the sale of the Vessel Defendants. *Id.* ¶¶ 11-12.

11

Case 3:25-cv-00137   Document 24-1   Filed 12/18/25 in TXSD   Page 137 of 140
Case 1:25-cv-01711-OEM-MI   SEALED*   Document 5   Filed 3/27/25   Page 12 of 13
PageID #: 90

Third, the dispute between Pennantia and RCM has no public media attention and essentially is a vessel management dispute. It does not have any significant public interest like a class action, an antitrust case, a lawsuit involving government corruption, or the like.

Fourth, the information sought to be sealed is contemporaneous – the issues are current and continuing. *See id.* Rather than seeking to seal stale information, Pennantia's request involves real time business issues that are critical to pending significant transaction.

Fifth, as Pennantia has indicated. it does not seek to keep the Proposed Sealing Documents under seal for a lengthy period of time. Rather, Pennantia foresees the contemplated sales transaction happening within the next six weeks, after which it would approach this Court to unseal a large portion of the Proposed Sealing Documents. *See id.* ¶ 16 & n.1.[3]

Finally, courts view sealing orders designed to protect non-parties to lawsuits with greater deference. *See, e.g., In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, Nos. 14-MD-2542 (VSB), 14-MC-2542 (VSB), 2023 WL 196134, at *4 (S.D.N.Y. Jan. 17, 2023) (citations omitted). As mentioned in the Trump Declaration, another reason why granting an initial sealing order is appropriate is that RCM should have the right to ask this Court to seal certain aspects of this record if it chooses to do so. Trump Decl., ¶ 16 n.1. By issuing a temporary sealing order, it gives RCM a chance to apply to the Court to seal – or redact – the Proposed Sealing Documents.

---

[3] For the Court's information, Pennantia expects that when it approaches the Court to unseal the Proposed Sealing Documents, it will seek to have certain portions of the Proposed Sealing Documents redacted to keep certain information (such as financial data, etc.) out of the public eye. When Pennantia approaches the Court, it will present to the Court its proposed redactions as well as the basis for those proposed redactions. *See* Trump Decl., ¶ 16.

12

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 138 of 140
Case 1:25-cv-01711-OEM-MN    SEALED*    Document 5    File .3/27/25    Page 13 of 13
PageID #: 91

## CONCLUSION

Most of the Proposed Sealing Documents are not judicial documents. To the extent that any qualify as judicial documents, the three which arguably qualify should be given only moderate weight in any balancing test. Finally, there are several factors supporting Pennantia's position that the balance of interests weigh in favor of temporarily sealing the Proposed Sealing Documents, with those documents to be unsealed once the Pennantia sale of the Vessel Defendants is consummated. For the foregoing reasons, Pennantia respectfully requests that this Court issue the requested sealing order.

Dated: New York, New York
      March 26, 2025

HOLLAND & KNIGHT LLP

Chiara D. Kalogjera Sackellares

Chiara D. Kalogjera Sackellares

Michael J. Frevola

787 Seventh Avenue
New York, New York 10019
michael.frevola@hklaw.com
chiara.sackellares@hklaw.com
Telephone: 212.513.3200 Fax:
212.385.9010

*Attorneys for Plaintiffs*

13

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 139 of 140
Case 1:25-cv-01711-OEM-MM... *SEALED*    Document 12    Filed 04/09/25    Page 1 of 2
PageID #: 135

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

PENNANTIA, LLC; RCM 252, LLC;
SUSAN ROSE, LLC; RCM 250, LLC;
JORDAN ROSE, LLC; RCM 260, LLC;
RCM 262, LLC

              Plaintiffs,               **ORDER OF SEALING**
                                                25-CV-01711 (OEM) (MMH)

        -against-

*TANK BARGE RCM 252* (Official #1292046);
*TUG SUSAN ROSE* (Official # 1282121);
*TANK BARGE RCM 250* (Official #1235496);
*TUG JORDAN ROSE* (Official #1234828);
*TANK BARGE RCM 260* (Official #1210060); and
*TANK BARGE RCM 262* (Official #1216336),
their engines, tackle, appurtenances, etc., *in rem*,

              Defendants.

---------------------------------------------------------------x

ORELIA E. MERCHANT, United States District Judge:

        Upon reading the Declaration of Joshua Trump in support of Plaintiffs' application to file

under seal the Verified Complaint and the Court having considered the issues raised in

memorandum of law submitted in support of the application, it is

        ORDERED, that all pleadings filed in this proceeding, including:

        a)  The Verified Complaint;

        b)  The Memorandum of Law in Support of the motion to arrest the Vessel Defendants

            pursuant to Supplemental Rule D, as well as documents associated with the motion

            to arrest;

        c)  Any arrest order issued by the Court against the Vessel Defendants in this

            proceeding as well as the Warrant of Arrest issued thereafter by the Clerk of the

            Court;

Case 3:25-cv-00137    Document 24-1    Filed 12/18/25 in TXSD    Page 140 of 140
Case 1:25-cv-01711-OEM-M... *SEALED*    Document 12    Filed 04/09/25    Page 2 of 2
                                    PageID #: 136

d) Ancillary documents (such as the civil cover sheet, Rule 7.1 Statement, substitute custodian application and order, etc.) filed by Pennantia, LLC in support of its application to arrest the Vessel Defendants under Supplemental Rule D;

e) The documents filed by Pennantia, LLC in support of this sealing application (as well as any opposition papers filed by any party);

f) Any documents filed in opposition to Pennantia, LLC's arrest application; and

g) Any reply to any opposition filed,

shall be filed under seal and shall remain under seal until further order of this Court.


SO ORDERED.

                                    /s/
                                    ORELIA E. MERCHANT
                                    United States District Judge

Dated: April 9, 2025
       Brooklyn, New York

2